1  THE WEISER LAW FIRM, P.C.
   KATHLEEN A. HERKENHOFF (SBN 168562)
2  12707 High Bluff Drive, Suite 200
   San Diego, CA 92130
3  Telephone: 858-794-1441
   Facsimile: 858-794-1450
4  Email: kah@weiserlawfirm.com

5  Attorneys for Plaintiff Bruce Johnson and
   Proposed Co-Lead Counsel

6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10
    GERALD EASTON, Derivatively On    )  Case No. SACV12-01716-
11  Behalf of QUESTCOR               )  DMG(FMOx)
    PHARMACEUTICALS, INC.,           )
12                                   )  DECLARATION OF KATHLEEN A.
                        Plaintiff,   )  HERKENHOFF IN SUPPORT OF
13                                   )  MOTION FOR CONSOLIDATION
          vs.                        )  AND APPOINTMENT OF LEAD
14                                   )  COUNSEL
    DON M. BAILEY, MICHAEL H.        )
15  MULROY, STEPHEN L. CARTT,        )  DATE:      November 30, 2012
    DAVID YOUNG, VIRGIL D.           )  TIME:      9:30 a.m.
16  THOMPSON, MITCHELL J. BLUTT,     )  CTRM:      7
    MD, NEAL C. BRADSHER,            )  JUDGE:     Hon. Dolly M. Gee
17  STEPHEN C. FARRELL, LOUIS E.     )
    SILVERMAN and SCOTT M.           )  Date Case Filed: 10/4/12
18  WHITCUP, MD.,                    )
                                     )
19                      Defendants,  )
                                     )
20        – and –                    )
                                     )
21  QUESTCOR PHARMACEUTICALS,        )
    INC., a California Corporation,  )
22                                   )
                   Nominal Party.    )
23  ─────────────────────────────── )

24  Caption continued on following pages.

25

26

27

28

| | |
|---|---|
| BRUCE JOHNSON, Derivatively on Behalf of QUESTCOR PHARMACEUTICALS, INC., | Case No. SACV12-01718-DMG (FMOx) |
| Plaintiff, | Date Case Filed: 10/4/12 |
| vs. | |
| DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, VIRGIL D. THOMPSON, MITCHELL J. BLUTT, NEAL C. BRADSHER, STEPHEN C. FARRELL, LOUIS E. SILVERMAN and SCOTT M. WHITCUP, | |
| Defendants, | |
| – and – | |
| QUESTCOR PHARMACEUTICALS, INC., | |
| Nominal Party. | |

| | |
|---|---|
| NILABRATA GOSWAMI, Individually and On Behalf of All Others Similarly Situated, | Case No. SACV12-01753-DMG (FMOx) |
| Plaintiff, | Date Case Filed: 10/11/12 |
| vs. | |
| DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, VIRGIL D. THOMPSON, MITCHELL J. BLUTT, and STEPHEN C. FARRELL, | |
| Defendants, | |
| – and – | |
| QUESTCOR PHARMACEUTICALS, INC., | |
| Nominal Defendant. | |

Caption continued on following page.

| | | |
|---|---|---|
| 1 | EARL RICHARDS, Individually and On Behalf of All Others Similarly Situated, | Case No. SACV12-01754-DMG (FMOx) |
| 2 | | |
| 3 | Plaintiff, | Date Case Filed: 10/11/12 |
| 4 | vs. | |
| 5 | DON M. BAILEY, MICHAEL H. | |
| 6 | MULROY, STEPHEN L. CARTT, DAVID YOUNG, VIRGIL D. | |
| 7 | THOMPSON, MITCHELL J. BLUTT, and STEPHEN C. FARRELL, | |
| 8 | Defendants, | |
| 9 | | |
| 10 | – and – | |
| | QUESTCOR PHARMACEUTICALS, | |
| 11 | INC., | |
| 12 | Nominal Defendant. | |
| 13 | | |

| | | |
|---|---|---|
| 14 | JAMES TRIPOLI, Derivatively On Behalf of QUESTCOR | Case No. SACV12-01759-AG (MLGx) |
| 15 | PHARMACEUTICALS, | Date Case Filed: 10/11/12 |
| 16 | Plaintiff, | |
| 17 | vs. | |
| 18 | DON M. BAILEY, MICHAEL H. | |
| 19 | MULROY, STEPHEN L. CARTT, DAVID YOUNG, DAVID J. | |
| 20 | MEDEIROS, MITCHELL J. BLUTT, VIRGIL D. THOMPSON, STEPHEN | |
| 21 | C. FARRELL, NEAL C. BRADSHER, LOUIS E. SILVERMAN, and SCOTT | |
| 22 | M. WHITCUP, | |
| 23 | Defendants, | |
| 24 | – and – | |
| | QUESTCOR PHARMACEUTICALS, | |
| 25 | INC., a California Corporation, | |
| 26 | Nominal Defendant. | |
| 27 | | |
| 28 | | |

1    I, Kathleen A. Herkenhoff, declare as follows:

2    1.    I am of counsel to The Weiser Law Firm, P.C. ("The Weiser Firm"),

3    counsel for Plaintiff Bruce Johnson ("Johnson") in *Johnson v. Bailey, et al.*, Case No.

4    SACV12-01718-DMG(FMOx) (the "*Johnson Action*").   I am an attorney duly

5    licensed to practice before all courts of the State of California.   I submit this

6    Declaration of Kathleen A. Herkenhoff in Support of the Motion for Consolidation

7    and Appointment of Lead Counsel.  I have personal knowledge of the matters stated

8    herein and, if called upon, I could and would competently testify thereto.

9    2.    Prior to filing the initial complaint in the *Johnson Action*, The Weiser

10   Firm conducted substantial and detailed research concerning the misconduct

11   ultimately alleged in the *Johnson Action*.  The research undertaken includes, but is not

12   limited to, a thorough review of Questcor Pharmaceuticals, Inc.'s ("Questcor" or the

13   "Company") periodic filings with the Securities and Exchange Commission, the

14   Company's publicly issued press releases, and additional information.  As the dockets

15   for the above-captioned actions (the "Derivative Actions") reflect, the *Johnson Action*

16   was one of the first-filed of the five related Derivative Actions, and it was in the

17   *Johnson Action* that a stipulation was first presented to the Court to provide for the

18   orderly negotiation of a timeframe for the response of Questcor and the defendants to

19   any consolidated complaint ultimately filed in the Derivative Actions.  *See* Dkt. No.

20   10 in the *Johnson Action*.

21   3.    On October 15, 2012, I exchanged voicemails with Kevin Kim from

22   Robbins Umeda, LLP, counsel for Plaintiff James Tripoli ("Tripoli"), wherein Kim

23   and his supervising partner, Brian Robbins, advised that Tripoli intended to move to

24   consolidate and appoint Robbins Umeda as Lead Counsel.  In return, I advised on

25   October 15, 2012 that Plaintiff Johnson intended to move to consolidate the

26   Derivative Actions and to appoint The Weiser Firm as Lead Counsel.  To date, I have

27   engaged in additional telephone calls with Felipe J. Arroyo of Robbins Umeda, but

28

1   those discussions have not prompted a resolution of the competing views on the

2   selection of Lead Counsel.

3       4.    On October 15, 2012, I also telephoned, and spoke to, Avi Wagner,

4   counsel for Plaintiffs Earl Richards ("Richards") and Nilabrata Goswami

5   ("Goswami"). During the telephone call on October 15, 2012, I advised Mr. Wagner

6   that Plaintiff Johnson intended to move to consolidate the related Derivative Actions

7   and to appoint The Weiser Firm as Lead Counsel. Mr. Wagner advised that he was

8   serving only as a local counsel and that I should contact either Willie Briscoe or the

9   Powers Taylor LLP law firm. Accordingly, on October 15, 2012, I e-mailed Mr.

10  Briscoe and Mr. Powers and advised them of the substance of the intended motion. I

11  received a return e-mail advising that Plaintiffs Richards and Goswami intended to

12  support Robbins Umeda as Lead Counsel.

13      5.    On October 15, 2012, I also left a message for Frank Johnson of Johnson

14  & Weaver, LLP ("Johnson & Weaver") concerning Plaintiff Johnson's intention to

15  move to consolidate and seek the appointment of The Weiser Firm as Lead Counsel.

16  On and after October 15, 2012, Mr. Johnson and I engaged in communications to

17  continue to discuss the proposed motions, and during those communications Mr.

18  Johnson advised that he would also file such a motion. Ultimately, Mr. Johnson and I

19  have determined to file the motion jointly and seek the appointment of Johnson &

20  Weaver and The Weiser Firm as Co-Lead Counsel. In large part, the clients

21  represented by Johnson & Weaver and The Weiser Firm are the first to file derivative

22  actions in this District on behalf of Questcor concerning the misconduct at issue in the

23  Derivative Actions, demonstrating their strong determination and keen desire to seek a

24  recovery for Questcor for the harm caused by the defendants. In addition, as detailed

25  in the separately filed Declaration of Frank J. Johnson in Support of Motion for

26  Consolidation and Appointment of Lead Counsel, and Exhibit F hereto, The Weiser

27  Firm and Johnson & Weaver have stellar qualifications to successfully lead the

28  litigation of the claims asserted in the Derivative Actions on behalf of Questcor.

6.      Attached hereto are true and correct copies of the following exhibits:

Exhibit A:   The October 4, 2012 Verified Shareholder Derivative Complaint filed in *Easton v. Bailey, et al.*, Case No. SACV12-01716-DMG (FMOx).

Exhibit B:   The October 4, 2012 Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Gross Mismanagement, Abuse of Control, and Unjust Enrichment filed in *Johnson v. Bailey, et al.*, Case No. SACV12-01718-DMG (FMOx).

Exhibit C:   The October 11, 2012 Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Contribution and Indemnification filed in *Goswami v. Bailey, et al.*, Case No. SACV12-01753-DMG (FMOx).

Exhibit D:   The October 11, 2012 Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Contribution and Indemnification filed in *Richards v. Bailey, et al.*, Case No. SACV12-01754-DMG (FMOx).

Exhibit E:   The October 11, 2012 Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment filed in *Tripoli v. Bailey, et al.*, Case No. SACV12-01759-AG (MLGx).

Exhibit F:   The Weiser Firm Resume.

Exhibit G:   October 26, 2009 Stipulation of Settlement entered by the parties in *Gregory v. Tuchman, et al.*, C.A. No. 3925-CC (Del. Ch.) ("*TeleTech*").

Exhibit H:   Relevant excerpts from the January 5, 2010 Settlement Hearing Transcript in *TeleTech*.

1          Exhibit I:     Final Judgment Approving Settlement and Order of Dismissal

2                      entered on January 5, 2010 in *TeleTech*.

3          Exhibit J:    Stipulation Consolidating Actions, Appointing Lead Counsel and

4                      Related Matters and Order Thereon, entered on August 26, 2010

5                      in *King v. Meyer III, et al.*, Civil Action No. 1:10-cv-01786-DAP

6                      (N.D. Ohio).

7        I declare under penalty of perjury under the laws of the United States of

8 America that the foregoing is true and correct. Executed this 26th day of October,

9 2012, at San Diego, California.

10

11                                        /s/ Kathleen A. Herkenhoff

12                                  KATHLEEN A. HERKENHOFF

13

14                          12707 High Bluff Drive, Suite 200

15                          San Diego, CA 92130

                          Telephone: 858-794-1441

16                          Facsimile: 858-794-1450

17                          Attorneys for Plaintiff Bruce Johnson
                         and Proposed Co-Lead Counsel

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

1   JOHNSON & WEAVER, LLP
    Frank J. Johnson (174882)
2   David Elliot (270381)
    110 West "A" Street, Suite 750
3   San Diego, CA 92101
    Telephone: (619) 230-0063
4   Facsimile: (619) 255-1856

5   *Attorneys for Plaintiff*

6

7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10  GERALD EASTON, Derivatively on     Case No.: SACV12 - 01716 DOC (JPRx)
    Behalf of QUESTCOR
11  PHARMACEUTICALS, INC.,             VERIFIED SHAREHOLDER
                                       DERIVATIVE COMPLAINT
12              Plaintiff,
13                                     JURY TRIAL DEMANDED
                v.
14

15  DON M. BAILEY, MICHAEL H.
    MULROY, STEPHEN L. CARTT,
16  DAVID YOUNG, VIRGIL D.
    THOMPSON, MITCHELL J.
17  BLUTT, MD, NEAL C.
    BRADSHER, STEPHEN C.
18  FARRELL, LOUIS E.
    SILVERMAN, and SCOTT M.
19  WHITCUP, MD,
20
21              Defendants,
22
    -and-
23
    QUESTCOR
24  PHARMACEUTICALS, INC., a
    California corporation,
25
26              Nominal Defendant.
27

28

─────────────────────────────────────
         Verified Shareholder Derivative Complaint

By and through his undersigned counsel, Plaintiff Gerald Easton ("Plaintiff") brings this shareholder derivative action on behalf of QUESTCOR PHARMACEUTICALS, INC., ("Questcor" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, and aiding and abetting thereof. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: a) review and analysis of public filings made by Questcor and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on Questcor's website concerning the Company's public statements; and d) review of other publicly available information concerning Questcor and the Individual Defendants (defined herein).

## INTRODUCTION

1.     Questcor is a pharmaceutical company based on, in effect, a single product. The Company's core product, H.P. Acthar Gel (Repository Corticotropin Injection) ("Acthar"), provides over 90% of the Company's revenues.

---

2.     Acthar is an injectable drug that has been in use since the 1950's. Over time, Acthar has received approvals by the U. S. Food and Drug Administration ("FDA") for use in the treatment of 19 different conditions including multiple sclerosis ("MS"), nephrotic syndrome (a kidney condition), and infantile spasms.

3.     Questcor acquired the rights to Acthar in 2001 for $100,000. At the time, Acthar was used almost exclusively to treat infantile spasms. The drug had enjoyed some popularity in the 1970's as a treatment for M.S., but had been largely abandoned for this purpose as less expensive and more powerful corticosteroids became the preferred treatment for the condition.

4.     From April 26, 2011 to September 21, 2012, (the "Relevant Period"), as discussed further below, the Individual Defendants caused the Company to embark on a massive and concerted effort to re-market Acthar for other conditions for which it had historically been approved, despite an absence of clinical verification that it was effective or cost-effective for those conditions.

5.     That marketing effort, which has now come under scrutiny by federal authorities for allegedly improper or illegal practices, worked. Company revenues skyrocketed, and the Company's share price rose in response to both the Company's short-term financial performance and the numerous misleading public statements the Individual Defendants made, authorized, or failed to

correct, that predicted accelerating growth in deployment of its core product Acthar into additional markets and applications.

6. What the Individual Defendants did not disclose, however, was that the Company did not have clinical evidence that Acthar was superior, or even cost-effective, when compared with other available treatments for 18 of the 19 indications for which the drug was approved.

7. Specifically, during the Relevant Period, the Individual Defendants violated the federal securities laws by disseminating false and misleading statements to the investing public about the effectiveness of Acthar as a treatment for MS, for nephrotic syndrome, and for other conditions, and by causing the Company to do so, making it impossible for shareholders to gain a meaningful or realistic understanding of the Company's prospects for market success. As a result of these false statements, Questcor's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $57.64 per share on July 9, 2012.

8. On September 19, 2012, Citron Research, a research entity unrelated to Questcor, disclosed that Aetna Inc. ("Aetna"), one of the nation's largest insurers, had determined that it would no longer reimburse prescriptions for Acthar for 18 of the 19 conditions for which the drug had been approved.

9. Aetna announced in a clinical policy bulletin that the available clinical research indicated the drug is only "medically necessary" for one of its

3

Verified Shareholder Derivative Complaint

19 approved conditions: West syndrome, a rare condition that causes infantile spasms. For other conditions such as MS that are treated with steroids, Aetna found that Acthar was "not medically necessary because there is no clinical evidence that the drug is more effective than steroids."

10.    On this news, Questcor's stock plummeted $24.17 per share to close at $26.35 per share on September 19, 2012, a one-day decline of 48% on high volume.

11.    Later on September 19, 2012, in response to news of the insurer's finding, the Company issued a press release stating:

> "Currently the Company does not believe that the [Aetna] bulletin represents a material change in insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar.  Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations."

12.    Investors were at least partially reassured by this statement, as the stock price recovered approximately 20% in the following days.

13.    Then, on September 24, 2012, Questcor announced in a Form 8-K filed with the SEC that the U.S. Government had initiated an investigation into the Company's marketing and promotional practices.

4

Verified Shareholder Derivative Complaint

14.   After this news, Questcor's stock dropped $11.05 per share to close at $19.08 per share on September 24, 2012, a one-day decline of 37% on high volume.

15.   The dramatic run-up in the Company's share price, which came to a crashing halt when the true facts were disclosed, was a result of the Individual Defendants' deliberately misleading statements and practices.   The true facts, which were known by the Individual Defendants but concealed from the investing public during the Relevant Period, were as follows:

(a) the Individual Defendants lacked clinical evidence to support the use of Acthar for any indications other than infantile spasms.

(b) the Individual Defendants had engaged in or caused the Company to engage in questionable tactics to promote the sale and use of Acthar in the treatment of MS and nephrotic syndrome.

(c) the Individual Defendants lacked a reasonable basis to make positive statements about the Company or its outlook, including statements about the effectiveness of and potential market growth for Acthar.

16.   As a result of the Individual Defendants' false public statements and improper practices, Questcor stock traded at artificially inflated levels during the Relevant Period.   However, after the above revelations seeped into the market, the Company's share price plummeted, losing 67% of its value from the period high.

17.     Plaintiff, a shareholder of Questcor, therefore brings this shareholder derivative lawsuit against the Individual Defendants for breaching their fiduciary duties to the Company by issuing false and misleading statements and by causing and failing to disclose the improper practices during the Relevant Period.

18.     The Questcor Board of Directors ("Board") has not and will not commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Questcor for authorizing or failing to correct the false and misleading statements and improper practices alleged herein.  Accordingly, a pre-suit demand upon the Questcor Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate Questcor's rights against its wayward fiduciaries and hold them responsible for the damages they have caused Questcor.

## JURISDICTION AND VENUE

19.     Jurisdiction is conferred by 28 U.S.C § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Questcor maintains its principal executive offices in this district, one or more of the Individual Defendants reside in this district, a substantial portion of the transactions and wrongs complained of herein -- including the Individual

Defendants' primary participation in the wrongful acts detailed herein – occurred in this district, and the Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district.

## THE PARTIES

21.     Plaintiff has been a shareholder of common stock of Questcor at all times during the wrongdoing complained of herein and continues to hold shares in the Company.  Plaintiff is a citizen of Ohio.

22.     Nominal Defendant Questcor is a California corporation with its principal offices located at 1300 North Kellogg Drive, Suite D, Anaheim Hills, California 92087.  Questcor is publically-traded on the NASDAQ exchange with trading symbol QCOR.  As of October 1, 2012, Questcor had approximately 61.11 million common shares outstanding.

23.     Defendant Don M. Bailey ("Bailey") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO"), President and a director.  During the Relevant Period, defendant Bailey sold 440,000 shares of his Questcor stock for proceeds of over $17.7 million.   Bailey is a citizen of California.

24.     Defendant Michael H. Mulroy ("Mulroy") is, and at all relevant times was, the Company's Chief Financial Officer ("CFO"), Senior Vice President and General Counsel.  Mulroy is a citizen of California.

25.     Defendant Stephen L. Cartt ("Cartt") is, and at all relevant times was, the Company's Chief Operating Officer ("COO").   During the Relevant Period, defendant Cartt sold 505,509 shares of his Questcor stock for proceeds of over $16.2 million.  Cartt is a citizen of California.

26.     Defendant David Young ("Young") is, and at all relevant times was, the Company's Chief Scientific Officer.  During the Relevant Period, defendant Young sold 175,124 shares of his Questcor stock for proceeds of nearly $7.1 million.  Young is a citizen of California.

27.     Defendant Virgil D. Thompson ("Thompson") is the Chairman of the Board, having joined the Board in January 1996.  Thompson is a member of the Audit Committee, the Compensation Committee, and the Compliance Committee.   During the Relevant Period, Thompson sold 167,500 shares for proceeds of over $ 3.4 million.  Thompson is a citizen of California.

28.     Defendant Mitchell J. Blutt, MD ("Blutt") is a Director of the Company.  Blutt has been a director since 2010.  Blutt is a member of the Audit Committee.  During the Relevant Period, Blutt sold 636,255 shares for proceeds of over $ 21.4 million.  Blutt is a citizen of New York.

29.     Defendant Neal C. Bradsher ("Bradsher") is a director of the Company.  Bradsher joined the Company's Board in March 2004. Bradsher is a citizen of New York.

30.     Defendant Stephen C. Farrell ("Farrell") is a director of the Company. Farrell joined the Company's Board in November 2007. Farrell is a member of the Audit Committee, the Compensation Committee, and the Compliance Committee. During the Relevant Period, Farrell sold 25,000 shares for proceeds of over $ 1.0 million. Farrell is a citizen of Massachusetts.

31.     Defendant Louis E. Silverman ("Silverman") is a director of the Company.  Silverman joined the Company's Board in December, 2009. Silverman is a member of the Compliance Committee. Silverman is a citizen of California.

32.     Defendant Scott M. Whitcup ("Whitcup") is a director of the Company. Whitcup is a member of the Compliance Committee. Whitcup is a citizen of Illinois.

33.     The defendants named above in ¶¶23-32 are referred to herein as the "Individual Defendants."

34.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Questcor's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, and therefore to the investment market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

*The Individual Defendants Made or Allowed False and Misleading Statements and Violated their Fiduciary Duties During the Relevant Period*

35. On April 26, 2011, the Individual Defendants caused Questcor to issue a press release announcing its first quarter 2011 financial results. The Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011.

36. Defendant Bailey made several false and misleading statements in the press release which stated in part:

> "Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking

forward, we expect to continue to grow sales in this important

therapeutic area."  Mr. Bailey added, "We are also encouraged by the

early positive results from our small, dedicated nephrology sales

team, which initiated selling efforts at the beginning of March.  The

number of nephrologists who are using Acthar to treat patients with

nephrotic syndrome is increasing."

37.    After the Individual Defendants caused Questcor to issue its first

quarter 2011 financial results on April 26, 2011, the Individual Defendants

hosted a conference call for analysts, media representatives and investors.

38.    During the call, certain of the Individual Defendants reiterated the

record financial results reported in the Company's press release and defendant

Mulroy discussed the Company's financial performance in depth.  Defendants

Bailey and Cartt further presented prepared statements at the conference call and

represented as follows:

[BAILEY:] In summary, we are off to a very good start this year as

we continue to execute our straightforward strategy to sell more

Acthar. Our decision to expand the MS sales force is clearly paying

off. Also, our nephrotic syndrome sales force is having some early

success.

* * *

We believe this MS sales performance reflects the strong, underlying demand for Acthar. This growth in demand is being driven by the increasing productivity of our expanded sales force. We believe net sales in the MS market are now about 60% of total Acthar net sales.

* * *

[CARTT:] Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter we shipped a record 508 paid Acthar prescriptions for the treatment of MS relapses. This was an increase of 120% over the year ago period and 44% over the previous quarter. We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

* * *

Our promotional efforts are increasingly focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients and two, helping doctors, nurses and others in their medical practice become more effective at identifying potential Acthar patients.

* * *

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs. In these programs existing Acthar prescribers present to small groups of physicians their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses. When combined with followup sales calls, these programs appear to be a key driver of our sales growth. Recently we've been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

39.    On July 26, 2011, the Individual Defendants caused Questcor to issue a press release announcing its second quarter 2011 financial results.  The Company reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46.0 million for the second quarter of 2011.  The release stated in part:

"Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow. Accordingly, growing MS sales remains our number one priority. Also, following our early

success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

40. On June 14, 2012, the Individual Defendants caused the Company to issue a press release touting the prospects for the further commercialization of its star product Acthar. The press release stated, in relevant part:

Questcor Pharmaceuticals, Inc. (NASDAQ: QCOR) today announced key elements of the Company's initial commercialization plans for H.P. Acthar® Gel (repository corticotropin injection) in the treatment of rheumatology-related indications already included on the FDA-approved package insert for Acthar.

Acthar is indicated for multiple FDA-approved rheumatology-related conditions, including its use as adjunctive therapy in psoriatic arthritis, rheumatoid arthritis, juvenile rheumatoid arthritis, and ankylosing spondylitis. Acthar is also approved by the FDA as acute or maintenance therapy in selected cases of systemic lupus erythematosus and systemic dermatomyositis (polymyositis). The Company believes Acthar has the potential to help patients suffering from these serious, difficult-to-treat disorders who do not respond adequately to, or experience problematic side effects from, current treatments.

14

Verified Shareholder Derivative Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Questcor's initial commercial plans for Acthar in rheumatology include the following:

- Creation of a Rheumatology Sales Force with 12 experienced rheumatology reps, a national sales director and two regional sales managers;

- Commencement of a pilot rheumatology selling effort in mid-July 2012 with an initial focus on the rare and closely related neuromuscular disorders dermatomyositis (DM) and polymyositis (PM);

- Potential expansion of the Rheumatology Sales Force following evaluation of results from the pilot effort;

- Potential roll-out in late 2012 of a DM/PM selling effort by Questcor's current Neurology Sales Force to as many as 1,000 neurologists specializing in neuromuscular disease.

Furthermore, Questcor will support creation of a patient registry for Acthar in DM/PM and will actively work to help gather clinical data in systemic lupus erythematosus, rheumatoid arthritis and psoriatic arthritis.

"As we have previously stated, there are significant opportunities to enter markets where Acthar has FDA approval beyond our three key markets within nephrology, multiple sclerosis and infantile spasms," said Don M. Bailey, President and Chief Executive Officer of Questcor. "We are excited about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders who are in need of additional treatment options. Our commercialization launch plans for Acthar Rheumatology indications replicate the model we have successfully used to help patients afflicted with MS and certain types of nephrotic syndrome."

* * *

"While DM/PM will be the initial focus of our pilot Rheumatology Sales Force, we believe that with Acthar also being FDA-approved for the treatment of SLE, RA and psoriatic arthritis, a total of five Acthar indications related to rheumatology could become commercially viable within the next 24 months," commented Steve Cartt, Chief Operating Officer of Questcor. "Each of these five FDA-approved, Acthar indications appear to have significant revenue potential due to the high unmet need evident in these therapeutic

areas. The commercialization of each of these indications has the potential to significantly add to Questcor shareholder value."

41.     In an April, 24, 2012 conference call for analysts and investors, Defendant Young, stated "… Acthar can truly be considered a pipeline within a drug.  While quite rare, there are, in effect, few other successful examples of the type of product.  Soliris and Botox come to mind, for example.  We have a significant opportunity with Acthar to expand use from our three existing markets . . .  to other markets that are part of the list of 19 approved on-label indications."

42.     These, as well as other similar statements disseminated by the Individual Defendants during the Relevant Period, were materially misleading because they failed to disclose that Questcor lacked reliable clinical evidence of Acthar's efficacy or cost-effectiveness in these additional applications.   The statements also failed to disclose that the Company's apparent success in marketing the drug hinged on its allegedly improper marketing practices.  All of this information was available to the Individual Defendants but was not disclosed to investors.

43.     Certain of the Individual Defendants have caused the Company to assert on its official website that "Questcor's Compliance Program strives to ensure that the consequences of violating the law or company policy are clearly understood and the appropriate, consistent disciplinary action is enforced.

17

Additional efforts are underway to create a Compliance Program that increases the likelihood that unlawful and unethical behavior is identified and prevented. . . . As such, our Compliance Program requires the company to evaluate each case and respond promptly to potential violations of law or company policy, take appropriate disciplinary action, assess whether the violation is in part due to gaps in our policies, practices, or internal controls, and take action to prevent future violations."

44.     Further, Questcor's website alleges regarding the Company sales and marketing practices that, "…all of our sales representatives receive extensive training on how to conduct themselves before they go out into the field to call on physicians and other healthcare providers. Questcor has also developed rigorous internal procedures governing how we produce and utilize promotional and educational materials."

45.     Questcor's "rigorous internal procedures," if they exist at all, apparently failed to detect or even respond to the misleading public statements or the questionable marketing practices that are the subject of the announced government investigation.

### INSIDER SELLING ALLEGATIONS

46.     Individual Defendants Bailey, Blutt, Cartt, Farrell, Thompson, and Young all sold their shares in Questcor during the Relevant Period, realizing substantial proceeds from the artificially-inflated share prices during this period.

47.     These Individual Defendants' sales of Questcor stock were made on the basis of material, nonpublic information regarding the clinical data, efficacy, and cost-effectiveness, and the Company's marketing practices for Acthar, such that these Individual Defendants received a material benefit that other shareholders, not privy to that information, did not receive.

### DUTIES OF THE INDIVIDUAL DEFENDANTS

Fiduciary Duties

48.     By reason of their positions as officers, directors, and/or fiduciaries of Questcor and because of their ability to control the business and corporate affairs of Questcor, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Questcor in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Questcor and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

49.     Each director and officer of the Company owes to Questcor and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants

had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Duties of the Audit Committee

50.     In addition to these fiduciary duties, the members of the Audit Committee owed specific duties to Questcor under the Audit Committee's Charter.     In particular, the Audit Committee's Charter requires the Audit Committee to assist the Board with its oversight responsibilities regarding: (a) the integrity of the Company's financial statements; and (b) the Company's compliance with legal and regulatory requirements.

51.     Audit Committee duties further include that:

The Committee shall review and discuss the quarterly financial statements with management and the external auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the

20

Verified Shareholder Derivative Complaint

performance and independence of the Company's external auditor, or any other matter the Committee determines is necessary or advisable to report to the Board.

<u>Duties of the Compliance Committee</u>

52.    The Individual Defendants who are members of Questcor's Compliance Committee owe additional fiduciary duties to the Company.

53.    According to the Company's charter, the purpose of the Compliance Committee is to assist the Board with its oversight of significant healthcare related compliance and regulatory issues.

54.    Specific duties required to be carried out by the Compliance Committee members include:

- Review and oversee the Company's Compliance Program, including but not limited to, evaluating its effectiveness and receiving updates about the activities of the Chief Compliance Officer and other compliance personnel.

- Review the status of the Company's compliance with relevant laws, regulations, and internal procedures (e.g., compliance with U.S. federal healthcare program requirements; compliance with U.S. pharmaceutical product promotional rules and regulations, including with respect to "off-label" and other product promotional activities, unapproved product uses, fair balance, product safety claims, and product superiority or efficacy

21

Verified Shareholder Derivative Complaint

claims; product manufacturing quality control; clinical studies quality control; and required reporting to the Food and Drug Administration ("FDA")). The Audit Committee of the Company's Board of Directors shall continue to assist the Board with its oversight responsibilities regarding the integrity of the Company's financial statements and the Company's compliance with legal and regulatory requirements generally.

- Review and evaluate internal reports and external data to assess whether there are significant concerns regarding the Company's regulatory and/or compliance practices, including:

- Receive details and factual reports on relevant government investigations, including the conduct at issue and whether it reflects a regulatory or compliance issue at the Company.

* * *

At least annually, receive all FDA warning letters and the responses to such letters, as well as a report on the steps taken to implement the responses and an evaluation of whether the letters, as responded to by the Company, raise any healthcare related regulatory and compliance issues.

* * *

The Committee shall report at least annually to the Board of Directors on (i) the state of the Company's compliance functions, (ii) relevant compliance issues involving the Company of which the Committee has

22

been made aware, including a summary of the results of any compliance investigations conducted by the Company, (iii) any potential patterns of non-compliance identified within the Company, (iv) any significant disciplinary actions against any compliance personnel, and (v) any other issues that may reflect any systemic or widespread problems in compliance or regulatory matters exposing the Company to substantial compliance risk. In advance of such report, the Committee and the Audit Committee, either through their respective Chairs or otherwise, shall confer on any matters of mutual interest in light of their respective responsibilities.

<u>Control, Access, and Authority</u>

55.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Questcor, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Questcor.

56.     Because of their advisory, executive, managerial, and directorial positions with Questcor, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Questcor.

57.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Questcor, and was at all times acting within the course and scope of such agency.

<u>Reasonable and Prudent Supervision</u>

58.    To discharge their duties, the officers and directors of Questcor were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Questcor were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)    remain informed as to how Questcor conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or

practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Questcor was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

59. Each of the Individual Defendants, by virtue of his or her position as a director and/or officer, owed to Questcor and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Questcor, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Questcor, the absence of good faith on their part, and a reckless disregard for their duties to Questcor and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Questcor.

60. The Individual Defendants breached their fiduciary duties to investors by implementing and/or approving improper marketing practices, by concealing and failing to timely disclose the risks of these marketing practices, and by issuing false and misleading public announcements regarding the Company's prospects.

61.    The Individual Defendants each further breached their duty of loyalty and good faith by allowing other of the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that Questcor's success with and future prospects for Acthar were based on reliable clinical data and proper marketing practices, and by failing to correct these statements after they were made.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that Questcor was successfully diversifying into new businesses while increasing revenues and market share in its traditional switching and router businesses and that its new organizational structure was operating successfully.  In furtherance of this plan, conspiracy, and course of

conduct, the Individual Defendants collectively and individually took the actions set forth herein.

64.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently issue false and misleading statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO QUESTCOR

67. As a result of the Individual Defendants' wrongful conduct, Questcor adopted improper marketing strategies and practices. The Individual Defendants' further caused Questcor to disseminate false and misleading statements which concealed the truth from investors, which resulted in increased damages to Questcor. The losses and improper statements have devastated Questcor's credibility. Additionally, Questcor is the subject of a securities fraud class action lawsuit. The Company will face substantial costs in connection with an investigation and the lawsuit.

68. As a direct and proximate result of the Individual Defendants' actions as alleged above, Questcor's market capitalization has been substantially damaged.

69. Further, as a direct and proximate result of the Individual Defendants' conduct, Questcor has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Questcor and certain officers in a government regulatory investigation, the federal class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy adverse criminal and/or civil judgments;

(b) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part

28

Verified Shareholder Derivative Complaint

on Questcor's artificially-inflated stock price and inflated revenues; and

(c)      costs incurred from the loss of the Company's customers' confidence in Questcor's services.

70.    Moreover, these actions have irreparably damaged Questcor's corporate image and goodwill.  For at least the foreseeable future, Questcor will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Questcor's ability to raise equity capital or debt on favorable terms in the future is already impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.    Plaintiff brings this action derivatively in the right and for the benefit of Questcor to redress injuries suffered, and to be suffered, by Questcor as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Questcor is named as a nominal defendant solely in a derivative capacity.

72.    Plaintiff will adequately and fairly represent the interests of Questcor in enforcing and prosecuting its rights.

73.    Plaintiff was a shareholder of Questcor at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

74.     Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

75.     The Board of Questcor currently consists of the following seven defendants: Thompson, Bailey, Blutt, Bradsher, Farrell, Silverman, and Whitcup. Demand is futile as to each of them for the following reasons.

76.     Demand is futile as to Defendant Thompson, because Thompson faces a substantial likelihood of liability for his individual misconduct. Thompson, as Chairman of the Board and as a member of the Audit, Compensation, and Compliance Committees, knew of the false and misleading statements regarding Acthar's efficacy and cost-effectiveness, and either knew or with reasonable diligence should have known about the improper marketing practices, and did nothing to stop those practices or establish systems to prevent them. Defendant Thompson was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Thompson faces a substantial likelihood of liability.

77.    Demand is futile as to Defendant Bailey, because Bailey faces a substantial likelihood of liability for his individual misconduct.   Bailey, as President and CEO of the Company, and as a member of the Board, made false and misleading statements and knew them to be false and misleading regarding Acthar's efficacy and cost-effectiveness, and either knew or with reasonable diligence should have known about the improper marketing practices, and either encouraged or did nothing to stop those practices or establish systems to prevent them.   Defendant Bailey was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.   Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.   This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Bailey faces a substantial likelihood of liability.

78.    Demand is futile as to Defendant Blutt, because Blutt faces a substantial likelihood of liability for his individual misconduct.  Blutt, as a Board member and member of the Audit Committee, knew of the false and misleading statements regarding Acthar's efficacy and cost-effectiveness, and either knew or with reasonable diligence should have known about the improper marketing practices, and did nothing to stop those practices or establish systems to prevent

31

Verified Shareholder Derivative Complaint

them. Defendant Blutt was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Blutt faces a substantial likelihood of liability.

79. Demand is futile as to Defendant Bradsher, because Bradsher faces a substantial likelihood of liability for his individual misconduct. Bradsher knew of the false and misleading statements regarding Acthar's efficacy and cost-effectiveness, and either knew or with reasonable diligence should have known about the improper marketing practices, and did nothing to stop those practices or establish systems to prevent them. Defendant Bradsher was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to

correct them constitutes a breach of fiduciary duty, for which Defendant Bradsher faces a substantial likelihood of liability.

80. Demand is futile as to Defendant Farrell, because Farrell faces a substantial likelihood of liability for his individual misconduct. Farrell, as a member of the Audit and Compliance Committees, knew of the false and misleading statements regarding Acthar's efficacy and cost-effectiveness, and either knew or with reasonable diligence should have known about the improper marketing practices, and did nothing to stop those practices or establish systems to prevent them. Defendant Farrell was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Farrell faces a substantial likelihood of liability.

81. Demand is futile as to Defendant Silverman, because Silverman faces a substantial likelihood of liability for his individual misconduct. Silverman, as a member of the Compliance Committee, knew of the false and misleading statements regarding Acthar's efficacy and cost-effectiveness, and

either knew or with reasonable diligence should have known about the improper marketing practices, and did nothing to stop those practices or establish systems to prevent them. Defendant Silverman was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Silverman faces a substantial likelihood of liability.

82. Demand is futile as to Defendant Whitcup, because Whitcup faces a substantial likelihood of liability for his individual misconduct. Whitcup, as a member of the Compliance Committee, knew of the false and misleading statements regarding Acthar's efficacy and cost-effectiveness, and either knew or with reasonable diligence should have known about the improper marketing practices, and did nothing to stop those practices or establish systems to prevent them. Defendant Whitcup was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and

34

Verified Shareholder Derivative Complaint

misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Whitcup faces a substantial likelihood of liability.

83. Further, if not already, several of the Individual Defendants are expected to be named defendants in a federal class action in the Central District of California alleging that they and the Company violated §10(b) of the Securities Exchange Act of 1934 Act Rule 10b-5 when they disseminated or approved false statements. The Individual Defendants are therefore interested and unable to entertain a demand objectively.

84. A true and correct copy of this complaint was delivered to Questcor prior to being filed with this Court.

### COUNT I

*Against the Individual Defendants for Breach of Fiduciary Duty*

85. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86. The Individual Defendants owed and owe Questcor fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Questcor the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

87.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

88.    The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

89.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Questcor has sustained significant damages. As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

90.    Plaintiff, on behalf of Questcor, has no adequate remedy at law.

## COUNT II

*Against the Individual Defendants for Unjust Enrichment*

91.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Questcor.

93.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Questcor.

94.    Plaintiff, as a shareholder and representative of Questcor, seeks restitution from these Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants from their wrongful conduct and fiduciary breaches.

95.    Plaintiff, on behalf of Questcor, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.    Directing Questcor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Questcor and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to

place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to provide for immediate management notice and corrective action in the event that any trading or other activities expose the Company to unacceptable exposure or risk levels;

- a provision to permit the shareholders of Questcor to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Questcor's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding compliance, marketing, internal controls and auditing matters;

- a provision to strengthen the Questcor's insider trading controls; and

- a provision to appropriately test and then strengthen the internal audit, compliance, governance and control functions.

C.    Awarding to Questcor restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses to the extent provided by law; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully Submitted,

Dated: October 4, 2012                    JOHNSON & WEAVER, LLP

By: _David Elliot_____

DAVID ELLIOT

*Attorneys for Plaintiff*

## VERIFICATION

I, Gerald Easton, hereby verify that I am a shareholder of Questcor Pharmaceutical, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date 10/03/12

Gerald Easton

# EXHIBIT B



THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: (858) 794-1441
Facsimile: (858) 794-1450
kah@weiserlawfirm.com

Attorneys for Plaintiff

(Additional counsel listed on signature page)

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SANTA ANA DIVISION

| | |
|---|---|
| BRUCE JOHNSON, Derivatively on Behalf of QUESTCOR PHARMACEUTICALS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, VIRGIL D. THOMPSON, MITCHELL J. BLUTT, NEIL C. BRADSHER, STEPHEN C. FARRELL, LOUIS E. SILVERMAN, and SCOTT M. WHITCUP, <br><br> Defendants, <br><br> – and – <br><br> QUESTCOR PHARMACEUTICALS, INC., <br><br> Nominal Party. | Case No. SACV12 - 01718 JST (MLGx) <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, GROSS MISMANAGEMENT, ABUSE OF CONTROL, AND UNJUST ENRICHMENT <br><br><br> JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1. Plaintiff Bruce Johnson ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") against certain members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

2. According to its public filings, Questcor is a biopharmaceutical company that provides prescription drugs for the treatment of multiple sclerosis, nephrotic syndrome, and infantile spasms indications. It primarily offers H.P. Acthar Gel ("Acthar"), an injectable drug for the treatment of acute exacerbations of multiple sclerosis ("MS") in adults; to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus; and as monotherapy for the treatment of infantile spasms in infants and children under two years of age. The company's H.P. Acthar Gel also focuses on rheumatology-related conditions, including collagen diseases and rheumatic disorders. In addition, it offers Doral for the treatment of insomnia. The company sells its Acthar primarily to specialty pharmacies; and Doral to pharmaceutical wholesalers.

3. Throughout the relevant time period, defendants issued materially false and misleading statements regarding the Company's business and financial results. Specifically, defendants disseminated false and misleading statements about the effectiveness of Acthar as a treatment for MS and nephrotic syndrome, making it impossible for the public to gain a meaningful or realistic understanding of the drug's prospects and market success.

4. As a result of defendants' false statements, Questcor's stock traded at artificially inflated prices, reaching a relevant time period high of $57.64 per share on July 9, 2012.

5. On September 19, 2012, Citron Research ("Citron") reported that Aetna Inc. ("Aetna"), one of the nation's largest insurers, had recently revised its policy concerning Acthar, which would severely limit coverage of Questcor's primary drug. Aetna had engaged in a review of the 19 indications for which the U.S. Food and Drug Administration ("FDA") had approved Acthar. Based upon its findings, Aetna determined that clinical research supported only one of the 19 indications. In Aetna's clinical policy bulletin issued in connection with its review, Aetna reported that

Exhibit B, Page 49

1   studies suggested that the drug is only "medically necessary" for West syndrome, a rare condition that

2   causes infantile spasms, and not for other indications, such as MS, which are treated with steroids.

3   Typically, Aetna only reimburses for drugs when they are deemed medically necessary.  According to

4   an Aetna spokesperson, "'Our previous position was that this was a last-resort treatment. . . We now

5   state that it is not medically necessary because there is no clinical evidence that the drug is more

6   effective than steroids.'"

7         6.     On this news, Questcor's stock plummeted $24.17 per share to close at $26.35 per share

8   on September 19, 2012, a one-day decline of *48%*.

9         7.     Then, on September 24, 2012, defendants caused the Company to announce in a Form 8-

10   K filed with the SEC that the U.S. government had initiated an investigation into the Company's

11   promotional practices.

12         8.     On this news, Questcor's stock dropped another $11.05 per share to close at $19.08 per

13   share on September 24, 2012, a one-day decline of *37%*.

14         9.     The true facts, which were known by the defendants but concealed from the investing

15   public, were as follows:

16           (a)     Defendants lacked clinical evidence to support the use of Acthar for indications

17   other than infantile spasms;

18           (b)     Defendants had engaged in questionable tactics to promote the sale and use of

19   Acthar in the treatment of MS and nephrotic syndrome; and

20           (c)     Defendants lacked a reasonable basis to make positive statements about the

21   Company or its outlook, including statements about the effectiveness of and potential market growth for

22   Acthar.

23        10.     As a result of defendants' false and misleading statements, Questcor's stock traded at

24   artificially inflated levels.  However, after the above revelations seeped into the market, the Company's

25   shares were hammered by massive sales, sending them down over *67%* from their relevant time period

26   high.

27        11.     Further, as a result of defendants' breaches, the price of the Company's stock still has

28   not recovered and currently trades for around $19.40 per share.

- 2 -

**JURISDICTION AND VENUE**

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and defendants are citizens of different states and/or countries and the matter in controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

13.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district. Additionally, nominal defendant Questcor is headquartered in this district.

**THE PARTIES**

14.     Plaintiff is a shareholder of Questcor and has continuously held Questcor stock since July 2012. Plaintiff is a citizen of Maryland.

15.     Nominal defendant Questcor is a California corporation with its executives offices located at 1300 Kellogg Drive, Suite D, Anaheim, CA 92807. According to its public filings, the Company provides prescription drugs for the treatment of multiple sclerosis, nephrotic syndrome, and infantile spasms indications.

16.     Defendant Don M. Bailey ("Bailey") has served as the Chief Executive Officer ("CEO") and President of the Company since November 2007. In addition, defendant Bailey served as the Interim President of the Company from May 2007 to November 2007. Further, defendant Bailey has served as a director of the Company since May 2006. Upon information and belief, defendant Bailey is a citizen of California.

17.     Defendant Michael H. Mulroy ("Mulroy") has served as the Chief Financial Officer ("CFO") of Company since January 2011. Upon information and belief, defendant Mulroy is a citizen of California.

- 3 -

1      18.     Defendant Stephen L. Cartt ("Cartt") has served as the Chief Operating Officer ("COO")

2  of Company since March 2005.  Upon information and belief, defendant Cartt is a citizen of California.

3      19.     Defendant David Young ("Young") has served as the Chief Scientific Officer ("CSO")

4  of the Company since October 2009.  Upon information and belief, defendant Young is a citizen of

5  California.

6      20.     Defendant Virgil D. Thompson ("Thompson") has served as a director of the Company

7  since January 1996.  In addition, defendant Thompson has served as a member of the Board's Audit

8  Committee (the "Audit Committee") and as Chairman of the Board during the relevant time period.

9  Further, defendant Thompson has served as a member of the Board's Compliance Committee (the

10  "Compliance Committee") during the relevant time period.  Upon information and belief, defendant

11  Thompson is a citizen of California.

12      21.     Defendant Mitchell J. Blutt ("Blutt") has served as a director of the Company since July

13  2010.  In addition, defendant Blutt has served as a member of the Audit Committee during the relevant

14  time period.  Upon information and belief, defendant Blutt is a citizen of New York.

15      22.     Defendant Neil C. Bradsher ("Bradsher") has served as a director of the Company since

16  March 2004.  Upon information and belief, defendant Bradsher is a citizen of New York.

17      23.     Defendant Stephen C. Farrell ("Farrell") has served as a director of the Company since

18  November 2007.  In addition, defendant Farrell has served as the Chairman of the Audit Committee

19  during the relevant time period.  Further, defendant Farrell has served as a member of Compliance

20  Committee during the relevant time period.  Upon information and belief, defendant Farrell is a citizen

21  of Florida.

22      24.     Defendant Louis E. Silverman ("Silverman") has served as a director of the Company

23  since December 2009.  Upon information and belief, defendant Silverman is a citizen of California.

24      25.     Defendant Scott M. Whitcup ("Whitcup") has served as a director of the Company since

25  February 2012.  Upon information and belief, defendant Whitcup is a citizen of Pennsylvania.

26      26.     Collectively, defendants Bailey, Mulroy, Cartt, Young, Thompson, Blutt, Bradsher,

27  Farrell, Silverman, and Whitcup shall be referred to herein as the "Defendants."

28

- 4 -

27.     Collectively, defendants Thomson, Blutt, and Farrell shall be referred to herein as the
"Audit Committee Defendants."

28.     Collectively, defendants Whitcup, Farrell, and Thompson shall be referred to herein as
the "Compliance Committee Defendants."

### DEFENDANTS' DUTIES

29.     By reason of their positions as officers, directors, and/or fiduciaries of Questcor and
because of their ability to control the business and corporate affairs of Questcor, Defendants owed
Questcor and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are
required to use their utmost ability to control and manage Questcor in a fair, just, honest, and equitable
manner. Defendants were and are required to act in furtherance of the best interests of Questcor and its
shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or
benefit. Each director and officer of the Company owes to Questcor and its shareholders the fiduciary
duty to exercise good faith and diligence in the administration of the affairs of the Company and in the
use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     Defendants, because of their positions of control and authority as directors and/or
officers of Questcor, were able to and did, directly and/or indirectly, exercise control over the wrongful
acts complained of herein. Because of their advisory, executive, managerial, and directorial positions
with Questcor, each of the Defendants had knowledge of material non-public information regarding the
Company.

31.     To discharge their duties, the officers and directors of Questcor were required to exercise
reasonable and prudent supervision over the management, policies, practices and controls of the
Company. By virtue of such duties, the officers and directors of Questcor were required to, among
other things:

(a)     Exercise good faith to ensure that the affairs of the Company were conducted in
an efficient, business-like manner so as to make it possible to provide the highest quality performance
of their business;

- 5 -

1           (b)     Exercise good faith to ensure that the Company was operated in a diligent, honest

2 and prudent manner and complied with all applicable federal and state laws, rules, regulations and

3 requirements, and all contractual obligations, including acting only within the scope of its legal

4 authority; and

5           (c)     When put on notice of problems with the Company's business practices and

6 operations, exercise good faith in taking appropriate action to correct the misconduct and prevent

7 its recurrence.

8       32.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are

9 required, *inter alia*, to:

10          (a)     Review and discuss the Company's quarterly financial statements with

11 management;

12          (b)     Discuss with management the Company's earnings press releases;

13          (c)     Discuss with management any of the following, which are brought to the Audit

14 Committee's attention:  correspondence from or with regulators or governmental agencies, any

15 employee complaints or any published reports that raise material issues regarding the Company's

16 financial statements, financial reporting process or accounting policies;

17          (d)     Discuss with management and outside counsel any legal matters brought to the

18 Audit Committee's attention that could reasonably be expected to have a material impact on the

19 Company's financial statements;

20          (e)     Discuss with management the Company's significant financial risk exposures and

21 the actions management has taken to limit, monitor or control such exposures; and

22          (f)     Regularly report to, and review with, the Board any issues that arise with respect

23 to the quality or integrity of the Company's financial statements, the Company's compliance with legal

24 or regulatory requirements, or any other matter the Audit Committee determines is necessary or

25 advisable to report to the Board.

26       33.    Pursuant to the Compliance Committee's charter, the members of the Compliance

27 Committee are required, *inter alia*, to:

28

1    (a)    Review and oversee the Company's Compliance Program, including but not

2    limited to, evaluating its effectiveness and receiving updates about the activities of the Chief

3    Compliance Officer and other compliance personnel;

4    (b)    Review the status of the Company's compliance with relevant laws, regulations,

5    and internal procedures (*e.g.,* compliance with U.S. federal healthcare program requirements;

6    compliance with U.S. pharmaceutical product promotional rules and regulations, including with respect

7    to "off-label" and other product promotional activities, unapproved product uses, fair balance, product

8    safety claims, and product superiority or efficacy claims; product manufacturing quality control; clinical

9    studies quality control; and required reporting to the Food and Drug Administration);

10    (c)    Review and evaluate internal reports and external data to assess whether there are

11    significant concerns regarding the Company's regulatory and/or compliance practices; and

12    (d)    Report at least annually to the Board on (i) the state of the Company's

13    compliance functions, (ii) relevant compliance issues involving the Company of which the Committee

14    has been made aware, including a summary of the results of any compliance investigations conducted

15    by the Company, (iii) any potential patterns of non-compliance identified within the Company, (iv) any

16    significant disciplinary actions against any compliance personnel, and (v) any other issues that may

17    reflect any systemic or widespread problems in compliance or regulatory matters exposing the

18    Company to substantial compliance risk.

19    **SUBSTANTIVE ALLEGATIONS**

20    **A.    Background of the Company**

21    34.    According to its public filings, Questcor is a single product company, with Acthar

22    accounting for nearly all of its revenue.  Acthar, a highly specialized, low-volume, premium-priced

23    drug, was originally approved by the FDA in 1952.  The injectable hormone has a broad label, as it has

24    been approved by the FDA for use in 19 indications.  Acthar is a first-line treatment for infantile

25    spasms, a rare, terrible seizure disorder that affects around 1,500 babies a year in the U.S.  Acthar was

26    approved for the treatment of MS relapse in 1978.  It was used extensively as a treatment for MS in the

27    1970s, but was largely abandoned in the 1980s after corticosteroids came on the market, as the powerful

28    steroids proved to be a superior alternative to Acthar.

35.     According to its public filings, Questcor acquired the rights to Acthar in 2001 for $100,000. At the time, Acthar was almost exclusively being used to treat infantile spasms. In 2007, Defendants caused Questcor to file an application with the FDA to obtain orphan drug status for Acthar for the treatment of infantile spasms. The FDA grants orphan status to a drug that treats a disease affecting fewer than 200,000 people. Orphan status provides a company with seven years of marketing exclusivity. At the same time Defendants filed the Company's application with the FDA, Questcor raised the price of Acthar from $1,650 per vial to $23,000 per vial, which represents an overnight increase of over 1300%. As a result of the significant price increase, 2007 was the first year in the history of the drug that Acthar made money. The FDA approved Questcor's orphan drug status application in October 2010.

36.     Soon after Defendants enacted the tremendous price hike, Questcor, under Defendants' direction, embarked on an aggressive strategy to transform Acthar into a blockbuster drug. Defendants' sole strategic goal was to promote Acthar and expand the use of the drug for other indications, initially focusing on using Acthar for the treatment of MS beginning at the end of 2007, followed by nephrotic syndrome in the first quarter of 2011. Questcor markets Acthar as a second line treatment for MS after patients are not responsive to steroids and markets Acthar as a first-line treatment for nephrotic syndrome.

37.     As a result of Defendants' new strategy, the Company grew tremendously, with its net sales increasing from $49.8 million in 2007 to $218.2 million in 2011. The main source of the Company's growth is the use of Acthar in the treatment of MS and nephrotic syndrome. Currently, infantile spasms, the condition for which it received orphan drug status, accounts for only 6%-10% of the Company's revenues.

**B.     Defendants' False and Misleading Statements**

38.     On April 26, 2011, Defendants caused the Company to issue a press release announcing its first quarter 2011 financial results. Defendants reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011. The release stated in part:

"Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. The number of nephrologists

39.     After issuing its first quarter 2011 financial results on April 26, 2011, Defendants hosted a conference call for analysts, media representatives and investors.  During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey and Cartt further presented prepared statements at the conference call and represented as follows:

[BAILEY:] In summary, we are off to a very good start this year as we continue to execute our straightforward strategy to sell more Acthar.  Our decision to expand the MS sales force is clearly paying off.  Also, our nephrotic syndrome sales force is having some early success.

*        *        *

We believe this MS sales performance reflects the strong, underlying demand for Acthar. This growth in demand is being driven by the increasing productivity of our expanded sales force. We believe net sales in the MS market are now about 60% of total Acthar net sales.

*        *        *

[CARTT:] Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter we shipped a record 508 paid Acthar prescriptions for the treatment of MS relapses. This was an increase of 120% over the year ago period and 44% over the previous quarter. We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

*        *        *

Our promotional efforts are increasingly focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients and two, helping doctors, nurses and others in their medical practice become more effective at identifying potential Acthar patients.

*        *        *

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs. In these programs existing Acthar prescribers present to small groups of physicians their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses.

- 9 -

When combined with followup sales calls, these programs appear to be a key driver of our sales growth. Recently we've been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

40.     On July 26, 2011, Defendants caused the Company to issue a press release announcing its second quarter 2011 financial results. Defendants reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46.0 million for the second quarter of 2011. The release stated in part:

"Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow. Accordingly, growing MS sales remains our number one priority. Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

41.     After issuing its second quarter 2011 financial results on July 26, 2011, Defendants hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[CARTT:] During the quarter we shipped a record 751 paid Acthar prescription for the treatment of MS relapses. This was an increase of 147% over the year-ago period, and 48% over the previous quarter. We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected. In addition to rapid growth, our trends at MS are all very good and indicate that we are building momentum in this key Acthar market.

                    *          *          *

So, let's summarize. We are very pleased with the robust MS prescription growth during the quarter and expect continued growth during 2011 and into 2012 as a result of the continued sustained sales call activity. Our early prescription trends in nephrology are surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.

                    *          *          *

[BAILEY:] Our go-forward plan is extremely simple and remains to sell more Acthar. That is, gross sales in each of our key markets, MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets. In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow. We are continuing to focus on MS sales. The commercial team is highly motivated, highly incentivized and highly productive.

- 10 -

1  Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts. We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

42.  On October 25, 2011, Defendants caused the Company to issue a press release announcing its third quarter 2011 financial results. Defendants reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million for the third quarter of 2011. The release stated in part:

"Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

43.  After issuing its third quarter 2011 financial results on October 25, 2011, Defendants hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey and Cartt further presented prepared statements at the conference call and represented as follows:

[CARTT:] [W]e shipped 886 paid Acthar prescription for the treatment of MS relapses during the third quarter of 2011. This was an increase of 174% over the year-ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.

*       *       *

Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the annual meeting of the America Society of Nephrology, or ASN, held this year in Philadelphia. These abstracts are available on ASN's website, www.asnonline.org. The new data provides further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease.

We believe availability of this data provides further evidence for the direction [sic] action of Acthar on kidney disease. Importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology. Our emerging

- 11 -

understanding of the apparent immune-modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

44.     On January 11, 2011, *TheStreetSweeper.org ("Streetsweeper")* announced that it had initiated a short position in Questcor. *StreetSweeper* further reported that it intended to issue the first article in a two-part investigative series about Questcor in the following week. According to *StreetSweeper*:

> The first article raises serious questions about the aggressive marketing practices that [Questcor] has used to generate explosive – but potentially unsustainable – growth in prescriptions for its only drug while the second story further examines QCOR's business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy.

45.     Thereafter, Defendants went to extensive lengths to refute the claims raised by *StreetSweeper* and defend the Company's business practices. As a result, Questcor's stock continued to be artificially inflated.

46.     For instance, on January 11, 2012, Defendants caused the Company to issue a press release entitled "Questcor Pharmaceuticals Issues Statement," which stated in part:

> Questcor Pharmaceuticals, Inc. today announced it became aware that an investor blog is preparing to issue a report regarding the Company's marketing and business practices. Questcor issued the following statement:

> The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices. Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

47.     On February 22, 2012, Defendants caused the Company to issue a press release announcing its fourth quarter and full year 2011 financial results. Defendants reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million for the fourth quarter of 2011. Additionally, Defendants reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million for fiscal year 2011. The release stated in part:

- 12 -

"Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments."

48. After issuing its fourth quarter and full year 2011 financial results on February 22, 2012, Defendants hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:] As we look ahead to 2012 and beyond, we believe we can sustainably grow our Business due to three key factors. First, Acthar provides benefits to many difficult to treat patients not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small. And third, we have assembled an excellent, experienced commercial team to pursue our growth plan. Our focus remains on helping patients with serious, difficult to treat medical conditions.

\* \* \*

A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbations or relapses, particularly in those patients not well served by steroids, which are generally considered first line therapy by most neurologists. This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS. In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010. This is a 167% year-over-year increase. There were several factors behind this growth – positive patient outcome; increasing awareness among neurologists about how best to incorporate Acthar into their practices; continued excellent Acthar insurance coverage for MS relapses; and the increase in productivity of our MS commercial team – all combined to generate this growth.

\* \* \*

We believe that because Acthar provides real and substantial benefits to many patients who would otherwise continue to suffer the effects of serious, difficult-to-treat disorders, our growth should be sustainable. We are expanding the Organization and associated infrastructure to address the significant growth opportunities in front of us. At the same time, we are off to a good start to 2012, with January MS, NS, and IS paid prescription each having a good month.

49. On April 24, 2012, Defendants caused the Company to issue a press release announcing its first quarter 2012 financial results. Defendants reported net income of $38.5 million, or $0.58 diluted EPS, and net sales of $96.0 million for the first quarter of 2012. The release stated in part:

- 13 -

"While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor. "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."

50.     After issuing its first quarter 2012 financial results on April 24, 2012, Defendants hosted a conference call for analysts, media representatives and investors. During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:] Questcor's unconventional but simple business model continues to produce excellent financial results. Shift files, net sales and earnings were all up well over 100% year-over-year. We continue to expand nephrologist and neurologist awareness of patient benefits from Acthar, and as a result paid prescriptions continue to increase. Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologists to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October. The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that, by our calculation, nephritic syndrome scrip value now exceeds MS.

                    *          *          *

[CARTT:] Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options. Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact, data from one study at the University of Toronto, is being presented just this week at the Canadian nephrology society annual meeting. This particular study found that about two-thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy, had their proteinuria drop by 50% or more, due to Acthar treatment.

                    *          *          *

[YOUNG:] As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug. While quite rare, there are, in effect, few other successful examples of the type of product. Soliris and Botox come to mind, for example. We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications. In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs, where we and others believe Acthar could provide a significant clinical benefit. Currently, we have approximately 20 company-sponsored pre-clinical and clinical studies ongoing, and are supporting around 20 ongoing investigator-initiated studies.

- 14 -

1    51.    On July 9, 2012, Questcor's stock reached its relevant time period high of $57.64 per

2    share.

3    52.    On July 10, 2012, Citron issued an in-depth research report regarding Questcor. Citron

4    expanded on the *StreetSweeper* articles and further raised concerns about the Company's marketing

5    strategy and a possible generic threat to Acthar. The report discussed the competitive landscape for

6    Acthar and was critical of the Company's assertions that there were significant barriers to entry into the

7    market. Citron further questioned whether there was credible scientific data to support Questcor's

8    aggressive strategy to expand the use of Acthar for indications other than infantile spasms. In addition,

9    the research report analyzed the Company's marketing expenses and questioned how the drug was

10   being marketed to doctors. The Citron report further condemned Questcor for the lack of any

11   meaningful research and development being engaged in by the biopharmaceutical company. The report

12   noted: "Just the insider selling over the last year represents more cash than Questcor has spent on

13   research and development over its entire lifespan." The research report was not only critical of the

14   amount of insider selling over the past year but it was also critical about its timing given the Company

15   was buying back large amounts of Company stock at the same time the insiders were selling their

16   shares.

17   53.    Despite the serious allegations raised in the Citron report, Defendants continued to refute

18   the claims and portrayed the claims as being made by a short seller. As a result, Questcor's stock

19   continued to be artificially inflated.

20   54.    On July 24, 2012, Defendants caused the Company to issue a press release announcing

21   its second quarter 2012 financial results. Defendants reported net income of $41.5 million, or $0.65

22   diluted EPS, and net sales of $112.5 million for the second quarter of 2012. The release stated in part:

23   "In the second quarter, we surpassed $100 million in quarterly net sales for the
     first time in our history," said Don M. Bailey, President and CEO of Questcor. "Our
24   strong financial results were driven by increasing usage of Acthar among nephrologists
     and neurologists. With the expansion of our Nephrology Sales Force now complete, the
25   expansion of our Neurology Sales Force nearing completion, and the initial detailing
     effort of a small sales force in Rheumatology just getting started, we are optimistic
26   about the potential for Acthar to help an increasing number of patients with serious,
     difficult-to-treat autoimmune and inflammatory disorders."

27

28

55.     After issuing its second quarter 2012 financial results on July 24, 2012, Defendants hosted a conference call for analysts, media representatives and investors.  During the call, Defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young further presented prepared statements at the conference call and represented as follows:

[BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost doubled the number of shipped vials in the quarter, more than doubled net sales, and tripled earnings from the year-ago quarter. Paid scripts increased for both nephrotic syndrome and MS. We expanded two sales forces and started building a third sales force in Rheumatology, using the same formula that worked so well with MS and nephrotic syndrome. And, we also made good progress in both our science and compliance programs.

*       *       *

[CARTT:] Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients. This is not always the case, of course; not everyone responds. But, clearly, many patients are benefiting significantly from this drug, and there are few other treatment options available. All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

*       *       *

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

*       *       *

[YOUNG:] As you can see by our operating results reported in today's press release, we have been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects – our objectives are to produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond current on-label indications. Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research. Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH in the clinical role of Acthar Gel.

*       *       *

In summary, I'd like to bring you back to my initial topic on R&D expansion. As we have previously reported, our R&D efforts have been and are continuing to focus on three areas. First, producing additional supporting data for the commercial team for on-label indications. Second, expanding Acthar Gel use beyond the existing on-label indications and following FDA processes. And third, our greatest priority, better understanding the unique chemical, biological, and clinical characteristics of Acthar Gel. Our research results from this third area, thus far, suggest that developing a generic drug for Acthar Gel is very challenging. All three areas of research are intended to

- 16 -

advance the science of Acthar Gel in order to further help patients with devastating autoimmune and inflammatory diseases.

## C. **The Truth Begins to Emerge**

56.     On September 19, 2012, Citron reported that Aetna, one of the nation's largest insurers, had recently revised its policy concerning Acthar, which would severely limit coverage of Questcor's primary drug. Aetna had engaged in a review of the 19 indications for which the FDA had approved Acthar. Based upon its findings, Aetna decided that clinical research supported only one of the 19 indications. In Aetna's clinical policy bulletin issued in connection with its review, Aetna reported that studies suggested that the drug is only "medically necessary" for West syndrome, a rare condition that causes infantile spasms, and not for other indications, such as MS, that are treated with steroids. Aetna generally only reimburses for drugs when they are deemed medically necessary. According to an Aetna spokesperson, "Our previous position was that this was a last-resort treatment. . . . We now state that it is not medically necessary because there is no clinical evidence that the drug is more effective than steroids."

57.     On this news, Questcor's stock plummeted $24.16 per share to close at $26.25 per share on September 19, 2012, a one-day decline of nearly 48% on high volume.

58.     Subsequently, on September 19, 2012, Defendants caused the Company to issue a press release entitled "Questcor Comments on Insurance Policy Bulletin," which stated in part:

> The Company is continuing to review the Clinical Policy Bulletin related to Acthar from Aetna Inc. ("Aetna"). Currently, the Company does not believe that the bulletin represents a material change in insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar. Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

59.     Then, on September 24, 2012, Defendants announced in a Form 8-K filed with the SEC that the U.S. government had initiated an investigation into the Company's promotional practices.

60.     After this news, Questcor's stock dropped $11.05 per share to close at $19.08 per share on September 24, 2012, a decline of 37% on high volume.

61.     The true facts, which were known by the Defendants but concealed from the investing public, were as follows:

- 17 -

(a)     Defendants lacked clinical evidence to support the use of Acthar for indications other than infantile spasms;

(b)     Defendants had engaged in questionable tactics to promote the sale and use of Acthar in the treatment of MS and nephrotic syndrome; and

(c)     Defendants lacked a reasonable basis to make positive statements about the Company or its outlook, including statements about the effectiveness of and potential market growth for Acthar.

62.     As a result of Defendants' false and misleading statements, Questcor stock traded at artificially inflated levels. However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down 67% from their relevant time period high.

63.     Further, as a result of Defendants' breaches of fiduciary duty and other misconduct, the price of the Company's stock still has not recovered and currently trades for around $19.40 per share.

## DERIVATIVE AND DEMAND ALLEGATIONS

64.     Plaintiff brings this action derivatively in the right and for the benefit of Questcor to redress the breaches of fiduciary duty and other violations of law by Defendants.

65.     Plaintiff will adequately and fairly represent the interests of Questcor and its shareholders in enforcing and prosecuting its rights.

66.     The Board currently consists of the following seven (7) directors: defendants Thompson, Bailey, Blutt, Bradsher, Farrell, Silverman, and Whitcup. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

(a)     At all relevant times, defendants Thompson, Blutt, and Farrell served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the integrity of the Company's internal controls. Defendants Thompson, Blutt, and Farrell breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-

- 18 -

discussed internal control failures, which resulted in the improper marketing of Acthar. Therefore, defendants Thompson, Blutt, and Farrell each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

(b)    At all relevant times, defendants Whitcup, Farrell, and Thompson served as members of the Compliance Committee. Pursuant to the Company's Compliance Committee Charter, the members of the Compliance Committee were and are responsible for, *inter alia*, reviewing and reporting to the Board the status of the Company's compliance with relevant laws, regulations, and internal procedures including compliance with U.S. pharmaceutical product promotional rules and regulations. Defendants Whitcup, Farrell, and Thompson breached their fiduciary duties of due care, loyalty, and good faith, because the Compliance Committee, *inter alia*, allowed or permitted the Company to engage in the illicit promotional activities described herein. Therefore, defendants Whitcup, Farrell, and Thompson each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

(c)    The principal professional occupation of defendant Bailey is his employment with Questcor as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, according to the Company's Proxy Statement filed on March 30, 2012, Defendants have admitted that defendant Bailey is not independent. Thus, defendant Bailey lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

67.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Questcor disseminated accurate, truthful and complete information to its shareholders.

- 19 -

1      69.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or

2 allowing the Company to disseminate to Questcor shareholders materially misleading and inaccurate

3 information through, *inter alia*, SEC filings, press releases, conference calls, and other public

4 statements and disclosures as detailed herein. These actions could not have been a good faith exercise

5 of prudent business judgment.

6      70.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties,

7 the Company has suffered significant damages, as alleged herein.

8

9 **COUNT II**

10 **AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES
FOR FAILING TO MAINTAIN INTERNAL CONTROLS**
11

12      71.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set

13 forth herein.

14      72.    As alleged herein, each of the Defendants (and particularly the Audit Committee

15 Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the

16 Company's financial statements were prepared in accordance with GAAP, and, when put on notice of

17 problems with the Company's business practices and operations, exercise good faith in taking

18 appropriate action to correct the misconduct and prevent its recurrence.

19      73.    Defendants willfully ignored the obvious and pervasive problems with Questcor's

20 internal controls and practices and procedures and failed to make a good faith effort to correct these

21 problems or prevent their recurrence.

22      74.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary

23 duties, the Company has sustained damages.

24 **COUNT III**

25 **AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING
TO PROPERLY OVERSEE AND MANAGE THE COMPANY**
26

27      75.    Plaintiff incorporates by reference and realleges each and every allegation contained

28 above, as though fully set forth herein.

- 20 -

76.     Defendants owed and owe Questcor fiduciary obligations. By reason of their fiduciary relationships, Defendants specifically owed and owe Questcor the highest obligation of good faith, fair dealing, loyalty and due care.

77.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

78.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Questcor has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

79.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

80.     Plaintiff, on behalf of Questcor, has no adequate remedy at law.

## COUNT IV

## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Questcor.

83.     Plaintiff, as a shareholder and representative of Questcor, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## COUNT V

## AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Questcor, for which they are legally responsible.  In particular, Defendants abused their

- 21 -

positions of authority by causing or allowing Questcor to misrepresent material facts regarding its financial position and business prospects.

86. As a direct and proximate result of Defendants' abuse of control, Questcor has sustained significant damages.

87. As a result of the misconduct alleged herein, Defendants are liable to the Company.

88. Plaintiff, on behalf of Questcor, has no adequate remedy at law.

## COUNT VI

## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

89. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90. Defendants had a duty to Questcor and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Questcor.

91. Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Questcor in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Questcor's affairs and in the use and preservation of Questcor's assets.

92. During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Questcor to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Questcor, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged Questcor.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

- 22 -

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Questcor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Questcor restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 4, 2012

                                          THE WEISER LAW FIRM, P.C.


                                          KATHLEEN A. HERKENHOFF (168562)

                                          12707 High Bluff Drive, Suite 200
                                          San Diego, CA 92130
                                          Telephone: 858-794-1441
                                          Facsimile: 858-794-1450

- 23 -

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT STECKER
JEFFREY CIARLANTO
22 Cassatt Avenue
First Floor
Telephone: (610) 225-2677
Facsimile:  (610) 408-8026

RYAN & MANISKAS, LLP
KATHARINE M. RYAN
RICHARD A. MANISKAS
995 Old Eagle School Rd., Suite 311
Wayne, PA 19087
Telephone:  (484) 588-5516
Facsimile:  (484) 450-2582

Counsel for Plaintiff

- 24 -

## VERIFICATION

I, Bruce Johnson, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action. I have read the foregoing Complaint and authorized its filing. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED: 10/3/2012

Bruce Johnson

# EXHIBIT C

Avi Wagner (SBN 226688)
THE WAGNER FIRM
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 491-7949
Facsimile: (310) 694-3967
Email: avi@thewagnerfirm.com

*Attorneys for Plaintiff Nilabrata Goswami*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NILABRATA GOSWAMI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, VIRGIL D. THOMPSON, MITCHELL J. BLUTT, and STEPHEN C. FARRELL<br><br>Defendants,<br><br>-and-<br><br>QUESTCOR PHARMACEUTICALS, INC.,<br><br>Nominal Defendant. | Case No.<br>SACV12 1753 CJC (MLGx)<br><br>**CLASS ACTION**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND CONTRIBUTION AND INDEMNIFICATION**<br><br>**DEMAND FOR JURY TRIAL** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Nilabrata Goswami ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

2.    This Court has jurisdiction over each defendant because each

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 1 -

defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

3.     Venue is proper in this Court under 28 U.S.C. §1391(a) because (1) one or more of defendants reside in, or maintain executive offices in, this district; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts described herein, occurred within this District; and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have an impact in this District.

4.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

5.     Plaintiff as set forth in the attached Certification, was a shareholder of Questcor at the time of the wrongs complained of, has continuously been a shareholder since that time and is a current shareholder.

6.      Nominal Defendant Questcor is a California corporation with principal executive offices located at 1300 North Kellogg Drive, Suite D, Anaheim, California 92807.  Questcor's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "QCOR."

7.      Defendant Don M. Bailey ("Bailey") was, at all relevant times, the Company's President and Chief Executive Officer.

8.      Defendant Michael H. Mulroy ("Mulroy") was, at all relevant times, the Company's Chief Financial Officer, Secretary and General Counsel.

9.      Defendant Stephen L. Cartt ("Cartt") was, at all relevant times, the Company's Chief Operating Officer.

10.     Defendant David Young ("Young") was, at all relevant times, the Company's Chief Scientific Officer.

11.     Defendant Virgin D. Thompson ("Thompson") was, at all relevant times, a member of the Company's audit committee.

12.     Defendant Mitchell J. Blutt ("Blutt") was, at all relevant times, a member of the Company's audit committee.

13.     Defnedant Stephen C. Farrell ("Farrell) was, at all relevant times, the chair of the Company's audit committee.

14.     The defendants referenced above in ¶¶ 7 through 13 are sometimes referred to herein as the "Individual Defendants." Because of the Individual

Defendants' positions with the Company, they had access to key adverse but undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and through reports and other information provided to them in connection therewith.

15.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Questcor, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition as these defendants were involved in drafting, producing, reviewing and/or disseminating the false and

1   misleading statements and information alleged herein, were aware, or recklessly

2   disregarded, that the false and misleading statements were being issued

3
    regarding the Company, and approved or ratified these statements, in violation of
4

5   the federal securities laws.

6
        16.    As officers and controlling persons of a publicly-held company
7

8   whose common stock has been, at all relevant times, registered with the SEC

9
    under the Exchange Act which is traded on the NASDAQ, and is governed by
10

11  the provisions of the federal securities laws, the Individual Defendants each had

12  a duty to promptly disseminate accurate and truthful information with respect to

13
    the Company's financial condition and performance, growth, operations,
14

15  financial statements, business, markets, management, earnings and present and

16  future business prospects, and to correct any previously-issued statements that

17
    had become materially misleading or untrue, so that the market price of the
18

19  Company's publicly-traded common stock would be based upon truthful and

20
    accurate information. The Individual Defendants' misrepresentations and
21

22  omissions violated these specific requirements and obligations.

23
        17.    The Individual Defendants participated in the drafting, preparation,
24

25  and/or approval of the various public and shareholder and investor reports and

26  other communications complained of herein and were aware of, or recklessly

27
    disregarded, the misstatements contained therein and omissions therefrom, and
28

were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Questcor, each of the Individual Defendants had access to the adverse undisclosed information about Questcor's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Questcor and its business issued or adopted by the Company materially false and misleading.

18.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period. Further, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit by

disseminating materially false and misleading statements and/or concealing material adverse facts, which has severely damaged Questcor and its shareholders by extension.

## SUBSTANTIVE ALLEGATIONS

### Background

20.    Nominal Defendant Questcor is a company with a single product, a highly specialized, low volume, expensive drug originally approved by the FDA in 1952.  It has since been approved for use in 19 indications, but primarily for infantile spasms, a rare seizure disorder affecting about 1,500 infants a year in the U.S.  In 1978, Acthar was approved for treatment of MS relapse and was used extensively in the 1970s for that purpose, until corticosteroids came on the market and proved to be a superior alternative.

21.    On April 4, 2011, Questcor issued a press release announcing its preliminary first quarter 2011 results.  The press release stated the following in relevant part:

> New, paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of exacerbations of multiple sclerosis (MS) during the quarter were greater than 500, up over 115% from the year ago period and up over 40% from the prior quarter.

> New, paid prescriptions for infantile spasms (IS) were estimated at 88.

> New, paid prescriptions for nephrotic syndrome (NS) were estimated at 18.

2,010 vials of the Company's principal drug, Acthar, were shipped during the quarter ended March 31, 2011.

Gross sales were $48.6 million.

* * *

"The strong performance we saw late in the fourth quarter of 2010 has continued in the first quarter of 2011 and was driven by the increasing productivity of our recently expanded Acthar sales force. March showed significant growth in MS prescriptions and exceeded February's record performance by over 50%. In addition, we are pleased with the very early results from the efforts of our small dedicated Nephrology sales team. While we are very encouraged by the first quarter new prescription results, we note that prior sharp increases in sequential quarterly Acthar prescriptions have usually been followed by more modest sequential growth," said Don M. Bailey, President and CEO of Questcor Pharmaceuticals.

22.    On April 26, 2011, the Company issued a press release announcing financial results for the first quarter ended March 31, 2011.  Specifically, the Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011 as compared to net income of $8 million, or $0.12 diluted EPS, and net sales of $26.2 million for the same period a year ago.  The press release stated the following in relevant part:

> The Company's financial performance was driven by a 120% year-over-year increase in the number of new paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of multiple sclerosis (MS) exacerbations. In the first quarter, paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) increased to 18 while prescriptions for the treatment of infantile spasms (IS) were 89, which is within the historic range for IS.

"Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing. In addition, during the second quarter we will initiate a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy. Acthar is indicated 'to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus'."

23. After issuing its first quarter 2011 financials, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey and Cartt further represented the following in relevant part:

[BAILEY:] In summary, we are off to a very good start this year as we continued to execute our straightforward strategy to sell more Acthar. Our decision to expand the MS sales force is clearly paying off. Also, our nephrotic syndrome sales force is having some early success.

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 9 -

We believe this MS sales performance reflects the strong underlying demand for Acthar. This growth in demand is being driven by the increasing productivity of our expanded sales force.

We believe net sales in the MS market are now about 60% of total Acthar net sales.

\* \* \*

[CARTT:]    Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter, we shipped a record 508 paid Acthar prescriptions, for the treatment of MS relapses. This was an increase of 120% over the year ago period and 44% over the previous quarter.

We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

\* \* \*

[O]ur promotional efforts are increasingly focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients, and two, helping doctors, nurses, and others in their medical practice become more effective at identifying potential Acthar patients.

\* \* \*

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs.

In these programs, existing Acthar prescribers present to small groups of physicians, their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses. When combined with follow-up sales calls, these programs appear to be a key driver of our sales growth.

Recently, we have been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

24.    On April 27, 2011, Questcor filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.    In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.    In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $11.3 million for the three months ended March 31, 2011, as compared to $6.7 million for the three months ended March 31, 2010. The increase of $4.6 million in 2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we doubled the size of our sales organization, increasing the sales force to 77 Acthar specialists and an additional five nephrology sales representatives.

26.    On July 26, 2011, the Company issued a press release announcing financial results for its second quarter ended June 30, 2011.  For the quarter, the Company reported net income of $13.9 million, or $0.21 diluted EPS, and net

sales of $46.0 million as compared to net income of $9.3 million, or $0.14 diluted EPS, and net sales of $28.3 million for the same period a year ago. The press release stated the following in relevant part:

> 147% year-over-year increase in the number of paid H.P. Acthar® Gel (Acthar) prescriptions for the treatment of multiple sclerosis (MS) exacerbations led to increased shipments of Acthar vials. Paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) also increased sharply in the quarter. In addition, paid Acthar prescriptions for the treatment of infantile spasms (IS) were at the highest quarterly level since the third quarter of 2008.

> "Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow. Accordingly, growing MS sales remains our number one priority. Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

> "To generate data in support of the expanded nephrology selling effort, we recently initiated a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy," continued Mr. Bailey. "And, today, we are announcing our fourth on-label target market for Acthar, systemic lupus erythematosus. We believe that this market has many of the same characteristics as our other three vertical markets for Acthar--MS, NS and IS."

27.     After issuing its second quarter 2011 financial results on July 26, 2011, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey,

Cartt and Young represented the following in relevant part:

> [CARTT:] During the quarter we shipped a record 751 paid Acthar prescriptions for the treatment of MS relapses. This was an increase of 147% over the year-ago period, and 48% over the previous quarter. We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected. In addition to rapid growth, our trends at MS are all very good and indicate that we are building momentum in this key Acthar market.
>
> * * *
>
> So let's summarize. We are very pleased with the robust growth during the quarter and expect continued growth during 2011 and into 2012 as a result of the continued sustained sales call activity. Our early prescription trends in nephrology are surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.
>
> * * *
>
> [BAILEY:] Our go-forward plan is extremely simple and remains to sell more Acthar. That is, gross sales in each of our key markets. MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets. In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow. We are continuing to focus on MS sales. The commercial team is highly motivated, highly incentivized and highly productive.
>
> Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts. We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

28. On July 29, 2011, Questcor filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by

Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

29. In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $14.7 million for the three months ended June 30, 2011, as compared to $6.0 million for the three months ended June 30, 2010. The increase of $8.7 million in 2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build-on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists who treat patients for MS or IS, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we are significantly expanding our NS selling effort. Specifically, we are in the process of hiring approximately 23 additional representatives for our Nephrology Sales Force and we are giving a limited supportive selling role to our 77 representative Specialty Sales Force.

30. On October 25, 2011, Questcor issued a press release announcing financial results for its third quarter ended September 30, 2011. For the quarter, the Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million, as compared to net income of $11.5 million, or $0.18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 14 -

diluted EPS, and net sales of $31.3 million for the same period a year ago.  The release stated the following in relevant part:

> "Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

> "Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

31.     After issuing its third quarter 2011 financial results on October 25, 2011, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey and Cartt represented the following in relevant part:

> [CARTT:]   [W]e shipped 886 paid Acthar prescriptions for the treatment of MS relapses during the third quarter of 2011. This was an increase of 174% over the year ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.

*  *  *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 15 -

Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the Annual Meeting of the American Society of Nephrology or ASN held this year in Philadelphia. These abstracts are available on ASN's website www.asn-online.org. The new data provides further insight into the immune modulating and other therapeutic properties of Acthar specifically relating to kidney disease.

We believe the availability of this data provides further evidence for the direct action of Acthar on kidney disease. And importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology. Our emerging understanding of the apparent immune modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

32.     On October 27, 2011, Questcor filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

Selling and marketing expenses were $13.7 million for the three months ended September 30, 2011, as compared to $7.7 million for the three months ended September 30, 2010. The increase of $6.1 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs and costs associated with our expanded

sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we have significantly expanded our NS selling effort. Specifically, we have hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to our 77 representative Specialty Sales Force.

34.     On January 11, 2012, *TheStreetSweeper.org* issued an article stating that it would publish the first part of a two-part investigative series about Questcor in the following week. The article stated the following in relevant part:

The first article raises serious questions about the aggressive marketing practices that QCOR has used to generate explosive – but potentially unsustainable – growth in prescriptions for its only drug while the second story further examines QCOR's business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy.

35.     In response to the *StreetSweeper* article, Questcor's stock price dropped $6.20 per share or nearly 15%, to close at $35.34 per share on January 11, 2012.

36.     On January 11, 2012, Questcor issued a press release entitled "Questcor Pharmaceuticals Issues Statement," which stated in relevant part:

Questcor   Pharmaceuticals,   Inc.   (NASDAQ:   QCOR)   today announced it became aware that an investor blog is preparing to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 17 -

issue a report regarding the Company's marketing and business practices. Questcor issued the following statement:

The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices. Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

37.     On February 22, 2012, Questcor issued a press release announcing financial results for its fourth quarter and year ended December 31, 2011. For the quarter, the Company reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million as compared to net income of $6.4 million, or $0.10 diluted EPS, and net sales of $29.3 million for the same period a year ago. For the year, the Company reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million as compared to net income of $35 million, or $0.54 diluted EPS and net sales of $115.1 million for the same period a year ago. The release stated in relevant part:

"Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 18 -

to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments."

38. Also on February 22, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendants Bailey and Mulroy, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39. In connection with its marketing and promotion activities, the 10-K stated the following in relevant part:

Selling and marketing expenses were $56.7 million for the year ended December 31, 2011, as compared to $31.5 million in 2010 and $19.3 million in 2009. The increase of $25.2 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team and increased bonus compensation for other Company employees, and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial

Nephrology Sales Force was comprised of five representatives and, based on the results of their efforts, we significantly expanded our NS selling effort. Specifically, we hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to the 77 representatives in our Specialty Sales Force. While we have announced our intention to expand our MS and NS sales forces in 2012, our prescription growth trend may not continue and/or our sales force expansions intended for 2012 may not be successful. The process of significantly expanding a sales force in the biopharmaceutical industry is complex. We modify and re-allocate individual sales territories across our enlarged sales force, which can cause temporary disruptions in our selling efforts. Additionally, while the cost of our new sales representatives impacts our operating expenses immediately, there can be a delay in the expected ability of our new representatives to increase our net sales due to the time it takes for us to train the new representatives and for the new representatives to establish professional relationships with prescribing physicians within their territories.

40.     After issuing its fourth quarter and full year 2011 financial results, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:]  As we look ahead to 2012 and beyond, we believe we can sustain and re-grow our business due to three key factors. First, Acthar provides benefits to many difficult-to-treat patients, not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar while growing remains relatively small and third, we have [assembled an excellent,] experienced commercial team to pursue our growth plan.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 20 -

Our focus remains on helping patients with serious difficult-to-treat medical conditions.

\* \* \*

[CARTT:]  A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbation or relapses, particularly in those patients not well served by steroid, which are generally considered first line therapy by most neurologists. This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS.

In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010. This is a 167% year-over-year increase. There were several factors behind this growth; positive patient outcome, increasing awareness among neurologists about how best to incorporate Acthar into their practices, continued excellent Acthar insurance coverage for MS relapses and the increase in productivity of our MS commercial team, all combined to generate this growth.

\* \* \*

We believe that because Acthar provides real and substantial benefits to many patients who would otherwise continue to suffer the effects of serious, difficult-to-treat disorders, our growth should be sustainable.  We are expanding the Organization and associated infrastructure to address the significant growth opportunities in front of us.  At the same time, we are off to a good start to 2012, with January MS, NS, and IS paid prescription each having a good month.

41.    On April 24, 2012, Questcor issued a press release announcing financial results for its first quarter ended March 31, 2012.  The Company reported net income of $38.5 million, or $0.58 diluted EPS, and net sales of $96.0 million, as compared to net income of $11.2 million, or $0.17 diluted EPS, and net sales of $36.8 million for the same period a year ago.  The release stated the following in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 21 -

"While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor. "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."

42.     After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:]  Questcor's unconventional, but simple business model continues to produce excellent financial results. Shift files, net sales and earnings will all up well over 100% year-over-year. We continued to expand nephrologist and neurologist awareness, our patient benefits from Acthar and as a result, pay prescriptions continue to increase.

Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologist to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October. The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that by our calculation, nephrotic syndrome scrip value now exceeds MS.

* * *

[CARTT:] Insurance reimbursements for Acthar and nephrotic syndrome continues to be very good with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome, if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 22 -

Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact data from one study at the University of Toronto is being presented just this week at the Canadian Nephrology Society Annual Meeting. This particular study found that about two thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy had their proteinuria drop by 50% or more due to Acthar treatment.

* * *

[YOUNG:] As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug. While quite rare, there are, in effect, a few other successful examples of the type of product. Soliris and Botox come to mind, for example. We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications.

In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs where we and others believe Acthar could provide a significant clinical benefit.

Currently, we have approximately 20 company-sponsored pre-clinical and clinical studies ongoing, and are supporting around 20 ongoing investigator-initiated studies.

43. On April 26, 2012, Questcor filed a quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 23 -

changes to the Company's internal control over financial reporting.

44.     In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $21.7 million for the three months ended March 31, 2012, as compared to $11.3 million for the three months ended March 31, 2011. The increase of $10.5 million in 2012 as compared to 2011 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team, and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives, later increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and is currently being expanded to 58 representatives.

45.     On July 10, 2012, Citron Research issued an in-depth research report on Questcor.  Citron expanded on the *StreetSweeper.org* articles and further raised concerns about the Company's marketing strategy and a possible generic threat to Acthar.  The report discussed the competitive landscape for Acthar and was critical of the Company's assertions that there were significant barriers to entry into the market:  "[It] is evident that Questcor's Acthar label simply copies the language of the previously approved generic product label for ACTH − no sign of the 'secret sauce' the company's misleading language suggests."  Citron further questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms.  In addition, the research report analyzed

the Company's marketing expenses and questioned how the drug was being marketed to doctors: "The sales and marketing for HP Acthar Gel is now up to $6,100 a vial . . . **more than 5 X the original price of the drug before Questcor became involved.**" [Emphasis in original.] The Citron report criticized Questcor for the lack of any meaningful research and development by the Company: "Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan," the report stated. The Citron report was not only critical of the amount of insider selling over the past year but was also critical of its timing: "[W]henever we see **large insider selling at the same time the company is buying back large amounts of stock,** it is an ominous sign." [Emphasis in original.]

46. On July 10, 2012, Questcor's common stock dropped $12.57 per share or nearly 22%, to close at $45.07 per share on July 10, 2012.

47. On July 24, 2012, Questcor issued a press release announcing financial results for its second quarter ended June 30, 2012. The Company reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million, as compared to net income of $13.9 million, or $0.21 diluted EPS, and net sales of $45.9 million for the same period a year ago. The release stated in relevant part:

> "In the second quarter, we surpassed $100 million in quarterly net
> sales for the first time in our history," said Don M. Bailey,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 25 -

President and CEO of Questcor. "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists. With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

48.     After issuing its second quarter 2012 financial results on July 24, 2012, Questcor hosted a conference call where Defendants reiterated the record financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost doubled the number of shipped vials in the quarter more than doubled net sales and tripled earnings from the year ago quarter. Paid scripts increased for both nephrotic syndrome and MS. We expanded two sales forces and starting building a third sales force in rheumatology using the same formula that works out well with MS and nephrotic syndrome. And we also made good progress in both our science and compliance programs.

* * *

[CARTT:] Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients. This is not always the case, of course, not everyone responds, but clearly, many patients are benefiting significantly from this drug and there are few other treatment options available. All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

\* \* \*

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

\* \* \*

[YOUNG:] As you can see by our operating results reported in today's press release we've been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects are objective to produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond the current on-label indications.

Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research. Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH and the clinical roles of Acthar Gel.

\* \* \*

In summary, I'd like to bring you back to my initial topic on our R&D efforts. We have previously reported our R&D efforts have been and are continuing to focus on three areas. First, producing its additional supporting data for the commercial team for on-label indications. Second, extending Acthar use -- Acthar Gel use beyond existing on-label indications in the following FDA processes. And third, our greatest priority, better understanding the unique chemical, biological and clinical characteristics of Acthar Gel.

Our research results from this third area thus far suggest that development of generic drugs of Acthar Gel is very challenging. All three areas of research are intended to advance the science of Acthar Gel in order to improve to help patients with devastating autoimmune and inflammatory diseases.

49. On July 25, 2012, Questcor filed a quarterly report for the period

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 27 -

ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

50.    In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $27.6 million for the three months ended June 30, 2012, as compared to $14.7 million for the three months ended June 30, 2011 . The increase of $12.9 million in 2012 as compared to 2011 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that details Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and commenced activities in the second quarter of 2011. This sales force was increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and as of May 29, 2012 was expanded further to 58 representatives.

51.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company was disseminating false and misleading statements to the public as to the efficacy of its 60-year-old drug, Acthar, as a

treatment for multiple sclerosis and for nephrotic syndrome; (ii) the Company was marketing Acthar aggressively as a treatment for these conditions, with an inadequate compliance program to monitor such marketing; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

### The Truth Emerges

52.     On September 19, 2012, Citron reported that insurance giant Aetna had recently revised its policy to severely limit coverage of Questcor's primary drug, Acthar.  Aetna's findings concluded that clinical research supported only one of the 19 indications, that it was only "medically necessary" for treatment of West syndrome, a rare condition that causes infantile spasms, and not for other indications such as MS which are treated with steroids.  According to Aetna's Clinical Policy Bulletin:

I.      Aetna considers repository corticotropin (H.P. Acthar® Gel) medically necessary for West syndrome (infantile spasms)

II.     Aetna considers repository corticotropin not medically necessary for diagnostic testing of adrenocortical function because it has not been shown to be superior to cosyntropin for this purpose.

III.    Aetna considers repository corticotropin not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications.

IV.     Aetna considers repository corticotropin experimental and investigational for all other indications because its effectiveness for these indications has not been established.

\*\*\*

ACTH Gel [such as Acthar] is rarely necessary for . . . corticosteroid-responsive conditions [including MS and nephrotic syndrome]. . . . In addition, there are a lack of clinical studies comparing the effectiveness of ACTH gel to corticosteroids in corticosteroid-responsive conditions. Also, because of uncertainties in the effect of ACTH gel on the magnitude of endogenous cortisol production, ACTH gel has the potential for inducing significant adverse effects.

53.     Later in the day, Questcor issued a press release entitled "Questcor Comments on Insurance Policy Bulletin," stated the following in relevant part:

The Company is continuing to review the Clinical Policy Bulletin related to Acthar from Aetna Inc. ("Aetna"). Currently, the Company does not believe that the bulletin represents a material change in insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar. Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

54.     On this news, Questcor's stock dropped $24.17 per share or nearly 48%, to close at $26.35 per share on September 19, 2012.

55.     On September 24, 2012, Questcor announced in a Form 8-K that the U.S. government had initiated an investigation into the Company's promotional practices.

56.     On this news, Questcor's stock dropped $11.05 per share, or almost 37%, to close at $19.08 per share on September 24, 2012.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 30 -

### Defendants' Duties

57.     By reason of their positions as officers, directors, and fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

58.     Defendants, because of their positions of control and authority as directors and officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company.

59.     To discharge their duties, the officers and directors of the Company

were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

a) exercise good faith to ensure the Company's affairs were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b) exercise good faith to ensure the Company operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

c) when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

60. Plaintiff brings this action derivatively in the right and for the benefit of Questcor to redress injuries suffered, and to be suffered, by Questcor as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Questcor is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

61. Plaintiff will adequately and fairly represent the interests of

Questcor and its shareholders in enforcing and prosecuting its rights.

62.     Plaintiff is the owner of Questcor common stock and was the owner of Questcor common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

63.     At the time that this action was commenced, the Questcor Board was comprised of, among others, the Individual Defendants.

64.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Questcor Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

   a.     Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action.

   b.     Questcor's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards.  These defendants are also interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options.  The following charts illustrate the substantial compensation that these directors have received, which demonstrates that demand upon such individuals would be futile:

| 2011 | | | | |
|---|---|---|---|---|
| Executive | Base Salary | Options Awards | Non-Equity Incentive Plan Compensation | TOTAL |
| Bailey | $584,8755 | $2,628,815 | $1,332,540 | $4,546,230 |
| Mulroy | $342,147 | $938,863 | $466,881 | $1,749,891 |
| Cartt | $389,917 | $1,126,635 | $781,756 | $2,298,308 |
| Young | $424,320 | $751,090 | $773,394 | $1,948,804 |

     c.     The entire Questcor Board and senior management participated in the wrongs complained of herein. For the reasons described herein, Questcor's directors are not disinterested or independent. Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs. Each of the above referenced defendants breached the fiduciary duties they owed to Questcor and its shareholders in that they failed to prevent and correct the dissemination of the Company false and misleading statements. Thus, the Questcor Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome because their actions have subjected Questcor to millions of dollars in potential liability for violations of applicable securities laws;

d. Individual Defendants certified certain of Questcor's SEC filings. Accordingly, demand is futile as he faces a substantial likelihood of liability for breach of fiduciary duties owed to Questcor;

e. Individual Defendants were aware of the Company's ongoing unlawful and improper business practices and the dissemination of materially false and misleading statements.

f. Defendants Thompson, Blutt, and Farrell served on Questcor's Audit Committee during the Relevant Period. Defendant Farrell was the chairman of Questcor's Audit Committee during the Relevant Period. The purpose of Questcor's Audit Committee was to assist the Board in fulfilling its oversight responsibilities for financial matters. Specifically, the Audit Committee was to assist the Board in: (1) identifying and recommending to the Board individuals qualified to become members of our Board and to fill vacant Board positions; (2) recommending to the Board the director nominees for the next annual meeting of shareholders; (3) recommending to the Board director committee assignments; (4) recommending to the Board the compensation for Company directors; (5) reviewing and evaluating succession planning for our Chief Executive Officer and other executive officers; (6) monitoring the continuing education program for our directors; and (7) evaluating annually the Nominations and Corporate Governance Committee charter. The Audit Committee, moreover, is responsible for oversight

of the Company's financial reporting process, including the effectiveness of the Company's internal accounting and financial controls and procedures, and controls over the accounting, auditing, and financial reporting practices. Additionally, the Audit Committee met privately, outside the presence of Questcor's management, with the Company's independent registered public accounting firm to discuss, among other matters, all communications required by standards of the Public Company Accounting Oversight Board, including the matters required to be discussed by PCAOB AU 380, *Communication with Audit Committees*, and Rule 2-07, *Communication with Audit Committees*, of Regulation S-X. As part of its oversight role with respect to the Company's financial statements and the public disclosure of the Company's financial results, moreover, the Company's Audit Committee regularly reviewed and discussed with Questcor's management the financial statements included in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, its quarterly earnings releases, and the financial guidance that the Company provided to analysts, ratings agencies, and the public. The Audit Committee also met regularly in separate executive sessions with Questcor's CFO, Chief Accounting Officer, and other members of the Company's executive management team. As a result, Defendants Thompson, Blutt, and Farrell knew, or should have known, of the Company's wrongdoing alleged herein, but intentionally or recklessly violated

their duties as members of the Audit Committee. Specifically, because of these duties and responsibilities – particularly the Audit Committee's responsibility to discuss the Company's financial information and earnings guidance with Questcor's management prior to release – members of the Audit Committee were aware that Questcor's positive statements about the Company's prospects and growth were made without a reasonable basis. Indeed, through such discussions with Questcor's management, the Audit Committee was aware or should have been aware of the significant problems with Acthar. Further, the Audit Committee was aware or should have been aware that these processes lacked effective supervision and oversight and the Company's operating efficiencies had been hindered. As such, Defendants breached their fiduciary duties of loyalty and good faith to the Company. Additionally, the failure of the Individual Defendants to perform their duties as members of the Audit Committee with loyalty and in good faith raises a substantial likelihood of non-exculpated personal liability on their part. As a result, the Individual Defendants cannot impartially consider a demand on the Board to commence litigation against themselves;

g. Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

h. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

i. In order to bring this suit, all of Questcor's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

j. The acts complained of constitute violations of the fiduciary duties owed by Questcor's officers and directors and these acts are incapable of ratification;

k. Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

l. Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and Questcor to further violations of the securities laws that would result in civil actions being filed against one or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 38 -

Exhibit C, Page 113

more of the Individual Defendants, thus, they are hopelessly conflicted in making

any supposedly independent determination whether to sue themselves;

m. Questcor has been, and will continue to be, exposed to significant

losses due to the wrongdoing complained of herein, yet the Individual Defendants

have not filed any lawsuits against themselves or others who were responsible for

that wrongful conduct to attempt to recover for Questcor any part of the damages

Questcor suffered and will suffer thereby; and

o. If the current directors were to bring this derivative action against

themselves, they would thereby expose their own misconduct, which underlies

allegations against them contained in a class action complaint for violations of

securities law, which admissions would impair their defense of the class action

and greatly increase the probability of their personal liability in the class action, in

an amount likely to be in excess of any insurance coverage available to the

Individual Defendants.  Thus, the Individual Defendants would be forced to take

positions contrary to the defenses they will likely assert in the securities class

action.

p. Moreover, despite the Individual Defendants having knowledge of

the claims and causes of action raised by Plaintiff, the current Board has failed

and refused to seek to recover for Questcor for any of the wrongdoing alleged by

plaintiff herein.

65. Plaintiff, moreover, has not made any demand on shareholders of Questcor to institute this action since demand would be a futile and useless act for the following reasons:

a. Questcor is a publicly held company with over 59.6 million shares outstanding, and thousands of shareholders;

b. Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders; and

c. Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

66. Furthermore, the conduct complained of herein could not have been the product of good faith business judgment, and each of these directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected Questcor to substantial damages. Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class action entitled *Lee Beng Heng v. Questcor Corporation*, Civil Action Number 8:2012-cv-01707, pending in the United States District Court for the Central District of California. Through their intentional misconduct, Individual Defendants have subjected the Company to potential costs, fines, and judgments

associated with the securities class action. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Questcor securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

68. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Questcor securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Questcor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice

similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the defendants' acts as alleged herein constitute breaches of fiduciary duties;

- whether statements made by defendants to the investing public during the relevant period misrepresented material facts about the business, operations and management of Questcor;

- whether the Individual Defendants caused Questcor to issue false and misleading financial statements during the relevant period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Questcor securities during the relevant period were artificially inflated because of the defendants' conduct complained of herein;

- whether defendants actions constitute gross mismanagement, and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)**

73. Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

74. Defendants owed a fiduciary duty to Questcor to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and they such filings conformed to applicable securities laws. Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Questcor's internal controls and by allowing the Company to issue and disseminate misleading statements and filings.

75. Defendants have engaged in a sustained and systematic failure to

exercise their oversight responsibilities and to ensure that Questcor complied with applicable laws, rules and regulations.

76. As members of the Questcor Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of them had knowledge of and actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing. The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

77. Each of defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company. As a result of defendants' breaches, Questcor is the subject of a major securities fraud class action lawsuit by defrauded investors, and the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

78.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

79.     Defendants had a duty to Questcor and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Questcor in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence, and candor in the management and administration of Questcor's affairs and in the use and preservation of the Company's assets.

80.     During the course of the discharge of their duties, defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, defendants caused Questcor to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged Questcor, thereby causing damage to the Company.

# COUNT III
# (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

81.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

82.    Questcor is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

83.    Questcor's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against Questcor, by virtue of the Individual Defendants' misconduct.

# COUNT IV
# (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

84.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

85.    The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over Questcor.

86.    As a direct and proximate result of the Individual Defendants' abuse

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 46 -

of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT V
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)

87.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

88.    The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of Questcor.

89.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

b.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

c.    Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 47 -

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 11, 2012

THE WAGNER FIRM

By: _____

Avi Wagner
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 491-7949
Facsimile: (310) 694-3967
Email: avi@thewagnerfirm.com

Patrick W. Powers
Zachary Groover
POWERS TAYLOR LLP
8150 North Central Expressway
Suite 1575
Dallas, Texas 75206
Phone: 214.239.8900
Fax:    214.239.8901
zach@powerstaylor.com
patrick@powerstaylor.com

Willie C. Briscoe
THE BRISCOE LAW FIRM, PLLC
8117 Preston Road, Suite 300
Dallas, Texas 75225
Phone: 214.706.9314
Fax: 214.706.9315
wbriscoe@thebriscoelawfirm.com

*Counsel for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 48 -

Exhibit C, Page 123

## VERIFICATION OF COMPLAINT

I, Nilabrata Goswami, am the named plaintiff in this action brought

derivatively on behalf of Questcor Pharmaceuticals, Inc. I have read this verification as

well as the Verified Shareholder Derivative Complaint. As to those allegations of which I

have personal knowledge, I believe them to be true. As to those allegations of which I

do not have personal knowledge, I rely on my counsel and their investigation and for

that reason believe them to be true. I am a current Questcor Pharmaceuticals, Inc.

shareholder and have been a Questcor Pharmaceuticals, Inc. shareholder throughout

the period in which the wrongful conduct as alleged in this complaint occurred.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10 day of October, 2012 at Garland , Texas.

# EXHIBIT D

1  Avi Wagner (SBN 226688)
   THE WAGNER FIRM
2  1925 Century Park East, Suite 2100
3  Los Angeles, California 90067
   Telephone: (310) 491-7949
4  Facsimile: (310) 694-3967
5  Email: avi@thewagnerfirm.com

6  *Attorneys for Plaintiff Earl Richards*

7
8  [Additional Counsel on Signature Page]

9

10             UNITED STATES DISTRICT COURT

11           CENTRAL DISTRICT OF CALIFORNIA

12
13  EARL RICHARDS, Individually and     Case No: __SACV12  1754 DOC(MLGx)__
    On Behalf of All Others Similarly
14  Situated,

15                Plaintiff,           **CLASS ACTION**

16                                     **VERIFIED SHAREHOLDER**
17           v.                        **DERIVATIVE COMPLAINT**
                                       **FOR BREACH OF FIDUCIARY**
18  DON M. BAILEY, MICHAEL H.          **DUTY, WASTE OF**
19  MULROY, STEPHEN L. CARTT,          **CORPORATE ASSETS, UNJUST**
20  DAVID YOUNG, VIRGIL D.             **ENRICHMENT, AND**
    THOMPSON, MITCHELL J. BLUTT,       **CONTRIBUTION AND**
21  and STEPHEN C. FARRELL             **INDEMNIFICATION**

22                Defendants,
23
24           -and-                     **DEMAND FOR JURY TRIAL**

25  QUESTCOR PHARMACEUTICALS,
    INC.,
26
27           Nominal Defendant.

28

                VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Earl Richards ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **JURISDICTION AND VENUE**

1.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

2.     This Court has jurisdiction over each defendant because each

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 1 -

defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

3. Venue is proper in this Court under 28 U.S.C. §1391(a) because (1) one or more of defendants reside in, or maintain executive offices in, this district; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts described herein, occurred within this District; and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have an impact in this District.

4. In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

5. Plaintiff as set forth in the attached Certification, was a shareholder of Questcor at the time of the wrongs complained of, has continuously been a shareholder since that time and is a current shareholder.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 2 -

6.     Nominal Defendant Questcor is a California corporation with principal executive offices located at 1300 North Kellogg Drive, Suite D, Anaheim, California 92807.  Questcor's common stock trades on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "QCOR."

7.     Defendant Don M. Bailey ("Bailey") was, at all relevant times, the Company's President and Chief Executive Officer.

8.     Defendant Michael H. Mulroy ("Mulroy") was, at all relevant times, the Company's Chief Financial Officer, Secretary and General Counsel.

9.     Defendant Stephen L. Cartt ("Cartt") was, at all relevant times, the Company's Chief Operating Officer.

10.     Defendant David Young ("Young") was, at all relevant times, the Company's Chief Scientific Officer.

11.     Defendant Virgin D. Thompson ("Thompson") was, at all relevant times, a member of the Company's audit committee.

12.     Defendant Mitchell J. Blutt ("Blutt") was, at all relevant times, a member of the Company's audit committee.

13.     Defnedant Stephen C. Farrell ("Farrell) was, at all relevant times, the chair of the Company's audit committee.

14.     The defendants referenced above in ¶¶ 7 through 13 are sometimes referred to herein as the "Individual Defendants." Because of the Individual

Defendants' positions with the Company, they had access to key adverse but undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and through reports and other information provided to them in connection therewith.

15.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Questcor, by virtue of his or her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition as these defendants were involved in drafting, producing, reviewing and/or disseminating the false and

misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16.     As officers and controlling persons of a publicly-held company whose common stock has been, at all relevant times, registered with the SEC under the Exchange Act which is traded on the NASDAQ, and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

17.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and

were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Questcor, each of the Individual Defendants had access to the adverse undisclosed information about Questcor's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Questcor and its business issued or adopted by the Company materially false and misleading.

18.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the relevant period. Further, each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit by

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 6 -

disseminating materially false and misleading statements and/or concealing material adverse facts, which has severely damaged Questcor and its shareholders by extension.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

20.  Nominal Defendant Questcor is a company with a single product, a highly specialized, low volume, expensive drug originally approved by the FDA in 1952. It has since been approved for use in 19 indications, but primarily for infantile spasms, a rare seizure disorder affecting about 1,500 infants a year in the U.S. In 1978, Acthar was approved for treatment of MS relapse and was used extensively in the 1970s for that purpose, until corticosteroids came on the market and proved to be a superior alternative.

21.  On April 4, 2011, Questcor issued a press release announcing its preliminary first quarter 2011 results. The press release stated the following in relevant part:

> New, paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of exacerbations of multiple sclerosis (MS) during the quarter were greater than 500, up over 115% from the year ago period and up over 40% from the prior quarter.
>
> New, paid prescriptions for infantile spasms (IS) were estimated at 88.
>
> New, paid prescriptions for nephrotic syndrome (NS) were estimated at 18.

2,010 vials of the Company's principal drug, Acthar, were shipped during the quarter ended March 31, 2011.

Gross sales were $48.6 million.

* * *

"The strong performance we saw late in the fourth quarter of 2010 has continued in the first quarter of 2011 and was driven by the increasing productivity of our recently expanded Acthar sales force. March showed significant growth in MS prescriptions and exceeded February's record performance by over 50%. In addition, we are pleased with the very early results from the efforts of our small dedicated Nephrology sales team. While we are very encouraged by the first quarter new prescription results, we note that prior sharp increases in sequential quarterly Acthar prescriptions have usually been followed by more modest sequential growth," said Don M. Bailey, President and CEO of Questcor Pharmaceuticals.

22.     On April 26, 2011, the Company issued a press release announcing financial results for the first quarter ended March 31, 2011. Specifically, the Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011 as compared to net income of $8 million, or $0.12 diluted EPS, and net sales of $26.2 million for the same period a year ago. The press release stated the following in relevant part:

The Company's financial performance was driven by a 120% year-over-year increase in the number of new paid prescriptions of H.P. Acthar® Gel (Acthar) for the treatment of multiple sclerosis (MS) exacerbations. In the first quarter, paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) increased to 18 while prescriptions for the treatment of infantile spasms (IS) were 89, which is within the historic range for IS.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- 8 -

"Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor. "Paid MS prescriptions are up sharply from last quarter. March was a particularly strong month and this momentum has continued so far in April. We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March. The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing. In addition, during the second quarter we will initiate a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy. Acthar is indicated 'to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus'."

23.     After issuing its first quarter 2011 financials, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey and Cartt further represented the following in relevant part:

[BAILEY:] In summary, we are off to a very good start this year as we continued to execute our straightforward strategy to sell more Acthar. Our decision to expand the MS sales force is clearly paying off. Also, our nephrotic syndrome sales force is having some early success.

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 9 -

We believe this MS sales performance reflects the strong underlying demand for Acthar. This growth in demand is being driven by the increasing productivity of our expanded sales force.

We believe net sales in the MS market are now about 60% of total Acthar net sales.

\* \* \*

[CARTT:] Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter, we shipped a record 508 paid Acthar prescriptions, for the treatment of MS relapses. This was an increase of 120% over the year ago period and 44% over the previous quarter.

We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

\* \* \*

[O]ur promotional efforts are increasingly focused on two main goals. One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients, and two, helping doctors, nurses, and others in their medical practice become more effective at identifying potential Acthar patients.

\* \* \*

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs.

In these programs, existing Acthar prescribers present to small groups of physicians, their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses. When combined with follow-up sales calls, these programs appear to be a key driver of our sales growth.

Recently, we have been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

24.     On April 27, 2011, Questcor filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.    In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.     In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $11.3 million for the three months ended March 31, 2011, as compared to $6.7 million for the three months ended March 31, 2010. The increase of $4.6 million in 2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we doubled the size of our sales organization, increasing the sales force to 77 Acthar specialists and an additional five nephrology sales representatives.

26.     On July 26, 2011, the Company issued a press release announcing financial results for its second quarter ended June 30, 2011.  For the quarter, the Company reported net income of $13.9 million, or $0.21 diluted EPS, and net

sales of $46.0 million as compared to net income of $9.3 million, or $0.14 diluted EPS, and net sales of $28.3 million for the same period a year ago. The press release stated the following in relevant part:

> 147% year-over-year increase in the number of paid H.P. Acthar® Gel (Acthar) prescriptions for the treatment of multiple sclerosis (MS) exacerbations led to increased shipments of Acthar vials. Paid Acthar prescriptions for the treatment of nephrotic syndrome (NS) also increased sharply in the quarter. In addition, paid Acthar prescriptions for the treatment of infantile spasms (IS) were at the highest quarterly level since the third quarter of 2008.
>
> "Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow. Accordingly, growing MS sales remains our number one priority. Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."
>
> "To generate data in support of the expanded nephrology selling effort, we recently initiated a company-sponsored Phase IV trial to study Acthar in the treatment of NS associated with idiopathic membranous nephropathy," continued Mr. Bailey. "And, today, we are announcing our fourth on-label target market for Acthar, systemic lupus erythematosus. We believe that this market has many of the same characteristics as our other three vertical markets for Acthar--MS, NS and IS."

27.    After issuing its second quarter 2011 financial results on July 26, 2011, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth. Defendants Bailey,

Cartt and Young represented the following in relevant part:

[CARTT:] During the quarter we shipped a record 751 paid Acthar prescriptions for the treatment of MS relapses. This was an increase of 147% over the year-ago period, and 48% over the previous quarter. We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected. In addition to rapid growth, our trends at MS are all very good and indicate that we are building momentum in this key Acthar market.

* * *

So let's summarize. We are very pleased with the robust growth during the quarter and expect continued growth during 2011 and into 2012 as a result of the continued sustained sales call activity. Our early prescription trends in nephrology are surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.

* * *

[BAILEY:] Our go-forward plan is extremely simple and remains to sell more Acthar. That is, gross sales in each of our key markets. MS, NS and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets. In the second quarter we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow. We are continuing to focus on MS sales. The commercial team is highly motivated, highly incentivized and highly productive.

Based on positive nephrotic syndrome script growth, we are now increasing our focus on nephrotic syndrome sales and are expanding our MS selling efforts. We are applying what we have learned during our four MS sales force increases, so that for nephrotic syndrome we can accelerate the commercial team buildout.

28. On July 29, 2011, Questcor filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, which was signed by

Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

29.   In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $14.7 million for the three months ended June 30, 2011, as compared to $6.0 million for the three months ended June 30, 2010. The increase of $8.7 million in 2011 as compared to 2010 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists who treat patients for MS or IS, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we are significantly expanding our NS selling effort. Specifically, we are in the process of hiring approximately 23 additional representatives for our Nephrology Sales Force and we are giving a limited supportive selling role to our 77 representative Specialty Sales Force.

30.   On October 25, 2011, Questcor issued a press release announcing financial results for its third quarter ended September 30, 2011.  For the quarter, the Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million, as compared to net income of $11.5 million, or $0.18

diluted EPS, and net sales of $31.3 million for the same period a year ago.  The

release stated the following in relevant part:

> "Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

> "Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

31.     After issuing its third quarter 2011 financial results on October 25,

2011, Questcor hosted a conference call where Defendants reiterated the

financial results reported in the Company's press release and Defendant Mulroy

discussed the Company's financial performance in depth.  Defendants Bailey

and Cartt represented the following in relevant part:

> [CARTT:]   [W]e shipped 886 paid Acthar prescriptions for the treatment of MS relapses during the third quarter of 2011. This was an increase of 174% over the year ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.

* * *

Switching gears to the subject of new scientific data, several Acthar-related abstracts will be presented in November at the Annual Meeting of the American Society of Nephrology or ASN held this year in Philadelphia. These abstracts are available on ASN's website www.asn-online.org. The new data provides further insight into the immune modulating and other therapeutic properties of Acthar specifically relating to kidney disease.

We believe the availability of this data provides further evidence for the direct action of Acthar on kidney disease. And importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology. Our emerging understanding of the apparent immune modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

32.     On October 27, 2011, Questcor filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

33.     In connection with its marketing and promotional activities, the Form 10-Q stated the following in relevant part:

Selling and marketing expenses were $13.7 million for the three months ended September 30, 2011, as compared to $7.7 million for the three months ended September 30, 2010. The increase of $6.1 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs and costs associated with our expanded

sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force which promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and, based on the results of their efforts we have significantly expanded our NS selling effort. Specifically, we have hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to our 77 representative Specialty Sales Force.

34.    On January 11, 2012, *TheStreetSweeper.org* issued an article stating that it would publish the first part of a two-part investigative series about Questcor in the following week.  The article stated the following in relevant part:

The first article raises serious questions about the aggressive marketing practices that QCOR has used to generate explosive – but potentially unsustainable – growth in prescriptions for its only drug while the second story further examines QCOR's business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy.

35.    In response to the *StreetSweeper* article, Questcor's stock price dropped $6.20 per share or nearly 15%, to close at $35.34 per share on January 11, 2012.

36.    On January 11, 2012, Questcor issued a press release entitled "Questcor Pharmaceuticals Issues Statement," which stated in relevant part:

Questcor Pharmaceuticals, Inc. (NASDAQ: QCOR) today announced it became aware that an investor blog is preparing to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 17 -

issue a report regarding the Company's marketing and business practices. Questcor issued the following statement:

The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices. Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

37.    On February 22, 2012, Questcor issued a press release announcing financial results for its fourth quarter and year ended December 31, 2011.  For the quarter, the Company reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million as compared to net income of $6.4 million, or $0.10 diluted EPS, and net sales of $29.3 million for the same period a year ago.  For the year, the Company reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million as compared to net income of $35 million, or $0.54 diluted EPS and net sales of $115.1 million for the same period a year ago.  The release stated in relevant part:

"Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar

to help patients with MS and NS," said Don M. Bailey, President and CEO of Questcor. "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments."

38.     Also on February 22, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendants Bailey and Mulroy, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

39.     In connection with its marketing and promotion activities, the 10-K stated the following in relevant part:

Selling and marketing expenses were $56.7 million for the year ended December 31, 2011, as compared to $31.5 million in 2010 and $19.3 million in 2009. The increase of $25.2 million in 2011 as compared to 2010 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team and increased bonus compensation for other Company employees, and costs associated with our expanded sales and marketing effort. During the latter part of 2010, to further build on positive prescription trends, we increased the size of our Specialty Sales Force, which calls on neurologists, from 38 representatives to 77 representatives effective November 2010. Additionally, in March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 19 -

Nephrology Sales Force was comprised of five representatives and, based on the results of their efforts, we significantly expanded our NS selling effort. Specifically, we hired approximately 23 additional representatives for our Nephrology Sales Force and have given a limited supportive selling role to the 77 representatives in our Specialty Sales Force. While we have announced our intention to expand our MS and NS sales forces in 2012, our prescription growth trend may not continue and/or our sales force expansions intended for 2012 may not be successful. The process of significantly expanding a sales force in the biopharmaceutical industry is complex. We modify and re-allocate individual sales territories across our enlarged sales force, which can cause temporary disruptions in our selling efforts. Additionally, while the cost of our new sales representatives impacts our operating expenses immediately, there can be a delay in the expected ability of our new representatives to increase our net sales due to the time it takes for us to train the new representatives and for the new representatives to establish professional relationships with prescribing physicians within their territories.

40.   After issuing its fourth quarter and full year 2011 financial results, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.   Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:]  As we look ahead to 2012 and beyond, we believe we can sustain and re-grow our business due to three key factors. First, Acthar provides benefits to many difficult-to-treat patients, not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar while growing remains relatively small and third, we have [assembled an excellent,] experienced commercial team to pursue our growth plan.

Our focus remains on helping patients with serious difficult-to-treat medical conditions.

\* \* \*

[CARTT:] A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbation or relapses, particularly in those patients not well served by steroid, which are generally considered first line therapy by most neurologists. This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS.

In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010. This is a 167% year-over-year increase. There were several factors behind this growth; positive patient outcome, increasing awareness among neurologists about how best to incorporate Acthar into their practices, continued excellent Acthar insurance coverage for MS relapses and the increase in productivity of our MS commercial team, all combined to generate this growth.

\* \* \*

We believe that because Acthar provides real and substantial benefits to many patients who would otherwise continue to suffer the effects of serious, difficult-to-treat disorders, our growth should be sustainable. We are expanding the Organization and associated infrastructure to address the significant growth opportunities in front of us. At the same time, we are off to a good start to 2012, with January MS, NS, and IS paid prescription each having a good month.

41. On April 24, 2012, Questcor issued a press release announcing financial results for its first quarter ended March 31, 2012. The Company reported net income of $38.5 million, or $0.58 diluted EPS, and net sales of $96.0 million, as compared to net income of $11.2 million, or $0.17 diluted EPS, and net sales of $36.8 million for the same period a year ago. The release stated the following in relevant part:

"While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor. "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."

42.    After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call where Defendants reiterated the financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:]  Questcor's unconventional, but simple business model continues to produce excellent financial results. Shift files, net sales and earnings will all up well over 100% year-over-year. We continued to expand nephrologist and neurologist awareness, our patient benefits from Acthar and as a result, pay prescriptions continue to increase.

Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologist to treat patients with nephrotic syndrome, a serious kidney ailment. After a successful pilot program, we stepped up our nephrology commercial effort last October. The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that by our calculation, nephrotic syndrome scrip value now exceeds MS.

* * *

[CARTT:]  Insurance reimbursements for Acthar and nephrotic syndrome continues to be very good with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome, if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition, and there are few other treatment options.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 22 -

Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact data from one study at the University of Toronto is being presented just this week at the Canadian Nephrology Society Annual Meeting. This particular study found that about two thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy had their proteinuria drop by 50% or more due to Acthar treatment.

* * *

[YOUNG:] As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug. While quite rare, there are, in effect, a few other successful examples of the type of product. Soliris and Botox come to mind, for example. We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications.

In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs where we and others believe Acthar could provide a significant clinical benefit.

Currently, we have approximately 20 company-sponsored pre-clinical and clinical studies ongoing, and are supporting around 20 ongoing investigator-initiated studies.

43. On April 26, 2012, Questcor filed a quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and disclosed any material

changes to the Company's internal control over financial reporting.

44.     In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $21.7 million for the three months ended March 31, 2012, as compared to $11.3 million for the three months ended March 31, 2011. The increase of $10.5 million in 2012 as compared to 2011 is due primarily to increases in headcount related costs, including increased incentive payments to our commercial team, and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that promotes Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives, later increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and is currently being expanded to 58 representatives.

45.     On July 10, 2012, Citron Research issued an in-depth research report on Questcor.  Citron expanded on the *StreetSweeper.org* articles and further raised concerns about the Company's marketing strategy and a possible generic threat to Acthar.  The report discussed the competitive landscape for Acthar and was critical of the Company's assertions that there were significant barriers to entry into the market:  "[It] is evident that Questcor's Acthar label simply copies the language of the previously approved generic product label for ACTH – no sign of the 'secret sauce' the company's misleading language suggests."  Citron further questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms.  In addition, the research report analyzed

the Company's marketing expenses and questioned how the drug was being marketed to doctors: "The sales and marketing for HP Acthar Gel is now up to $6,100 a vial . . . **more than 5 X the original price of the drug before Questcor became involved.**" [Emphasis in original.] The Citron report criticized Questcor for the lack of any meaningful research and development by the Company: "Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan," the report stated. The Citron report was not only critical of the amount of insider selling over the past year but was also critical of its timing: "[W]henever we see **large insider selling at the same time the company is buying back large amounts of stock,** it is an ominous sign." [Emphasis in original.]

46.     On July 10, 2012, Questcor's common stock dropped $12.57 per share or nearly 22%, to close at $45.07 per share on July 10, 2012.

47.     On July 24, 2012, Questcor issued a press release announcing financial results for its second quarter ended June 30, 2012. The Company reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million, as compared to net income of $13.9 million, or $0.21 diluted EPS, and net sales of $45.9 million for the same period a year ago. The release stated in relevant part:

"In the second quarter, we surpassed $100 million in quarterly net sales for the first time in our history," said Don M. Bailey,

President and CEO of Questcor.  "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists.  With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

48.    After issuing its second quarter 2012 financial results on July 24, 2012, Questcor hosted a conference call where Defendants reiterated the record financial results reported in the Company's press release and Defendant Mulroy discussed the Company's financial performance in depth.  Defendants Bailey, Cartt and Young represented the following in relevant part:

[BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost doubled the number of shipped vials in the quarter more than doubled net sales and tripled earnings from the year ago quarter. Paid scripts increased for both nephrotic syndrome and MS. We expanded two sales forces and starting building a third sales force in rheumatology using the same formula that works out well with MS and nephrotic syndrome. And we also made good progress in both our science and compliance programs.

* * *

[CARTT:]  Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients. This is not always the case, of course, not everyone responds, but clearly, many patients are benefiting significantly from this drug and there are few other treatment options available. All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

* * *

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse, and the increasing productivity of our MS commercial team.

* * *

[YOUNG:]  As you can see by our operating results reported in today's press release we've been increasing our investment in research and development to better understand the unique immunomodulator and anti-inflammatory properties of Acthar Gel. Our subjects are objective that produce additional supporting data for the commercial team for on-label indications and to expand our Acthar Gel used through FDA beyond the current on-label indications.

Surprisingly, previous owners of Acthar Gel in the pharmaceutical industry in general have not invested in ACTH-based research. Therefore, there are many research areas that still need to be assessed by our R&D group in order to better understand ACTH and the clinical roles of Acthar Gel.

* * *

In summary, I'd like to bring you back to my initial topic on our R&D efforts. We have previously reported our R&D efforts have been and are continuing to focus on three areas. First, producing its additional supporting data for the commercial team for on-label indications. Second, extending Acthar use -- Acthar Gel use beyond existing on-label indications in the following FDA processes. And third, our greatest priority, better understanding the unique chemical, biological and clinical characteristics of Acthar Gel.

Our research results from this third area thus far suggest that development of generic drugs of Acthar Gel is very challenging. All three areas of research are intended to advance the science of Acthar Gel in order to improve to help patients with devastating autoimmune and inflammatory diseases.

49.    On July 25, 2012, Questcor filed a quarterly report for the period

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 27 -

ended June 30, 2012 on Form 10-Q with the SEC, which was signed by Defendants Bailey and Mulroy and reiterated the Company's previously announced financial results. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Bailey and Mulroy stating that the information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

50.     In connection with its marketing and promotion activities, the Form 10-Q stated the following in relevant part:

> Selling and marketing expenses were $27.6 million for the three months ended June 30, 2012, as compared to $14.7 million for the three months ended June 30, 2011. The increase of $12.9 million in 2012 as compared to 2011 is due primarily to increases in headcount-related costs and costs associated with our expanded sales and marketing effort. In March 2011, we assembled a Nephrology Sales Force that details Acthar exclusively to nephrologists for use in treating NS. Our initial Nephrology Sales Force was comprised of just five representatives and commenced activities in the second quarter of 2011. This sales force was increased during the third quarter of 2011 to 28 representatives based on the results of their efforts and as of May 29, 2012 was expanded further to 58 representatives.

51.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company was disseminating false and misleading statements to the public as to the efficacy of its 60-year-old drug, Acthar, as a

treatment for multiple sclerosis and for nephrotic syndrome; (ii) the Company was marketing Acthar aggressively as a treatment for these conditions, with an inadequate compliance program to monitor such marketing; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

52.     On September 19, 2012, Citron reported that insurance giant Aetna had recently revised its policy to severely limit coverage of Questcor's primary drug, Acthar.  Aetna's findings concluded that clinical research supported only one of the 19 indications, that it was only "medically necessary" for treatment of West syndrome, a rare condition that causes infantile spasms, and not for other indications such as MS which are treated with steroids.  According to Aetna's Clinical Policy Bulletin:

I.      Aetna considers repository corticotropin (H.P. Acthar® Gel) medically necessary for West syndrome (infantile spasms)

II.     Aetna considers repository corticotropin not medically necessary for diagnostic testing of adrenocortical function because it has not been shown to be superior to cosyntropin for this purpose.

III.    Aetna considers repository corticotropin not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications.

IV.     Aetna considers repository corticotropin experimental and investigational for all other indications because its effectiveness for these indications has not been established.

***

ACTH Gel [such as Acthar] is rarely necessary for . . . corticosteroid-responsive conditions [including MS and nephrotic syndrome]. . . . In addition, there are a lack of clinical studies comparing the effectiveness of ACTH gel to corticosteroids in corticosteroid-responsive conditions. Also, because of uncertainties in the effect of ACTH gel on the magnitude of endogenous cortisol production, ACTH gel has the potential for inducing significant adverse effects.

53.     Later in the day, Questcor issued a press release entitled "Questcor Comments on Insurance Policy Bulletin," stated the following in relevant part:

The Company is continuing to review the Clinical Policy Bulletin related to Acthar from Aetna Inc. ("Aetna"). Currently, the Company does not believe that the bulletin represents a material change in insurance coverage for Acthar by Aetna. During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar. Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

54.     On this news, Questcor's stock dropped $24.17 per share or nearly 48%, to close at $26.35 per share on September 19, 2012.

55.     On September 24, 2012, Questcor announced in a Form 8-K that the U.S. government had initiated an investigation into the Company's promotional practices.

56.     On this news, Questcor's stock dropped $11.05 per share, or almost 37%, to close at $19.08 per share on September 24, 2012.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 30 -

## **Defendants' Duties**

57.     By reason of their positions as officers, directors, and fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

58.     Defendants, because of their positions of control and authority as directors and officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company.

59.     To discharge their duties, the officers and directors of the Company

were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a) exercise good faith to ensure the Company's affairs were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b) exercise good faith to ensure the Company operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c) when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

60. Plaintiff brings this action derivatively in the right and for the benefit of Questcor to redress injuries suffered, and to be suffered, by Questcor as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Questcor is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

61. Plaintiff will adequately and fairly represent the interests of

1   Questor and its shareholders in enforcing and prosecuting its rights.

2      62.   Plaintiff is the owner of Questor common stock and was the owner

3   of Questor common stock at all times relevant to the Individual Defendants'

4

5   wrongful course of conduct alleged herein.

6      63.   At the time that this action was commenced, the Questor Board

7   was comprised of, among others, the Individual Defendants.

8

9      64.   As a result of the facts set forth herein, Plaintiff has not made any

10  demand on the Questor Board to institute this action against the Individual

11

12  Defendants.  Such demand would be a futile and useless act with respect to each

13  and every one of the Individual Defendants because they are incapable of

14

15  making an independent and disinterested decision to institute and vigorously

16  prosecute this action for the following reasons:

17

18     a.    Defendants face a substantial likelihood of being held liable for
            breaching their fiduciary duties of loyalty and good faith as alleged
19          herein,  and  are  therefore  incapable  of  disinterestedly  and
20          independently considering a demand to commence and vigorously
            prosecute this action.
21

22     b.    Questor's non-employee directors have received, and continue to
            receive, substantial compensation in the form of cash and stock
23          option awards.  These defendants are also interested in maintaining
            their positions on the Board so as to safeguard their substantial
24          compensation and stock options.  The following charts illustrate the
            substantial compensation that these directors have received, which
25          demonstrates that demand upon such individuals would be futile:

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 33 -

| 2011 | | | | |
|---|---|---|---|---|
| **Executive** | **Base Salary** | **Options Awards** | **Non-Equity Incentive Plan Compensation** | **TOTAL** |
| Bailey | $584,8755 | $2,628,815 | $1,332,540 | $4,546,230 |
| Mulroy | $342,147 | $938,863 | $466,881 | $1,749,891 |
| Cartt | $389,917 | $1,126,635 | $781,756 | $2,298,308 |
| Young | $424,320 | $751,090 | $773,394 | $1,948,804 |

c.      The entire Questcor Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, Questcor's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above referenced defendants breached the fiduciary duties they owed to Questcor and its shareholders in that they failed to prevent and correct the dissemination of the Company false and misleading statements.  Thus, the Questcor Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome because their actions have subjected Questcor to millions of dollars in potential liability for violations of applicable securities laws;

d. Individual Defendants certified certain of Questcor's SEC filings. Accordingly, demand is futile as he faces a substantial likelihood of liability for breach of fiduciary duties owed to Questcor;

e. Individual Defendants were aware of the Company's ongoing unlawful and improper business practices and the dissemination of materially false and misleading statements.

f. Defendants Thompson, Blutt, and Farrell served on Questcor's Audit Committee during the Relevant Period.  Defendant Farrell was the chairman of Questcor's Audit Committee during the Relevant Period.   The purpose of Questcor's Audit Committee was to assist the Board in fulfilling its oversight responsibilities for financial matters.  Specifically, the Audit Committee was to assist the Board in: (1) identifying and recommending to the Board individuals qualified to become members of our Board and to fill vacant Board positions; (2) recommending to the Board the director nominees for the next annual meeting of shareholders; (3) recommending to the Board director committee assignments; (4) recommending to the Board the compensation for Company directors; (5) reviewing and evaluating succession planning for our Chief Executive Officer and other executive officers; (6) monitoring the continuing education program for our directors; and (7) evaluating annually the Nominations and Corporate Governance Committee charter.  The Audit Committee, moreover, is responsible for oversight

of the Company's financial reporting process, including the effectiveness of the Company's internal accounting and financial controls and procedures, and controls over the accounting, auditing, and financial reporting practices. Additionally, the Audit Committee met privately, outside the presence of Questcor's management, with the Company's independent registered public accounting firm to discuss, among other matters, all communications required by standards of the Public Company Accounting Oversight Board, including the matters required to be discussed by PCAOB AU 380, *Communication with Audit Committees*, and Rule 2-07, *Communication with Audit Committees*, of Regulation S-X. As part of its oversight role with respect to the Company's financial statements and the public disclosure of the Company's financial results, moreover, the Company's Audit Committee regularly reviewed and discussed with Questcor's management the financial statements included in the Company's annual reports on Form 10-K and quarterly reports on Form 10-Q, its quarterly earnings releases, and the financial guidance that the Company provided to analysts, ratings agencies, and the public. The Audit Committee also met regularly in separate executive sessions with Questcor's CFO, Chief Accounting Officer, and other members of the Company's executive management team. As a result, Defendants Thompson, Blutt, and Farrell knew, or should have known, of the Company's wrongdoing alleged herein, but intentionally or recklessly violated

their duties as members of the Audit Committee.  Specifically, because of these duties and responsibilities – particularly the Audit Committee's responsibility to discuss the Company's financial information and earnings guidance with Questcor's management prior to release – members of the Audit Committee were aware that Questcor's positive statements about the Company's prospects and growth were made without a reasonable basis.  Indeed, through such discussions with Questcor's management, the Audit Committee was aware or should have been aware of the significant problems with Acthar. Further, the Audit Committee was aware or should have been aware that these processes lacked effective supervision and oversight and the Company's operating efficiencies had been hindered.  As such, Defendants breached their fiduciary duties of loyalty and good faith to the Company.  Additionally, the failure of the Individual Defendants to perform their duties as members of the Audit Committee with loyalty and in good faith raises a substantial likelihood of non-exculpated personal liability on their part.  As a result, the Individual Defendants cannot impartially consider a demand on the Board to commence litigation against themselves;

g. Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

h. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

i. In order to bring this suit, all of Questcor's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

j. The acts complained of constitute violations of the fiduciary duties owed by Questcor's officers and directors and these acts are incapable of ratification;

k. Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

l. Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and Questcor to further violations of the securities laws that would result in civil actions being filed against one or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 38 -

more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

m. Questcor has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Questcor any part of the damages Questcor suffered and will suffer thereby; and

o. If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

p. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for Questcor for any of the wrongdoing alleged by plaintiff herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 39 -

65.    Plaintiff, moreover, has not made any demand on shareholders of Questcor to institute this action since demand would be a futile and useless act for the following reasons:

a.    Questcor is a publicly held company with over 59.6 million shares outstanding, and thousands of shareholders;

b.    Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders; and

c.    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

66.    Furthermore, the conduct complained of herein could not have been the product of good faith business judgment, and each of these directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected Questcor to substantial damages.  Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class action entitled *Lee Beng Heng v. Questcor Corporation*, Civil Action Number 8:2012-cv-01707, pending in the United States District Court for the Central District of California.   Through their intentional misconduct, Individual Defendants have subjected the Company to potential costs, fines, and judgments

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 40 -

associated with the securities class action. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Questcor securities during the Class Period (the "Class"); and were damaged thereby. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Questcor securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Questcor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice

similar to that customarily used in securities class actions.

69.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

70.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.   Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the defendants' acts as alleged herein constitute breaches of fiduciary duties;

- whether statements made by defendants to the investing public during the relevant period misrepresented material facts about the business, operations and management of Questcor;

- whether the Individual Defendants caused Questcor to issue false and misleading financial statements during the relevant period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Questcor securities during the relevant period were artificially inflated because of the defendants' conduct complained of herein;

- whether defendants actions constitute gross mismanagement, and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 42 -

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.    Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

<u>**COUNT I**</u>
<u>**(AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF**</u>
<u>**FIDUCIARY DUTY)**</u>

73.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

74.     Defendants owed a fiduciary duty to Questcor to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and they such filings conformed to applicable securities laws.  Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Questcor's internal controls and by allowing the Company to issue and disseminate misleading statements and filings.

75.     Defendants have engaged in a sustained and systematic failure to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 43 -

exercise their oversight responsibilities and to ensure that Questcor complied with applicable laws, rules and regulations.

76.     As members of the Questcor Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.  Each of them had knowledge of and actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.  The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

77.     Each of defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.  As a result of defendants' breaches, Questcor is the subject of a major securities fraud class action lawsuit by defrauded investors, and the Company's reputation in the business community and financial markets has been irreparably tarnished.

1
2

**COUNT II**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS**
**MISMANGEMENT)**

3
4
5

78.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

6
7
8
9
10
11
12
13
14
15
16
17
18

79.     Defendants had a duty to Questcor and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Questcor in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, defendants breached their duties of due care, diligence, and candor in the management and administration of Questcor's affairs and in the use and preservation of the Company's assets.

19
20
21
22
23
24
25
26

80.     During the course of the discharge of their duties, defendants were aware of the unreasonable risks and losses associated with their misconduct. Nevertheless, defendants caused Questcor to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, defendants grossly mismanaged Questcor, thereby causing damage to the Company.

27
28

## COUNT III
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

81.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

82.     Questcor is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

83.     Questcor's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of defendants, and the Company is entitled to contribution and indemnification from each defendant in connection with all such claims that have been, are, or may in the future be asserted against Questcor, by virtue of the Individual Defendants' misconduct.

## COUNT IV
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

84.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

85.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over Questcor.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 46 -

86.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT V
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR
## <u>WASTE OF CORPORATE ASSETS</u>)

87.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

88.    The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of Questcor.

89.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

b.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
- 47 -

1    c.   Granting such other and further relief as the Court deems just and
2         proper.

3                              **JURY DEMAND**

4         Plaintiff demands a trial by jury.

5

6

7    Dated:  October 11, 2012              THE WAGNER FIRM

8
                                           By: _____
9                                          Avi Wagner
10                                         1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
11                                         Telephone: (310) 491-7949
                                           Facsimile: (310) 694-3967
12                                         Email: avi@thewagnerfirm.com
13
14                                         Patrick W. Powers
15                                         Zachary Groover
                                           POWERS TAYLOR LLP
16                                         8150 North Central Expressway
17                                         Suite 1575
                                           Dallas, Texas 75206
18                                         Phone:  214.239.8900
19                                         Fax:    214.239.8901
                                           zach@powerstaylor.com
20                                         patrick@powerstaylor.com
21
22                                          Willie C. Briscoe
23                                         THE BRISCOE LAW FIRM, PLLC
                                           8117 Preston Road, Suite 300
24                                         Dallas, Texas 75225
25                                         Phone: 214.706.9314
                                           Fax: 214.706.9315
26                                         wbriscoe@thebriscoelawfirm.com
27
28                                         *Counsel for Plaintiff*

                     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
                                       - 48 -

## VERIFICATION OF COMPLAINT

I, _Earl Richards_____, am the named plaintiff in this action brought derivatively on behalf of Questcor Pharmaceuticals, Inc. I have read this verification as well as the Verified Shareholder Derivative Complaint. As to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I am a current Questcor Pharmaceuticals, Inc. shareholder and have been a Questcor Pharmaceuticals, Inc. shareholder throughout the period in which the wrongful conduct as alleged in this complaint occurred.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10_ day of October, 2012 at _Acworth_____, Georgia.

# EXHIBIT E

ROBBINS UMEDA LLP
BRIAN J. ROBBINS (190264)
brobbins@robbinsumeda.com
FELIPE J. ARROYO (163803)
farroyo@robbinsumeda.com
SHANE P. SANDERS (237146)
ssanders@robbinsumeda.com
KEVIN S. KIM (275200)
kkim@robbinsumeda.com
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525- 3991

Attorneys for Plaintiff

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JAMES TRIPOLI, Derivatively on Behalf of QUESTCOR PHARMACEUTICALS, INC., | Case No.: |
| | **SACV12 - 01759 AG (MLGx)** |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT** |
| DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT, DAVID YOUNG, DAVID J. MEDEIROS, MITCHELL J. BLUTT, VIRGIL D. THOMPSON, STEPHEN C. FARRELL, NEAL C. BRADSHER, LOUIS E. SILVERMAN, and SCOTT M. WHITCUP, | |
| Defendants, | |
| -and- | |
| QUESTCOR PHARMACEUTICALS, INC., a California corporation, | |
| Nominal Defendant. | **DEMAND FOR JURY TRIAL** |

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of nominal defendant Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") against certain of its officers and directors seeking to remedy defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, that have caused and will continue to cause substantial monetary losses to Questcor and other damages, such as to its reputation and goodwill.

2.     Questcor describes itself as a "biopharmaceutical company focused on the treatment of patients with serious, difficult-to-treat autoimmune and inflammatory disorders." Questcor essentially relies on one drug for its revenue, H.P. Acthar® Gel ("Acthar"). Although approved for the treatment of nineteen indications, Acthar is a first-line treatment[1] only for infantile spasms, a rare, terrible seizure disorder that affects approximately 1,500 babies a year in the United States.

3.     This action concerns breaches of fiduciary duty by certain of the Company's officers and directors, which culminated in them unloading hundreds of millions of dollars' worth of their personally held Questcor stock at artificially inflated prices on an unsuspecting public. As explained in greater detail below, certain of the Individual Defendants (as defined herein) drove up the stock price of Questcor by making improper statements about the purported broad effectiveness of Acthar, the Company's primary product. In particular, defendants claimed that the Company's rapidly increasing revenues was a sign of medical acceptance and market penetration of Acthar for its nineteen approved indications, including multiple sclerosis ("MS") and nephrotic syndrome ("NS"). In truth, the prescription of Acthar for these indications was due to the Company's improper

---

[1] First-line treatment refers to the initial or first treatment recommended for a disease or illness.

- 1 -

sales and marketing campaign for Achthar, which pushed the drug despite the fact that it was not the least expensive treatment and/or the most effective treatment.[2] This boost in Acthar's prescriptions and the Company's revenues was only temporary, however, because, as defendants knew, insurance companies would stop reimbursing for the use of Achtar for treatment of indications that it was not the most effective alternative.

4.      Defendants used their knowledge of the Company's true business health and prospects to benefit themselves.  While causing the Company to make improper statements that inflated its stock price, certain of the Company's officers and directors, including seven of the eleven Individual Defendants, were selling over *$107 million* worth of their stock in a massive and coordinated fashion. Further, at the same time as these defendants were massively selling off their stock, they caused the Company to repurchase $185 million of its own stock on the basis that it was undervalued.

5.      This scheme began to unravel on September 14, 2012.  On that day, Aetna Inc. ("Aetna"), one of the nation's largest insurers, issued a Clinical Policy Bulletin that severely limited reimbursement for Acthar and contained damaging conclusions regarding the drug's efficacy.  According to the Clinical Policy Bulletin, Aetna had engaged in a review of the nineteen indications for which the U.S. Food and Drug Administration ("FDA") had approved Acthar, and concluded that *clinical research supported only one of the nineteen indications*.  Aetna reported that studies suggested that the drug is only "medically necessary" for infantile spasms, and not for other indications, such as MS and NS, that are treated with steroids.

---

[2] Insurance companies, on which pharmaceutical companies like Questcor rely upon for reimbursements, focus on whether a drug is the least expensive treatment and/or the most effective alternative to determine whether to consider a drug "medically necessary" and reimbursable.

- 2 -

6. Then, on September 24, 2012, the Company announced that the U.S. government was investigating its sales and marketing tactics. While the Company did not provide specifics with respect to the investigation, the investigation is likely into whether the Company was paying kickbacks to doctors.

7. Upon disclosure of the Company's true business health and limited financial outlook, Questcor's market capitalization plunged by almost 67%, erasing more than $2.3 billion in value. As a direct result of the Individual Defendants' wrongdoing, the Company is now the subject of multiple securities class actions ("Securities Class Actions") filed in the United States District Court for the Central District of California on behalf of investors who purchased Questcor's shares. In addition to the liability Questcor faces as a result of the U.S. government investigation into its sales and marketing practices, these Securities Class Actions pose the risk of billions of dollars in damages to the Company.

8. Plaintiff brings this action against the Individual Defendants to repair the harm that they caused the Company and seeks disgorgement to the Company of unlawful insider trading proceeds.

## JURISDICTION AND VENUE

9. This Court has jurisdiction in this case over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10. This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Questcor maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Questcor, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff James Tripoli is a shareholder of Questcor and has continuously held stock since August 2008.  Plaintiff is a citizen of Maryland.

**Nominal Defendant**

13.     Nominal Defendant Questcor is a California corporation with its headquarters and principle executive offices located at 1300 North Kellogg Drive, Suite D, Anaheim, California.  Thus, Questcor is a citizen of California.  Questcor is a biopharmaceutical company that primarily relies on revenues associated with the sales of a drug called Acthar.[2]  Questcor acquired the rights to Acthar from a company called Aventis Pharmaceutical Products, Inc. in 2001 for $100,000.  In 2003, Questcor obtained "orphan drug" status for Acthar for the treatment of infantile spasms, a rare disorder that causes spasms in infants and affects approximately one of every 3,500 live births.  The FDA grants orphan drug status to a drug that treats a disease affecting fewer than 200,000 people.  Orphan drug

---

[2] Questcor has a second product, Doral® (quazepam) ("Doral"), which is indicated for the treatment of insomnia. Questcor describes its sales of Doral as "immaterial."

- 4 -

1   status for an approved indication provides a company with seven years of

2   marketing exclusivity, as well as tax incentives.  In 2006, Questcor applied for

3   approval to treat infantile spasms with Acthar.  In August 2007, while the

4   Company's application with the FDA was pending, Questcor raised the list price of

5   Acthar from $1,600 per vial to over $23,000 per vial – an instant increase of well

6   over 2,000%.  In October 2010, the FDA approved Acthar as a treatment for

7   infantile spasms.

8   **Defendants**

9          14.    Defendant Don M. Bailey ("Bailey") is Questcor's President and Chief

10  Executive Officer ("CEO") and has been since November 2007 and a director and

11  has been since May 2006.  Bailey is named as a defendant in the Securities Class

12  Actions that allege he violated sections 10(b) and 20(a) of the Securities and

13  Exchange Act of 1934 ("Exchange Act").  Bailey knowingly, recklessly, or with

14  gross negligence: (i) made improper statements in the Company's press releases

15  and public filings concerning the Company's business prospects, including, but not

16  limited to, the effectiveness of and potential market growth for Acthar; (ii) caused

17  Questcor to repurchase Company shares, and failed to halt the repurchases of

18  shares, while Questcor's share price was artificially inflated as a result of improper

19  statements regarding Questcor's business prospects; and (iii) failed to ensure that

20  reliable systems of financial controls and reporting were in place at the Company.

21  While in possession of material, non-public information concerning Questcor's true

22  business health, Bailey sold 440,000 shares of his stock for $17,718,533.36 in

23  proceeds.  Questcor paid Bailey the following compensation as an executive:

24

25

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $584,875 | $2,628,815 | $1,332,540 | $4,546,230 |

26

27  Bailey is a citizen of California.

28

- 5 -

15.     Defendant Michael H. Mulroy ("Mulroy") is Questcor's Senior Vice President, Chief Financial Officer ("CFO"), General Counsel, and Corporate Secretary and has been since January 2011.  Mulroy is also Questcor's Principal Accounting Officer and has been since September 2011.  Mulroy is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Mulroy knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company.  Questcor paid Mulroy the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $342,147 | $938,863 | $468,881 | $1,749,891 |

Mulroy is a citizen of California.

16.     Defendant Stephen L. Cartt ("Cartt") is Questcor's Chief Operating Officer and has been since February 2012.  Cartt was also Questcor's Chief Business Officer from February 2010 to February 2012 and an Executive Vice President from March 2005 to February 2012.  Cartt is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Cartt knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company.  While in possession of material, non-public information concerning Questcor's true

- 6 -

business health, Cartt sold 505,509 shares of his stock for $16,215,281.15 in proceeds. Questcor paid Cartt the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $389,917 | $1,126,635 | $781,756 | $2,298,308 |

Cartt is a citizen of California.

17.     Defendant David Young ("Young") is Questcor's Chief Scientific Officer and has been since October 2009. Young is named as a defendant in the Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act. Young knowingly, recklessly, or with gross negligence: (i) made improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. While in possession of material, non-public information concerning Questcor's true business health, Young sold 175,124 shares of his stock for $7,047,323.60 in proceeds. Questcor paid Young the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $424,320 | $751,090 | $773,394 | $1,948,804 |

Young is a citizen of California.

18.     Defendant David J. Medeiros ("Medeiros") is Questcor's Executive Vice President and Chief Technical Officer and has been since February 2012. Medeiros was also Questcor's Senior Vice President, Pharmaceutical Operations from February 2007 to February 2012 and Vice President, Manufacturing from June 2003 to February 2007. Medeiros knowingly, recklessly, or with gross negligence failed to ensure that reliable systems of financial controls and reporting were in place at the Company. While in possession of material, non-public information concerning Questcor's true business health, Medeiros sold 1,063,363

shares of his stock for $35,378,781.87 in proceeds. Questcor paid Medeiros the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | Total |
|------|--------|---------------|----------------------------------------|-------|
| 2011 | $362,066 | $375,545 | $494,945 | $1,232,556 |

Medeiros is a citizen of California.

19.     Defendant Mitchell J. Blutt ("Blutt") is a Questcor director and has been since July 2010. Blutt is also a member of Questcor's Audit Committee and has been since at least April 2011. Blutt knowingly or recklessly: (i) reviewed and approved improper statements in the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar; (ii) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (iii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. While in possession of material, non-public information concerning Questcor's true business health, Blutt sold 706,255 shares of his stock for $25,162,724.77 in proceeds. Questcor paid Blutt the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $57,500 | $194,235 | $251,735 |

Blutt is a citizen of New York.

20.     Defendant Virgil D. Thompson ("Thompson") is Questcor's Chairman of the Board and has been since July 2007 and a director and has been since January 1996. Thompson is a member of Questcor's Audit Committee and has been since at least April 2011. In addition, Thompson is a member of the Compliance Committee and has been since February 2012. Thompson knowingly or recklessly: (i) reviewed and approved improper statements in the Company's

- 8 -

1   press releases and public filings concerning the Company's business prospects,
2   including, but not limited to, the effectiveness of and potential market growth for
3   Acthar; (ii) caused Questcor to repurchase Company shares, and failed to halt the
4   repurchases of shares, while Questcor's share price was artificially inflated as a
5   result of improper statements regarding Questcor's business prospects; and (iii)
6   failed to ensure that reliable systems of financial controls and reporting were in
7   place at the Company.   While in possession of material, non-public information
8   concerning Questcor's true business health, Thompson sold 167,500 shares of his
9   stock for $3,413,650 in proceeds.   Questcor paid Thompson the following
10  compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $75,000 | $194,235 | $269,235 |

13  Thompson is a citizen of California.

14      21.   Defendant Stephen C. Farrell ("Farrell") is a Questcor director and has
15  been since November 2007.   Farrell is also Chairman of Questcor's Audit
16  Committee and has been since at least April 2011 and a member of the Compliance
17  Committee and has been since February 2012.  Farrell knowingly or recklessly: (i)
18  reviewed and approved improper statements in the Company's press releases and
19  public filings concerning the Company's business prospects, including, but not
20  limited to, the effectiveness of and potential market growth for Acthar; (ii) caused
21  Questcor to repurchase Company shares, and failed to halt the repurchases of
22  shares, while Questcor's share price was artificially inflated as a result of improper
23  statements regarding Questcor's business prospects; and (iii) failed to ensure that
24  reliable systems of financial controls and reporting were in place at the Company.
25  While in possession of material, non-public information concerning Questcor's true
26  business health, Farrell sold 55,000 shares of his stock for $2,353,622.64 in
27  proceeds. Questcor paid Farrell the following compensation as a director:

28

- 9 -

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $65,000 | $252,506 | $317,506 |

Farrell is a citizen of Massachusetts.

22. Defendant Neal C. Bradsher ("Bradsher") is a Questcor director and has been since at March 2004. Bradsher knowingly or recklessly: (i) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. Questcor paid Bradsher the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $52,500 | $252,506 | $305,006 |

Bradsher is a citizen of New York.

23. Defendant Louis E. Silverman ("Silverman") is a Questcor director and has been since November 2009. Silverman knowingly or recklessly: (i) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. Questcor paid Silverman the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|-------------------|---------------|-------|
| 2011 | $60,000 | $252,506 | $312,506 |

Silverman is a citizen of California.

24. Defendant Scott M. Whitcup ("Whitcup") is a Questcor director and has been since February 2012. Whitcup is also Chairman of Questcor's Compliance Committee and has been since February 2012. Whitcup knowingly or recklessly: (i) caused Questcor to repurchase Company shares, and failed to halt the repurchases of shares, while Questcor's share price was artificially inflated as a

- 10 -

1 result of improper statements regarding Questcor's business prospects; and (ii)
2 failed to ensure that reliable systems of financial controls and reporting were in
3 place at the Company. Whitcup is a citizen of California.

4        25.   The defendants identified in ¶¶14-18 are referred to herein as the
5 "Officer Defendants." The defendants identified in ¶¶14, 19-24 are referred to
6 herein as the "Director Defendants." The defendants identified in ¶¶19-21 are
7 referred to herein as the "Audit Committee Defendants." The defendants identified
8 in ¶¶20-21, 24 are referred to herein as the "Compliance Committee Defendants."
9 The defendants identified in ¶¶14, 16-21 are referred to herein as the "Insider
10 Selling Defendants." Collectively, the defendants identified in ¶¶14-24 are
11 referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

13 **Fiduciary Duties**

14        26.   By reason of their positions as officers, directors, and/or fiduciaries of
15 Questcor and because of their ability to control the business and corporate affairs
16 of Questcor, the Individual Defendants owed and owe Questcor and its
17 shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and
18 were and are required to use their utmost ability to control and manage Questcor in
19 a fair, just, honest, and equitable manner. The Individual Defendants were and are
20 required to act in furtherance of the best interests of Questcor and its shareholders
21 so as to benefit all shareholders equally and not in furtherance of their personal
22 interest or benefit.

23        27.   Each officer and director of the Company owes to Questcor and its
24 shareholders the fiduciary duty to exercise good faith and diligence in the
25 administration of the affairs of the Company and in the use and preservation of its
26 property and assets, and the highest obligations of fair dealing. In addition, as
27 officers and/or directors of a publicly held corporation, the Individual Defendants
28 had a duty to promptly disseminate accurate and truthful information with regard

- 11 -

1   to the Company's operations, performance, management, projections, and forecasts

2   so that the market price of the Company's stock would be based on truthful and

3   accurate information.

4   **Additional Duties of the Audit Committee Defendants**

5          28.    In addition to these duties, under the Company's Audit Committee

6   Charter in effect since at least April 2009, Audit Committee Defendants Blutt,

7   Farrell, and Thompson owed specific duties to Questcor to review and approve the

8   Company's earnings press releases, guidance, and quarterly and annual financial

9   statements.   Moreover, the Audit Committee Defendants were specially tasked

10  with assisting the Board with its oversight responsibilities regarding the Company's

11  compliance with legal and regulatory requirements.

12  **Additional Duties of the Compliance Committee Defendants**

13         29.    Under the Company's Compliance Committee Charter in effect since

14  at least March 2012, Compliance Committee Defendants Farrell, Whitcup, and

15  Thompson owed specific duties to Questcor to monitor the Company's compliance

16  with "significant healthcare related" and "regulatory issues."   Moreover, the

17  Compliance Committee Defendants were specifically tasked with reviewing the

18  status of the Company's "***compliance with U.S. pharmaceutical product***

19  ***promotional rules and regulations***, including with respect to 'off-label' and other

20  product promotional activities, unapproved product uses, fair balance, product

21  safety claims, and ***product superiority or efficacy claims***; product manufacturing

22  quality control; ***clinical studies quality control***; and required reporting to the Food

23  and Drug Administration ("FDA")."

24  **Control, Access, and Authority**

25         30.    The Individual Defendants, because of their positions of control and

26  authority as officers and/or directors of Questcor, were able to and did, directly

27  and/or indirectly, exercise control over the wrongful acts complained of herein, as

28  well as the contents of the various public statements issued by the Company.

31. Because of their advisory, executive, managerial, and directorial positions with Questcor, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Questcor. While in possession of this material, non-public information, the Individual Defendants made improper representations concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar.

32. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Questcor, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

33. To discharge their duties, the officers and directors of Questcor were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Questcor were required to, among other things:

(a) refrain from acting upon material, inside corporate information to benefit themselves;

(b) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(c) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(d) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- 13 -

1         (e)     ensure that the Company was operated in a diligent, honest, and

2 prudent manner in compliance with all applicable laws, rules, and regulations; and

3         (f)     remain informed as to how Questcor conducted its operations,

4 and, upon receipt of notice or information of imprudent or unsound conditions or

5 practices, make reasonable inquiry in connection therewith, and take steps to

6 correct such conditions or practices and make such disclosures as necessary to

7 comply with securities laws.

8 **BREACHES OF DUTIES**

9      34.    Each Individual Defendant, by virtue of his position as a director

10 and/or officer, owed to the Company and to its shareholders the fiduciary duty of

11 loyalty and good faith and the exercise of due care and diligence in the

12 management and administration of the affairs of the Company, as well as in the use

13 and preservation of its property and assets. The conduct of the Individual

14 Defendants complained of herein involves a knowing and culpable violation of

15 their obligations as officers and directors of Questcor, the absence of good faith on

16 their part, and a reckless disregard for their duties to the Company and its

17 shareholders that the Individual Defendants were aware or should have been aware

18 posed a risk of serious injury to the Company. The conduct of the Individual

19 Defendants who were also officers and/or directors of the Company have been

20 ratified by the remaining Individual Defendants who collectively comprised all of

21 Questcor's Board.

22      35.    The Individual Defendants breached their duty of loyalty and good

23 faith by allowing defendants to cause, or by themselves causing, the Company to

24 issue improper statements about Acthar and by misrepresenting the Company's

25 financial results and prospects. The Individual Defendants also failed to prevent

26 the other Individual Defendants from taking such illegal actions. As a result of

27 defendants' illegal actions and course of conduct, Questcor is now the subject of a

28 U.S. government investigation into its promotional practices and multiple class

- 14 -

1   action lawsuits that allege violations of securities laws.  As a result, Questcor has

2   expended, and will continue to expend, significant sums of money.

3                                    **OVERVIEW**

4          36.    Acthar is used as a first-line treatment only for infantile spasms.

5   Despite this, defendants caused the Company to embark on an aggressive

6   campaign to transform its business model by expanding the use of Acthar for

7   indications where, although it was approved, it was not a medically necessary use.

8   The Company commercialized Acthar for treating MS in 2007, and NS in early

9   2011, and announced plans to commercialize Acthar in the treatment of

10  rheumatology-related indications in June 2012.  Defendants caused the Company

11  to pursue this marketing campaign without the benefit of clinical studies showing

12  the efficacy of Acthar in comparison with the preferred steroid treatments.

13         37.    As a result of this dramatic shift in business strategy, Questcor has

14  seen its net sales skyrocket from $8.4 million in 2005, to $49.8 million in 2007, to

15  $218.2 million in 2011.  Most of this growth was attributable to increased usage of

16  Acthar as a second-line treatment, with infantile spasms currently accounting for

17  only 6%-10% of the Company's revenues.

18         38.    While successful in the short-term, this strategy was doomed to failure

19  as defendants were well aware that insurance companies would ultimately stop

20  reimbursing for the use of Acthar once they learned that there are other less

21  expensive and/or more effective alternatives for all the indications for which

22  Acthar is approved, except infantile spasms.    Without reimbursements from

23  insurers, sales of Acthar would be crippled.  Despite the fact that the defendants

24  operated an unsustainable business model that desperately relied on the improper

25  marketing of Acthar for indications outside of infantile spasms, they continued to

26  disseminate improper statements touting the Company's financial results and

27  business prospects.

28

                                    - 15 -

1                                **IMPROPER STATEMENTS**

2           39.     The Individual Defendants' improper statements began on April 26,

3 2011. On that date, Questcor issued a press release announcing its first quarter

4 2011 financial results. The Company reported net income of $11.2 million, or

5 $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first

6 quarter of 2011. In this press release, defendant Bailey touted the efficacy of

7 Acthar for treating MS and NS, and the effect this expansion of Acthar would have

8 on the Company's business prospects. The press release stated in part:

9          "Our strategy to expand the sales force is clearly paying off," said Don

10          M. Bailey, President and CEO of Questcor. "Paid MS prescriptions

11          are up sharply from last quarter. March was a particularly strong

12          month and this momentum has continued so far in April. *We believe*

13          *that Acthar is filling an increasingly important role in the treatment*

14          *of exacerbations associated with MS and, looking forward, we*

15          *expect to continue to grow sales in this important therapeutic area.*"

16          Mr. Bailey added, "We are also encouraged by the early positive

17          results from our small, dedicated nephrology sales team, which

18          initiated selling efforts at the beginning of March. *The number of*

19          *nephrologists who are using Acthar to treat patients with nephrotic*

20          *syndrome is increasing.*"

21           40.     After issuing its first quarter 2011 financial results on April 26, 2011,

22 Questcor hosted a conference call for analysts, media representatives, and

23 investors. During the call, defendants reiterated the record financial results

24 reported in the Company's press release and defendant Mulroy discussed the

25 Company's financial performance in depth. Defendants Bailey and Cartt discussed

26 the Company's purported success due to the expansion of Acthar in treating MS

27 and NS, stating in part:

28

[BAILEY:] In summary, we are off to a very good start this year as we continue to execute our straightforward strategy to sell more Acthar. *Our decision to expand the MS sales force is clearly paying off*. Also, *our nephrotic syndrome sales force is having some early success*.

* * *

*We believe this MS sales performance reflects the strong, underlying demand for Acthar*. This growth in demand is being driven by the increasing productivity of our expanded sales force. We believe net sales in the MS market are now about 60% of total Acthar net sales.

* * *

[CARTT:] *Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter. During the quarter we shipped a record 508 paid Acthar prescriptions for the treatment of MS relapses*. This was an increase of 120% over the year ago period and 44% over the previous quarter. We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

41.     On July 26, 2011, Questcor issued a press release announcing its second quarter 2011 financial results.  The Company reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46 million for the second quarter of 2011.   In this press release, defendant Bailey touted the Company's "terrific quarter," crediting "expanding the use of Acthar in the treatment of MS exacerbations" for the "record second quarter financial performance."  The release stated in part:

"Clearly, Questcor had a *terrific quarter*," said Don M. Bailey, President and CEO of Questcor.  "*Our focus on expanding the use of*

- 17 -

1    *Acthar in the treatment of MS exacerbations drove our record*

2    *second quarter financial performance*.  Importantly, in spite of the

3    rapid expansion in the use of Acthar for MS exacerbations, we believe

4    that the prescriber base can continue to grow.  Accordingly, growing

5    MS sales remains our number one priority.  Also, following our early

6    success in NS, we are immediately and substantially expanding our

7    nephrology selling effort."

8        42.  After issuing its second quarter 2011 financial results on July 26,

9    2011, Questcor hosted a conference call for analysts, media representatives, and

10   investors.  During the call, defendants reiterated the record financial results

11   reported in the Company's press release and defendant Mulroy discussed the

12   Company's financial performance in depth.  Additionally, defendant Cartt

13   specifically discussed the alleged success of Acthar for the treatment of MS

14   relapses, and stated that he expects "continued growth during 2011 and into 2012."

15   Cartt represented as follows:

16   [CARTT:]  *During the quarter we shipped a record 751 paid Acthar*

17   *prescription for the treatment of MS relapses*. This was an increase

18   of 147% over the year-ago period, and 48% over the previous quarter.

19   We believe this performance is a strong signal that the sales force

20   continues to gain traction in the MS market at a faster rate than we

21   expected. *In addition to rapid growth, our trends at MS are all very*

22   *good and indicate that we are building momentum in this key*

23   *Acthar market*.

24                      * * *

25   So, let's summarize. *We are very pleased with the robust MS*

26   *prescription growth during the quarter and expect continued growth*

27   *during 2011 and into 2012* as a result of the continued sustained sales

28   call activity.  Our early prescription trends in nephrology are

- 18 -

surprisingly strong and we are quickly expanding our sales capability in MS, which will result in a dramatic increase in the number of nephrologists that we can call on at the end of the third quarter, just about two months away.

43.    On October 25, 2011, Questcor issued a press release announcing its third quarter 2011 financial results.  The Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million for the third quarter of 2011.  Moreover, defendant Cartt discussed the Company's growing sales and marketing efforts, which were the primary drivers of "expanded usage of Acthar." The press release stated in part:

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st.  Despite the inherent disruption involved with this expansion, paid nephrotic syndrome *Acthar prescriptions increased during the quarter.  September was a particularly strong month for both MS and NS sales*."

44.    After issuing its third quarter 2011 financial results on October 25, 2011, Questcor hosted a conference call for analysts, media representatives, and investors.  During the call, defendants reiterated the record financial results reported in the Company's press release and defendant Mulroy discussed the Company's financial performance in depth.  Defendant Cartt further presented statements on the conference call regarding Acthar's positive trends in the Company's MS business, representing as follows:

- 19 -

1  [CARTT:] *[W]e shipped 886 paid Acthar prescription for the*
2  *treatment of MS relapses during the third quarter of 2011.This was*
3  *an increase of 174% over the year-ago period. In addition to strong*
4  *script growth, other positive trends in our MS business indicate that*
5  *we are building momentum in this key Acthar market.*

6  45. On January 11, 2012, *TheStreetSweeper.org ("StreetSweeper")*, a
7  website noted for unearthing corporate fraud in public companies, announced that
8  it had initiated a short position in Questcor. *StreetSweeper* further reported that it
9  intended to issue the first article in a two-part investigative series about Questcor's
10 marketing practices in the following week. According to *StreetSweeper*:

11 *The first article raises serious questions about the aggressive*
12 *marketing practices that [Questcor] has used to generate explosive –*
13 *but potentially unsustainable – growth in prescriptions for its only*
14 *drug while the second story further examines QCOR's business*
15 *practices, while taking a hard look at the leaders who have struck it*
16 *rich as a result of the company's controversial growth strategy.*

17 46. On January 11, 2012, Questcor issued a press release entitled
18 "Questcor Pharmaceuticals Issues Statement," which attempted to refute the claims
19 raised by *StreetSweeper* and defend the Company's business practices. The press
20 release stated:

21 Questcor Pharmaceuticals, Inc. today announced it became aware that
22 an investor blog is preparing to issue a report regarding the
23 Company's marketing and business practices. Questcor issued the
24 following statement:

25 *The Company believes that its marketing and business practices are*
26 *consistent with regulatory requirements and industry standard*
27 *practices.* Questcor markets H.P. Acthar® Gel for the treatment of
28 acute exacerbations of multiple sclerosis (MS) in adults, the treatment

of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age. The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team. Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome. ***The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices***. Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

47. *StreetSweeper* issued the first article in its two-part investigative series about Questcor's business practices on January 24, 2012. The second article was released three days later on January 27, 2012. Both of these *StreetSweeper* articles shed light on the defendants' improper marketing practices relating to expanding the use of Acthar for treating indications outside of infantile spasms. Moreover the *StreetSweeper* articles highlighted the fact that defendants caused the Company to completely and utterly disregard "regulatory requirements and industry standard practices." The *StreetSweeper* articles even quoted an industry veteran who resigned from the Company as stating:

"***It was 'anything for a referral***.' I heard that multiple times. The attitude there was: 'We're small. We're under the radar. And ***until we get caught, we're going to do anything we want***.' That's why I left. They've got this cavalier attitude about one of the most highly regulated industries in the country."

48. After issuing its fourth quarter and full year 2011 financial results on February 22, 2012, Questcor hosted a conference call for analysts, media

- 21 -

1  representatives, and investors.   During the call, defendants Bailey refuted the

2  serious allegations raised in the *StreetSweeper* articles and portrayed the claims as

3  being made by a short seller.  Bailey stated, in part:

4  > Before providing a little overall perspective on the value drivers for

5  > Questcor, *I wanted to briefly address some of the rumors that we are*

6  > *being told are being spread by members of the short selling*

7  > *community*.

8

9  > First was the rumor that we canceled the RBC conference due to bad

10 > news we did not want to share. Actually, we canceled the RBC

11 > conference because we were double-booked with the Citi conference.

12 > We presented at the Leerink conference last week and will present

13 > again next Monday, February 27, at the Citi conference. *The next*

14 > *rumor was that Questcor was the subject or soon to become the*

15 > *subject of one or more government investigations. In reality, we*

16 > *have no knowledge of any government investigation*. We have not

17 > been contacted by any government agency regarding an actual or

18 > potential investigation. *Furthermore, our recent compliance review*

19 > *found no violations of policy, guidance, or law*. The third rumor is

20 > that our success is due to just a couple of docs writing Acthar scripts.

21 > Actually, *as we continue to educate physicians on how Acthar works*

22 > *to treat serious medical conditions, the number of physicians*

23 > *prescribing Acthar continues to grow*. This number has more than

24 > doubled year-over-year, results in almost 900 doctors writing almost

25 > 1,800 Acthar prescriptions in the fourth quarter.

26

27 > This associated rumor is that only a few reps are making sales.

28 > Actually all MS reps generate scripts and three-quarters of all Acthar

- 22 -

MS reps met or exceeded their goal in Q4. *We have also heard the rumor that insurance companies are stopping their coverage of Acthar for nephrotic syndrome. As Steve reported, coverage of Acthar for nephrotic syndrome continues to be above 85%.* And we are asked about the rumor that our accounts receivable is up because payers have stopped approving Acthar. Accounts receivable are up mainly because sales are up. The day after the 8-K with our Leerink Swann investor conference presentation was filed, $13 million in checks were received and cleared payment. Payers do not pay us directly, so insurance issues would not affect AR in any case. There have been other rumors as well, but in the interest of time, I will not attempt to cover all of them. I think you get the idea.

49. Additionally, in that same February 22, 2012 conference call, defendant Bailey assured investors that the Company's business model would lead to sustainable growth:

[BAILEY:] As *we look ahead to 2012 and beyond, we believe we can sustainably grow our Business* due to three key factors. First, Acthar provides benefits to many difficult to treat patients not responding to other treatments. Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small. And third, we have assembled an excellent, experienced commercial team to pursue our growth plan. Our focus remains on helping patients with serious, difficult to treat medical conditions.

50. After issuing its first quarter 2012 financial results on April 24, 2012, Questcor hosted a conference call for analysts, media representatives, and investors. During the call, defendants reiterated the Company's record financial results and defendant Mulroy discussed the Company's financial performance in

- 23 -

depth.  Moreover, during the call, defendant Cartt touted the "continued strong coverage" by insurance for Acthar prescriptions used to treat NS, representing as follows:

> [CARTT:]  *Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered. We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated and approved in this condition*, and there are few other treatment options. Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding. In fact, data from one study at the University of Toronto, is being presented just this week at the Canadian nephrology society annual meeting. This particular study found that about two-thirds of patients with nephrotic syndrome due to idiopathic membranous nephropathy, had their proteinuria drop by 50% or more, due to Acthar treatment.

51.  On July 10, 2012, *CitronResearch.com* ("*Citron*") issued an in-depth research report regarding Questcor. *Citron* expanded on the *StreetSweeper* articles and further raised concerns about the Company's marketing strategy.  The report questioned whether there was credible scientific data to support Questcor's aggressive strategy to expand the use of Acthar for indications other than infantile spasms.  In addition, the research report analyzed the Company's marketing expenses and questioned how the drug was being marketed to doctors.  The *Citron* report further condemned Questcor for the lack of any meaningful research and development being engaged in by the biopharmaceutical company.  The report noted: "*Just the insider selling over the last year represents more cash than Questcor has spent on research and development over its entire lifespan*."  The

- 24 -

1 research report was not only critical of the amount of insider selling over the past

2 year but it was also critical about its timing given the Company was buying back

3 large amounts of Company stock at the same time the insiders were selling their

4 shares.

5       52.     Despite the serious allegations raised in the *Citron* report, defendants

6 caused Questcor to ignore the claims and continue reporting the Company's record

7 financial results. As a result, Questcor's stock continued to be artificially inflated.

8       53.     On July 24, 2012, Questcor issued a press release announcing its

9 second quarter 2012 financial results. The Company reported net income of $41.5

10 million, or $0.65 diluted EPS, and net sales of $112.5 million for the second

11 quarter of 2012. Defendant Bailey touted the fact that the Company "surpassed

12 $100 million in quarterly net sales for the first time in [its] history." The release

13 stated in part:

14       "***In the second quarter, we surpassed $100 million in quarterly net***

15       ***sales for the first time in our history***," said Don M. Bailey, President

16       and CEO of Questcor. "Our strong financial results were driven by

17       increasing usage of Acthar among nephrologists and neurologists.

18       With the expansion of our Nephrology Sales Force now complete, the

19       expansion of our Neurology Sales Force nearing completion, and the

20       initial detailing effort of a small sales force in Rheumatology just

21       getting started, we are optimistic about the potential for Acthar to help

22       an increasing number of patients with serious, difficult-to-treat

23       autoimmune and inflammatory disorders."

24       54.     After issuing its second quarter 2012 financial results on July 24,

25 2012, Questcor hosted a conference call for analysts, media representatives, and

26 investors. During the call, defendants reiterated the record financial results

27 reported in the Company's press release and defendant Mulroy discussed the

28 Company's financial performance in depth. Additionally, during the call,

- 25 -

defendant Bailey touted the fact that the Company "doubled the number of shipped vials in the quarter, more than doubled net sales, and tripled earnings from the year ago quarter." Furthermore, defendant Cartt discussed the Company's expanded sales forces to market Acthar and the "continued excellent Acthar insurance coverage for MS relapse." Bailey and Cartt represented as follows:

> [BAILEY:] We made significant progress with our business in the last three months. Financial performance again improved. We almost **doubled the number of shipped vials in the quarter, more than doubled net sales, and tripled earnings from the year-ago quarter**. Paid scripts increased for both nephrotic syndrome and MS. *We expanded two sales forces and started building a third sales force in Rheumatology, using the same formula that worked so well with MS and nephrotic syndrome*. And, we also made good progress in both our science and compliance programs.

> \* \* \*

> [CARTT:] Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, *continued excellent Acthar insurance coverage for MS relapse*, and the increasing productivity of our MS commercial team.

## REASONS THE STATEMENTS WERE IMPROPER

55.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Questcor lacked clinical evidence to support the use of Acthar for indications other than infantile spasms;

- 26 -

(b)     The defendants had caused Questcor to engage in improper promotional practices in relation to the sale and use of Acthar in the treatment of MS and NS; and

(c)     Questcor and its officers and/or directors lacked a reasonable basis to make positive statements and projections about the Company or its outlook, including statements about the effectiveness of, and/or potential market growth for, Acthar in light of: (i) the lack of clinical data supporting the use of Acthar for anything but the treatment of infantile spasms; and (ii) the Company's improper, and possibly illegal, sales practices.

## THE TRUTH IS REVEALED

56.     On September 14, 2012, Aetna, one of the nation's largest insurers, issued a Clinical Policy Bulletin concerning Acthar.  The Clinical Policy Bulletin severely limited reimbursement for Acthar and contained damaging conclusions regarding the drug's efficacy.  Indeed, according to the Clinical Policy Bulletin, Aetna had engaged in a review of the nineteen indications for which the FDA had approved Acthar, and concluded that *clinical research supported only one of the nineteen indications*. Aetna reported that studies suggested that the drug is only "medically necessary" for infantile spasms, and not for other indications, such as MS and NS, that are treated with steroids.

57.     Cynthia Michener, an Aetna spokesperson, provided further explanation regarding Aetna revising its position on Acthar.  She stated that "Our previous position was that this was a last-resort treatment.... *We now state that it is not medically necessary because there is no clinical evidence that the drug is more effective than steroids*."

58.     Aetna's Clinical Policy Bulletin has major, negative financial implications for Questcor because Aetna, like most other insurers, typically only reimburses for drugs when they are deemed medically necessary.  This is especially damaging to Questcor given that the Company's financial future, growth

- 27 -

1 prospects, and stock price were all predicated on the use of Acthar to treat diseases
2 other than infantile spasms.

3      59.    The Clinical Policy Bulletin was disclosed in a September 19, 2012
4 follow-up report by *Citron* and, not surprisingly, the market's reaction was swift
5 and brutal. Questcor's stock plummeted $24.16 per share to close that day at
6 $26.25 per share, a one-day decline of nearly 48% on high volume.

7      60.    The bad news did not, however, end with Aetna. On September 24,
8 2012, Questcor announced in a Form 8-K filed with the U.S. Securities and
9 Exchange Commission ("SEC") that the U.S. government had initiated an
10 investigation into the Company's promotional practices. On this news, Questcor's
11 stock dropped $11.05 per share to close at $19.08 per share, a decline of 37% on
12 high volume.

13      61.    While the Company did not provide specifics with respect to the U.S.
14 government investigation, some analysts speculated that the Company was paying
15 kickbacks to doctors. As stated by Roth Capital Partners in an analyst report
16 published on September 24, 2012:

17      Although the company is still learning the details of the full nature of
18      the investigation, *we believe the possible scope, based on our prior*
19      *experience, could potentially be 1) off-label (or false claim)*
20      *marketing or 2) kick-backs taking place during the process*.

21 That same day, ThinkEquity LLC stated the following in an analyst report:

22      Given the 19 labeled indications we would be surprised to see off-
23      label marketing for this drug. *Is it possible that QCOR has been*
24      *providing a too-high honorarium to high prescribing doctors which*
25      *has the appearance of "paying for Rx's"?*

26                      **THE IMPROPER REPURCHASES**

27      62.    While the Individual Defendants made improper statements and failed
28 to disclose material facts that had the effect of maintaining the Company stock

- 28 -

artificially inflated, defendants Bailey, Blutt, Thompson, Farrell, Bradsher, Silverman, and Whitcup authorized and implemented multiple repurchases of the Company's stock at these artificially inflated rates. Despite knowing or recklessly disregarding the fact that the value of the Company was inflated due to the improper statements concerning the Company's business prospects, including, but not limited to, the effectiveness of and potential market growth for Acthar, these defendants either directed or permitted the Company to materially overpay for its own stock through the repurchases detailed herein.[3]

63. From March 2012 to June 2012, defendants Bailey, Blutt, Thompson, Farrell, Bradsher, Silverman, and Whitcup caused the Company to repurchase approximately 4,528,354 shares of its stock at a staggering aggregate cost to the Company of over $185 million. The purchases of the Company's stock were at artificially inflated prices as a result of the improper statements, press releases, and filings with the SEC that failed to disclose material information regarding the Company business prospects, including, but not limited to the effectiveness of and potential market growth for Acthar.

64. Despite defendants Bailey, Blutt, Thompson, Farrell, Bradsher, Silverman, and Whitcup's knowledge of the true facts about the improper marketing of Acthar and the Company's resulting temporary and unsustainable financial success, they did not halt the Company's purchases and continued to

---

[3] On February 29, 2008, Robert J. Rubin and defendants Bailey, Bradsher, Farrell, Thompson, and Young approved a stock repurchase plan that provided for the repurchase of up to seven million shares of Questcor common stock. On May 29, 2009, defendants Bailey, Bradsher, Farrell, Thompson, and Young increased the stock repurchase plan by an additional 6.5 million shares. On May 9, 2012, defendants Bailey, Blutt, Bradsher, Farrell, Silverman, Thompson, and Whitcup increased the stock repurchase plan by an additional five million shares. This stock repurchase program did not have an expiration date and could have been limited or terminated at any time by the Board without prior notice.

1  allow the Company to purchase shares at artificially inflated prices. Bailey, Blutt,

2  Thompson, Farrell, Bradsher, Silverman, and Whitcup's decision was not the

3  product of a valid business judgment.

4       65.    Under defendants Bailey, Blutt, Thompson, Farrell, Bradsher,

5  Silverman, and Whitcup's purview, the Company bought back its shares at a

6  weighted average price of $40.87. Tellingly, the weighted average repurchase

7  price was over twice as high as Questcor's share price of $19.08 on September 24,

8  2012, when the truth about the defendants' unsustainable business model was

9  revealed. The following chart illustrates the average prices paid for the Company's

10  common stock during the repurchase period:

| February 2008 Repurchase Program | Period | Shares Repurchased | Average Price Per Share | Approximate Aggregate Cost | Source | File Date |
|---|---|---|---|---|---|---|
| | No Expiration | | | | 8K | 3/4/2008 |
| | Apr-11 | - | - | - | 10Q | 10/27/2011 |
| | May-11 | - | - | - | 10Q | 10/27/2011 |
| | Jun-11 | - | - | - | 10Q | 10/27/2011 |
| | Jul-11 | - | - | - | 10Q | 10/27/2011 |
| | Aug-11 | - | - | - | 10Q | 10/27/2011 |
| | Sep-11 | - | - | - | 10Q | 10/27/2011 |
| | Oct-11 | - | - | - | 10K | 2/22/2012 |
| | Nov-11 | - | - | - | 10K | 2/22/2012 |
| | Dec-11 | - | - | - | 10K | 2/22/2012 |
| | Jan-12 | - | - | - | 10Q | 4/26/2012 |
| | Feb-12 | - | - | - | 10Q | 4/26/2012 |
| | Mar-12 | 798,285 | $36.31 | $28,985,728 | 10Q | 4/26/2012 |
| | Apr-12 | 914,500 | $43.77 | $40,027,665 | 10Q | 7/25/2012 |
| | May-12 | 2,751,080 | $41.25 | $113,482,050 | 10Q | 7/25/2012 |
| | Jun-12 | 64,489 | $40.25 | $2,595,682 | 10Q | 7/25/2012 |
| Total: | | 4,528,354 | | $185,091,126 | | |

24       66.    Because the price of Questcor's shares was artificially inflated by way

25  of the Individual Defendants' concealment and misrepresentations, the Company

26  materially overpaid for its own stock. The stock purchases falsely signaled to

27  Questcor's shareholders and the public that the purchase of the Company's stock at

28  those prices was the best use of Questcor's cash. Thus, defendants Bailey, Blutt,

1  Thompson, Farrell, Bradsher, Silverman, and Whitcup breached their fiduciary
2  duties and committed corporate waste by causing Questcor to purchase over $185
3  million of its own shares at artificially inflated prices.

4  **INSIDER SELLING**

5  67.  The Individual Defendants' knowledge of the true health of Questcor's
6  business prospects and the ticking time clock until they would no longer be able to
7  successfully market Acthar for indications other than infantile spasms is also
8  shown in certain Questcor officers' and directors' sales of personally-held stock.
9  At the same time that they were causing the Company to repurchase Questcor
10  stock at artificially inflated prices, the Insider Selling Defendants, Mederios, Blutt,
11  Bailey, Cartt, Young, Thompson, and Farrell, were privy to adverse, non-public
12  information which they exploited for their own benefit, to the exclusion of other
13  shareholders, by selling their Company stockholdings before the truth came to
14  light.  While continuously making or causing the Company to make improper
15  statements touting its business prospects, certain officers and directors sold
16  massive amounts of Company stock in order to capitalize on the Company's
17  inflated stock price that they had helped create.

18  68.  As Questcor's Executive Vice President and Chief Technical Officer,
19  defendant Medeiros was a member of the Company's management.  He was privy
20  to material, non-public information about the limits to the effectiveness of, and
21  potential market growth for, Acthar.  Medeiros engaged in insider trading activity
22  at a time when he knew adverse material, non-public information that would
23  directly affect the Company's bottom line.

24  69.  While in possession of this knowledge, defendant Medeiros sold
25  1,063,363 shares of his personally held Questcor stock for proceeds of
26  $35,378,781.87.  Medeiros' sales are particularly suspicious given that his stock
27  sales during the period tainted by improper statements represented over 99% of his
28  holdings, as demonstrated by the chart below.  Furthermore, Medeiros' sales are

- 31 -

also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| Shares Sold During SP | 1,063,363 |
|---|---|
| Shares Remaining After Sales | 7,439 |
| Total Shares Before Sales | 1,070,802 |
| **Total Proceeds from Sales** | **$35,378,781.87** |
| **% of Total Ownership Sold During SP** | **99.31%** |

70.     As a director of Questcor, defendant Blutt was a member of the Company's Board.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Blutt engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

71.     While in possession of this knowledge, defendant Blutt sold 706,255 shares of his personally held Questcor stock for proceeds of $25,162,724.77.  Blutt's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 76% of his holdings, as demonstrated by the chart below.  Furthermore, Blutt's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| Shares Sold During SP | 706,255 |
|---|---|
| Shares Remaining After Sales | 220,000 |
| Total Shares Before Sales | 926,255 |
| **Total Proceeds from Sales** | **$25,162,724.77** |
| **% of Total Ownership Sold During SP** | **76.25%** |

72.     As Questcor's CEO, President, and a director, defendant Bailey was a member of the Company's management and Board.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Bailey engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

- 32 -

73.   While in possession of this knowledge, defendant Bailey sold 440,000 shares of his personally held Questcor stock for proceeds of $17,718,533.35. Bailey's sales are suspicious given that his stock sales during the period tainted by improper statements represented almost 75% of his holdings as demonstrated by the chart below.  Furthermore, Bailey's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| | |
|---|---|
| Shares Sold During SP | 440,000 |
| Shares Remaining After Sales | 147,422 |
| Total Shares Before Sales | 587,422 |
| **Total Proceeds from Sales** | **$17,718,533.35** |
| **% of Total Ownership Sold During SP** | **74.90%** |

74.   As Questcor's Chief Operating, Chief Business Officer, and an Executive Vice President, defendant Cartt was a member of the Company's management.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Cartt engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

75.   While in possession of this knowledge, defendant Cartt sold 505,509 shares of his personally held Questcor stock for proceeds of $16,215,281.15. Cartt's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 86% of his holdings as demonstrated by the chart below.  Furthermore, Cartt's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| | |
|---|---|
| Shares Sold During SP | 505,509 |
| Shares Remaining After Sales | 78,198 |
| Total Shares Before Sales | 583,707 |
| **Total Proceeds from Sales** | **$16,215,281.15** |
| **% of Total Ownership Sold During SP** | **86.60%** |

- 33 -

76.   As Questcor's Chief Scientific Officer, defendant Young was a member of the Company's management.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Young engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

77.   While in possession of this knowledge, defendant Young sold 175,124 shares of his personally held Questcor stock for proceeds of $7,047,323.60. Young's sales are particularly suspicious given that his stock sales during the period tainted by improper statements represented over 92% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 175,124 |
| Shares Remaining After Sales | 13,903 |
| Total Shares Before Sales | 189,027 |
| **Total Proceeds from Sales** | **$7,047,323.60** |
| **% of Total Ownership Sold During SP** | **92.64%** |

78.   As a director of Questcor, defendant Thompson was a member of the Company's Board.  He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar.  Thompson engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

79.   While in possession of this knowledge, defendant Thompson sold 167,500 shares of his personally held Questcor stock for proceeds of $3,413,650. Thompson's sales are particularly suspicious given that his stock sales during the period tainted by improper statements represented over 91% of his holdings as demonstrated by the chart below:

| | |
|---|---|
| Shares Sold During SP | 167,500 |
| Shares Remaining After Sales | 15,000 |
| Total Shares Before Sales | 182,500 |
| **Total Proceeds from Sales** | **$3,413,650.00** |
| **% of Total Ownership Sold During SP** | **91.78%** |

- 34 -

80. As a director of Questcor, defendant Farrell was a member of the Company's Board. He was privy to material, non-public information about the limits to the effectiveness of, and potential market growth for, Acthar. Farrell engaged in insider trading activity at a time when he knew adverse material, non-public information that would directly affect the Company's bottom line.

81. While in possession of this knowledge, defendant Farrell sold 55,000 shares of his personally held Questcor stock for proceeds of $2,353,622.64. Farrell's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 86% of his holdings as demonstrated by the chart below. Furthermore, Farrell's sales are also suspicious considering that he did not sell any of his stock in the same amount of time prior to the start of the wrongdoing detailed herein.

| | |
|---|---|
| Shares Sold During SP | 55,000 |
| Shares Remaining After Sales | 8,750 |
| Total Shares Before Sales | 63,750 |
| **Total Proceeds from Sales** | **$2,353,622.64** |
| **% of Total Ownership Sold During SP** | **86.27%** |

82. Combined, defendants Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell sold over $107 million worth of their Company stock while misleading investors about the Company's business prospects. The following is a table showing the total insider sales that occurred during the period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BAILEY** | 8/25/2011 | 19,800 | $26.04 | $515,592.00 |
| | 8/25/2011 | 10,200 | $26.99 | $275,298.00 |
| | 9/12/2011 | 6,299 | $25.28 | $159,238.72 |
| | 9/12/2011 | 8,353 | $26.26 | $219,349.78 |
| | 9/12/2011 | 8,433 | $27.25 | $229,799.25 |
| | 9/12/2011 | 6,415 | $28.09 | $180,197.35 |
| | 9/12/2011 | 500 | $28.90 | $14,450.00 |
| | 10/10/2011 | 7,200 | $31.43 | $226,296.00 |
| | 10/10/2011 | 22,800 | $32.45 | $739,860.00 |
| | 11/10/2011 | 29,900 | $41.07 | $1,227,993.00 |
| | 11/10/2011 | 100 | $41.81 | $4,181.00 |
| | 12/9/2011 | 4,500 | $43.18 | $194,310.00 |
| | 12/9/2011 | 23,882 | $44.16 | $1,054,629.12 |

- 35 -

| | | | | |
|---|---|---|---|---|
| | 12/9/2011 | 1,618 | $44.94 | $72,712.92 |
| | 1/10/2012 | 30,000 | $41.87 | $1,256,100.00 |
| | 2/10/2012 | 12,300 | $34.59 | $425,457.00 |
| | 2/10/2012 | 17,700 | $34.97 | $618,969.00 |
| | 3/9/2012 | 18,900 | $35.31 | $667,359.00 |
| | 3/9/2012 | 10,300 | $36.17 | $372,551.00 |
| | 3/9/2012 | 800 | $36.87 | $29,496.00 |
| | 4/10/2012 | 30,000 | $40.92 | $1,227,600.00 |
| | 5/10/2012 | 15,000 | $39.65 | $594,750.00 |
| | 5/10/2012 | 15,000 | $39.66 | $594,900.00 |
| | 6/11/2012 | 15,000 | $45.37 | $680,541.00 |
| | 6/11/2012 | 15,000 | $45.37 | $680,604.00 |
| | 7/10/2012 | 3,339 | $57.89 | $193,297.38 |
| | 7/10/2012 | 11,661 | $57.71 | $672,907.33 |
| | 7/10/2012 | 15,000 | $57.61 | $864,172.50 |
| | 8/27/2012 | 20,000 | $43.07 | $861,416.00 |
| | 8/27/2012 | 20,000 | $43.07 | $861,320.00 |
| | 9/13/2012 | 28,077 | $50.08 | $1,406,042.81 |
| | 9/13/2012 | 11,923 | $50.08 | $597,143.19 |
| | | **440,000** | | **$17,718,533.35** |
| | | | | |
| **BLUTT** | 9/12/2011 | 370,000 | $26.13 | $9,668,655.00 |
| | 11/15/2011 | 150,000 | $43.94 | $6,591,000.00 |
| | 5/3/2012 | 79,952 | $43.95 | $3,513,890.40 |
| | 5/4/2012 | 11,573 | $42.69 | $494,051.37 |
| | 7/2/2012 | 70,000 | $53.11 | $3,717,980.00 |
| | 9/4/2012 | 14,730 | $47.60 | $701,148.00 |
| | 9/4/2012 | 10,000 | $47.60 | $476,000.00 |
| | | **706,255** | | **$25,162,724.77** |
| | | | | |
| **CARTT** | 5/13/2011 | 70,400 | $22.73 | $1,600,192.00 |
| | 5/16/2011 | 79,087 | $22.04 | $1,743,077.48 |
| | 8/4/2011 | 25,513 | $30.17 | $769,727.21 |
| | 8/10/2011 | 25,000 | $31.00 | $775,000.00 |
| | 8/11/2011 | 60,968 | $31.00 | $1,890,008.00 |
| | 8/11/2011 | 25,000 | $31.19 | $779,750.00 |
| | 8/15/2011 | 14,032 | $31.50 | $442,008.00 |
| | 8/15/2011 | 33,123 | $31.50 | $1,043,374.50 |
| | 10/28/2011 | 139,286 | $41.36 | $5,760,868.96 |
| | 10/31/2011 | 25,000 | $42.60 | $1,065,000.00 |
| | 11/8/2011 | 8,100 | $42.75 | $346,275.00 |
| | | **505,509** | | **$16,215,281.15** |
| | | | | |
| **FARRELL** | 11/16/2011 | 15,918 | $43.21 | $687,816.78 |
| | 11/16/2011 | 14,082 | $43.73 | $615,805.86 |
| | 4/19/2012 | 25,000 | $42.00 | $1,050,000.00 |
| | | **55,000** | | **$2,353,622.64** |
| | | | | |
| **MEDEIROS** | 4/29/2011 | 204,841 | $20.36 | $4,170,562.76 |
| | 5/2/2011 | 80,372 | $20.70 | $1,663,700.40 |
| | 5/3/2011 | 4,500 | $20.38 | $91,710.00 |

- 36 -

| | | | | |
|---|---|---|---|---|
| | 5/12/2011 | 115,128 | $22.07 | $2,540,874.96 |
| | 8/3/2011 | 94,500 | $31.18 | $2,946,510.00 |
| | 10/28/2011 | 147,756 | $41.55 | $6,139,261.80 |
| | 10/31/2011 | 55,221 | $42.26 | $2,333,639.46 |
| | 10/31/2011 | 7,248 | $42.65 | $309,127.20 |
| | 11/5/2011 | 180,189 | $42.57 | $7,670,645.73 |
| | 11/11/2011 | 123,036 | $42.98 | $5,288,087.28 |
| | 11/14/2011 | 50,572 | $43.99 | $2,224,662.28 |
| | | 1,063,363 | | $35,378,781.87 |
| | | | | |
| THOMPSON | 4/29/2011 | 167,500 | $20.38 | $3,413,650.00 |
| | | 167,500 | | $3,413,650.00 |
| | | | | |
| YOUNG | 8/5/2011 | 10,000 | $28.50 | $285,000.00 |
| | 8/12/2011 | 9,208 | $32.00 | $294,656.00 |
| | 8/12/2011 | 100 | $32.00 | $3,200.00 |
| | 8/15/2011 | 5,792 | $32.00 | $185,344.00 |
| | 8/15/2011 | 300 | $32.00 | $9,600.00 |
| | 10/31/2011 | 75,000 | $41.03 | $3,077,250.00 |
| | 10/31/2011 | 4,724 | $41.40 | $195,573.60 |
| | 4/27/2012 | 70,000 | $42.81 | $2,996,700.00 |
| | | 175,124 | | $7,047,323.60 |
| | | | | |
| Total: | | 3,112,751 | | $107,289,917.39 |

83.     While defendants Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell sold some their personally-held Company stock pursuant to 10b5-1 plans, these plans were adopted after the misconduct had already begun. As such, Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell knew that Questcor's stock was artificially inflated due to their improper statements when adopting the 10b5-1 plans, and cannot avail themselves of the inference that they did not trade on the material adverse, non-public information.

## DAMAGES TO QUESTCOR

84.     As a result of the Individual Defendants' improprieties, Questcor disseminated improper, public statements concerning the Company's business prospects. These improper statements have devastated Questcor's credibility, corporate image, and goodwill as reflected by the Company's over $2.3 billion, or almost 67%, market capitalization loss after the truth was released concerning its improper marketing practices and overstated business prospects. For at least the

- 37 -

1  foreseeable future, Questcor will suffer from what is known as the "liar's discount,"

2  a term applied to the stocks of companies who have been implicated in improper

3  behavior and have misled the investing public, such that Questcor's ability to raise

4  equity capital or debt on favorable terms in the future is impaired.  In addition, the

5  Company will now likely face increased levels of scrutiny when it seeks

6  reimbursements from the U.S. government.

7       85.  Further, as a direct and proximate result of the Individual Defendants'

8  actions, Questcor has expended, and will continue to expend, significant sums of

9  money.  Such expenditures include, but are not limited to:

10       (a)  costs incurred in investigating and defending Questcor and

11  certain officers and directors in the pending Securities Class Actions;

12       (b)  costs incurred from paying any potential settlement or adverse

13  judgment in the pending Securities Class Actions;

14       (c)  costs incurred in responding to the U.S. government

15  investigation into the Company's promotional practices;

16       (d)  costs incurred from paying any potential fines to the U.S.

17  government;

18       (e)  costs incurred from repurchasing almost $185 million of the

19  Company's own stock at artificially inflated prices; and

20       (f)  costs incurred from compensation and benefits paid to the

21  defendants who have breached their duties to Questcor.

22       **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

23       86.  Plaintiff brings this action derivatively in the right and for the benefit

24  of Questcor to redress injuries suffered, and to be suffered, by Questcor as a direct

25  result of the breaches of fiduciary duty, waste of corporate assets, and unjust

26  enrichment by the Individual Defendants.  Questcor is named as a nominal

27  defendant solely in a derivative capacity.  This is not a collusive action to confer

28  jurisdiction on this Court that it would not otherwise have.

- 38 -

1    87.    Plaintiff will adequately and fairly represent the interests of Questcor

2  in enforcing and prosecuting its rights.

3    88.    Plaintiff was a shareholder of Questcor at the time of the wrongdoing

4  complained of, has continuously been a shareholder since that time, and is a

5  current Questcor shareholder.

6    89.    The current Board of Questcor consists of the following seven

7  individuals: defendants Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman, and

8  Whitcup.  Plaintiff has not made any demand on the Board because such a demand

9  would be a futile and useless act, particularly for the reasons stated below.

10  **Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid**

11  **Exercise of Business Judgment**

12    90.    The Director Defendants' challenged misconduct at the heart of this

13  case constitutes the direct facilitation of improper business practices, and violations

14  of federal securities laws and regulations that threaten the Company's very

15  survival.  As the ultimate decision-making body of the Company, the Board

16  affirmatively adopted, implemented, and condoned a business strategy and model

17  based on deliberate and widespread improper activities.  Defendants Bailey,

18  Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup allowed and oversaw

19  Questcor's improper marketing of Acthar, which has exposed the Company to a

20  U.S. government investigation into its promotional practices.  Bailey, Thompson,

21  Blutt, Bradsher, Farrell, Silverman, and Whitcup were confronted with numerous

22  reports about the improprieties of the Company's business practices but authorized

23  the Company to deny the claims, and, just as importantly, continue to have the

24  Company operate in this improper manner.  As a result of these actions, Questcor

25  will now likely face increased levels of scrutiny when it seeks reimbursements

26  from the U.S. government for its products.  Causing the Company to engage in

27  improper and illegal conduct that threatens its survival is not a protected business

28

- 39 -

1 decision and such conduct can in no way be considered a valid exercise of business

2 judgment. Accordingly, demand on the Board is excused.

3     91. Defendants Bailey's, Thompson's, Blutt's, Bradsher's, Farrell's,

4 Silverman's, and Whitcup's authorizations to repurchase the Company's stock at

5 artificially inflated rates were not protected business decisions. Bailey, Thompson,

6 Blutt, Bradsher, Farrell, Silverman, and Whitcup were specifically empowered

7 with the authority to limit or terminate the stock repurchase program at any time

8 without prior notice. Despite this power, and even though Bailey, Thompson,

9 Blutt, Bradsher, Farrell, Silverman, and Whitcup knew or recklessly disregarded

10 the fact that the value of the Company was inflated due to improper statements

11 regarding Company's business prospects, these defendants directed or permitted

12 the Company to materially overpay for its own stock. Even worse, Bailey,

13 Thompson, Blutt, Bradsher, Farrell, Silverman, and Whitcup expanded the original

14 February 2008 stock repurchase plan by an additional five million shares.

15 **Demand Is Excused Because a Majority of the Current Board Faces a**

16 **Substantial Likelihood of Liability for Their Misconduct**

17     92. Defendants Bailey's, Thompson's, Blutt's, Bradsher's, Farrell's,

18 Silverman's, and Whitcup's multiple authorizations and repurchases of the

19 Company's stock at artificially inflated rates, and failure to limit or terminate the

20 stock repurchase program, was in breach of their fiduciary duty and resulted in

21 corporate waste. Accordingly, Bailey, Thompson, Blutt, Bradsher, Farrell,

22 Silverman, and Whitcup face a substantial likelihood of liability for breaching their

23 fiduciary duty of loyalty and wasting corporate assets, rendering any demand upon

24 them futile.

25     93. Defendants Blutt, Bailey, Thompson, and Farrell, constituting four of

26 the seven current members of the Board, sold Questcor stock under highly

27 suspicious circumstances. As detailed above, Blutt, Bailey, Thompson, and

28 Farrell, as officers and/or directors of the Company, possessed material, non-public

- 40 -

1  company information and used that information to benefit themselves. These
2  insiders sold stock based on this knowledge of material, non-public information
3  concerning the Company's financial condition, future business prospects, and
4  outlook. As alleged herein, Blutt, Bailey, Thompson, and Farrell's trading was
5  suspicious in timing and amount. Blutt sold 706,255, or over 76% of his shares,
6  for proceeds of $25,162,724.77. Bailey sold 440,000, or almost 75% of his shares,
7  for proceeds of $17,718,533.35. Thompson sold 167,500, or over 91% of his
8  shares, for proceeds of $3,413,650. Farrell sold 55,000, or over 86% of his shares,
9  for proceeds of $2,353,622.64. Accordingly, Blutt, Bailey, Thompson, and Farrell
10 face a substantial likelihood of liability for breaching their fiduciary duty of
11 loyalty, rendering any demand upon them futile.

12   94. As explained above, defendant Bailey breached his fiduciary duties by
13 making improper statements in the Company's press releases and SEC filings
14 regarding the Company's business prospects.

15   95. Defendants Blutt, Thompson, and Farrell, as members of the Audit
16 Committee, reviewed and approved the improper statements and misleading
17 financial results. The Audit Committee's Charter provides that it is responsible for
18 compliance with legal and regulatory requirements. Moreover, the Audit
19 Committee Defendants were specifically tasked with "review[ing] and approv[ing]
20 the Company's earnings press releases, guidance, and quarterly and annual
21 financial statements." Thus, the Audit Committee Defendants are responsible for
22 knowingly or recklessly allowing the improper statements regarding the
23 Company's business prospects. Despite their knowledge, or with reckless
24 disregard, the Audit Committee Defendants caused, and additionally in some
25 instances signed, these improper statements. Accordingly, the Audit Committee
26 Defendants breached their fiduciary duty of loyalty and good faith because they
27 participated in the wrongdoing described herein. Thus, the Audit Committee

28

1  Defendants face a substantial likelihood of liability for their breach of fiduciary
2  duties.  Any demand upon them is futile.

3       96.    Defendants Farrell, Whitcup, and Thompson, as members of the
4  Compliance Committee, breached their fiduciary duty of loyalty by failing to
5  monitor the Company's compliance with "significant healthcare related" and
6  "regulatory issues." Farrell, Whitcup, and Thompson completely and utterly failed
7  in their duty to police the Company's compliance with "U.S. pharmaceutical
8  product promotional rules and regulations, including with respect to … product
9  promotional activities, unapproved product uses," as required by the Compliance
10  Committee Charter in effect at the time.  Farrell, Whitcup, and Thompson allowed
11  and oversaw Questcor's improper marketing of Acthar for indications other than
12  infantile spasms, which has exposed the Company to a U.S. government
13  investigation into its promotional practices.   According, any demand upon the
14  Compliance Committee Defendants is futile.

15       97.    Defendants Bailey, Thompson, Blutt, Bradsher, Farrell, Silverman,
16  and Whitcup, all seven members of the Board, breached their duty of loyalty by
17  failing to implement adequate internal controls and procedures to ensure the
18  accuracy of the Company's disclosures.   Bailey, Thompson, Blutt, Bradsher,
19  Farrell, Silverman, and Whitcup also failed to prevent the other Individual
20  Defendants from committing this wrongdoing.  As a result of Bailey, Thompson,
21  Blutt, Bradsher, Farrell, Silverman, and Whitcup's course of conduct, the Company
22  is now the subject of the Securities Class Actions.

23       98.    The acts complained of constitute violations of the fiduciary duties
24  owed by Questcor's officers and directors and these acts are incapable of
25  ratification.

26       99.    Questcor has been and will continue to be exposed to significant
27  losses due to the wrongdoing complained of herein, yet the Individual Defendants
28  and current Board have not filed any lawsuits against themselves or others who

- 42 -

1  were responsible for that wrongful conduct to attempt to recover for Questcor any
2  part of the damages Questcor suffered and will suffer thereby.

3      100. Plaintiff has not made any demand on the other shareholders of
4  Questcor to institute this action since such demand would be a futile and useless
5  act for at least the following reasons:

6          (a) Questcor is a publicly held company with over 59.6 million
7  shares outstanding and thousands of shareholders;

8          (b) making demand on such a number of shareholders would be
9  impossible for plaintiff who has no way of finding out the names, addresses, or
10 phone numbers of shareholders; and

11         (c) making demand on all shareholders would force plaintiff to
12 incur excessive expenses, assuming all shareholders could be individually
13 identified.

14                          **COUNT I**

15       **Against Individual Defendants for Breach of Fiduciary Duty**

16     101. Plaintiff incorporates by reference and realleges each and every
17 allegation contained above, as though fully set forth herein.

18     102. The Individual Defendants owed and owe Questcor fiduciary
19 obligations. By reason of their fiduciary relationships, the Individual Defendants
20 owed and owe Questcor the highest obligation of good faith, fair dealing, loyalty,
21 and due care.

22     103. Each of the Individual Defendants violated and breached their
23 fiduciary duties. More specifically, the Individual Defendants violated their duty
24 of loyalty by creating a culture of lawlessness within Questcor, and/or consciously
25 failing to prevent to Company from engaging in the unlawful acts complained of
26 herein.

27     104. The Officer Defendants, Bailey, Mulroy, Cartt, and Young,
28 knowingly, recklessly, or with gross negligence: (i) made improper statements in

- 43 -

the Company's press releases and public filings concerning the Company's business prospects, including, but not limited to, the effectiveness of, and potential market growth for, Acthar; and (ii) failed to ensure that reliable systems of financial controls and reporting were in place at the Company. Officer Defendant Medeiros knowingly, recklessly, or with gross negligence failed to ensure that reliable systems of financial controls and reporting were in place at the Company.

105. The Director Defendants, Bailey, Blutt, Thompson, Farrell, Bradsher, Silverman, and Whitcup, as directors of the Company, owed Questcor the highest duty of loyalty. The Director Defendants knowingly or recklessly breached their duty of loyalty by: (i) causing Questcor to repurchase Company shares, and failing to halt the repurchases of shares, while Questcor's share price was artificially inflated as a result of improper statements regarding Questcor's business prospects; and (ii) failing to ensure that reliable systems of financial controls and reporting were in place at the Company. The stock repurchases were made for improper purposes as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote Questcor's best interests.

106. The Audit Committee Defendants, Blutt, Farrell, and Thompson, breached their fiduciary duty of loyalty by approving the statements described herein that were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and Blutt, Farrell, and Thompson failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

107. The Compliance Committee Defendants, Farrell, Whitcup, and Thompson, breached their fiduciary duty of loyalty by failing to monitor the Company's compliance with "significant healthcare related" and "regulatory

- 44 -

1   issues." Farrell, Whitcup, and Thompson completely and utterly failed in their
2   duty to police the Company's compliance with "U.S. pharmaceutical product
3   promotional rules and regulations, including with respect to... product promotional
4   activities, unapproved product uses." As a result, the Company is now the subject
5   of a U.S. government investigation into its promotional practices.

6       108. The Insider Selling Defendants, Mederios, Blutt, Bailey, Cartt,
7   Young, Thompson, and Farrell, breached their duty of loyalty by selling Questcor
8   stock on the basis of the knowledge of the improper information described above
9   before that information was revealed to the Company's shareholders. The
10  information described above was proprietary, non-public information concerning
11  the Company's current and future business prospects. It was a proprietary asset
12  belonging to the Company, which Mederios, Blutt, Bailey, Cartt, Young,
13  Thompson, and Farrell used for their own benefit when they sold Questcor
14  common stock.

15      109. As a direct and proximate result of the Individual Defendants'
16  breaches of their fiduciary duties, Questcor has sustained substantial damages,
17  including direct monetary damages and damages to its reputation and goodwill in
18  the capital markets. As a result of the misconduct alleged herein, the Individual
19  Defendants are liable to the Company.

20      110. Plaintiff, on behalf of Questcor, has no adequate remedy at law.

21                      **COUNT II**

22    **Against All Director Defendants for Waste of Corporate Assets**

23      111. Plaintiff incorporates by reference and realleges each and every
24  allegation contained above, as though fully set forth herein.

25      112. As a result of the misconduct described above, the Individual
26  Defendants have wasted corporate assets by failing to consider the interests of the
27  Company and its public shareholders. The Individual Defendants failed to conduct
28  proper supervision in connection with the payment of $185 million to repurchase

- 45 -

1   shares of the Company's stock on the open market when the Individual Defendants

2   knew and/or consciously disregarded the fact that the stock price was artificially

3   inflated by improper statements concerning the Company's business prospects.

4   113.   Moreover, as a result of the Individual Defendants' failure to

5   implement adequate internal controls to ensure that the Company's public

6   statements and financial results were accurate, defendants made improper

7   statements in the Company's press releases and public filings.   As a result,

8   Questcor is now subject to the Securities Class Actions.   The Individual

9   Defendants have caused Questcor to waste its assets by forcing it to defend itself in

10  the ongoing litigation, in addition to any ensuing costs from a potential settlement

11  or adverse judgment.   Further, the Individual Defendants have caused Questcor to

12  waste its assets by paying improper compensation and bonuses to certain of its

13  executive officers and directors that breached their fiduciary duty.

14  114.   The Individual Defendants are liable to the Company for these acts of

15  waste.

16  115.   Plaintiff, on behalf of Questcor, has no adequate remedy at law.

17  **COUNT III**

18  **Against Individual Defendants for Unjust Enrichment**

19  116.   Plaintiff incorporates by reference and realleges each and every

20  allegation set forth above, as though fully set forth herein.

21  117.   By their wrongful acts and omissions, the Individual Defendants were

22  unjustly enriched at the expense of and to the detriment of Questcor.   Their unjust

23  enrichment includes, but is not limited to, compensation, bonuses, stock options

24  awards, and benefits paid to the Individual Defendants while they were breaching

25  their fiduciary duties of care, loyalty, and good faith to Questcor, and violating

26  federal and state laws.

27  118.   Moreover, the Insider Selling Defendants, Mederios, Blutt, Bailey,

28  Cartt, Young, Thompson, and Farrell, sold Questcor stock while in possession of

- 46 -

material adverse, non-public information that artificially inflated the price of Questcor stock. As a result, Mederios, Blutt, Bailey, Cartt, Young, Thompson, and Farrell profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

119. The Individual Defendants' unjust enrichment was directly related to the impoverishment of Questcor.

120. Plaintiff, as a shareholder and representative of Questcor, seeks restitution from these Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Directing Questcor to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Questcor and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1. a proposal to control insider selling;

2. a proposal to strengthen the Company's disclosure controls and procedures;

3. a proposal to ensure that Questcor prudently expends funds in stock repurchase programs;

- 47 -

1    4.    a proposal to implement and maintain internal controls that

2  police the Company's sales and marketing practices;

3    5.    a proposal to strengthen the firewall between the Company's

4  marketing and medical divisions in order to avoid potential conflicts;

5    6.    a proposal to strengthen the Board's supervision of operations

6  and develop and implement procedures for greater shareholder input into the

7  policies and guidelines of the Board; and

8    7.    a provision to permit the shareholders of Questcor to nominate

9  at least three candidates for election to the Board;

10    C.    Extraordinary equitable and/or injunctive relief as permitted by law,

11  equity and state statutory provisions sued hereunder, including attaching,

12  impounding, imposing a constructive trust on or otherwise restricting defendants'

13  assets so as to assure that plaintiff on behalf of Questcor has an effective remedy;

14    D.    Awarding to Questcor restitution from defendants, and each of them,

15  and ordering disgorgement of all profits, benefits, and other compensation obtained

16  by defendants, including all ill-gotten gains from the Insider Selling Defendants;

17    E.    Awarding to plaintiff the costs and disbursements of the action,

18  including reasonable attorneys' fees, accountants' and experts' fees, costs, and

19  expenses; and

20    F.    Granting such other and further relief as the Court deems just and

21  proper.

22    **JURY DEMAND**

23    Plaintiff demands a trial by jury.

24  Dated: October 11, 2012          ROBBINS UMEDA LLP
25                                   BRIAN J. ROBBINS
                                     FELIPE J. ARROYO
26                                   SHANE P. SANDERS
                                     KEVIN S. KIM
27

28                                   _____
                                          BRIAN J. ROBBINS

- 48 -

1      600 B Street, Suite 1900
    San Diego, CA 92101
2      Telephone: (619) 525-3990
    Facsimile: (619) 525-3991
3      brobbins@robbinsumeda.com
    farroyo@robbinsumeda.com
4      ssanders@robbinsumeda.com
    kkim@robbinsumeda.com

5      GOLDFARB LLP
    HAMILTON LINDLEY
6      2501 N. Harwood Street, Suite 1801
    Dallas, TX 75201
7      Telephone: (214) 583-2257
    Facsimile: (214) 583-2234
8      hlindley@goldfarbllp.com

9      Attorneys for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  773012

28

- 49 -

<u>VERIFICATION</u>

I, James Tripoli, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _____ 10/08/2012 _____

_____
JAMES TRIPOLI

775599

# EXHIBIT F

# THE WEISER LAW FIRM, P.C.

**A LEADING NATIONAL SHAREHOLDER LITIGATION FIRM DEDICATED EXCLUSIVELY TO PROTECTING INDIVIDUAL AND INSTITUTIONAL SHAREHOLDERS' INTERESTS AND PROMOTING IMPROVED CORPORATE GOVERNANCE PRACTICES**

### *FIRM BIOGRAPHY*

The Weiser Law Firm, P.C., a national shareholder litigation firm, was founded by its two principals, Patricia C. Weiser and Robert B. Weiser, in December, 2004.  Prior to December, 2004, Ms. Weiser and Mr. Weiser had both managed litigation groups at one of the nation's largest shareholder litigation firms.  The Weiser Law Firm is devoted to protecting the interests of individual and institutional investors in shareholder class, derivative and ERISA actions in state and federal courts nationwide.  The attorneys at The Weiser Law Firm devote a large percentage of their time to addressing complex corporate governance issues.

### PATRICIA C. WEISER

Ms. Weiser, a founding member of the firm, received her law degree from the Widener University School of Law in Wilmington, Delaware.  While in law school, she served as an intern for the Honorable Clarence J. Newcomer, U.S.D.J. for the Eastern District of Pennsylvania.  She is licensed to practice law in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the Eastern District of Michigan.

Ms. Weiser's practice is focused on shareholder class action litigation challenging management misconduct in connection with corporate takeovers and disputed contests for corporate control.  Ms. Weiser participated as lead or co-lead counsel in the following notable cases where significant financial benefits were achieved for shareholders:

> *In re Atlas Energy, Inc. Shareholder Litigation (Delaware Chancery Court)* in which Class Counsel were solely responsible for an aggregate benefit to the shareholder class of more than $7 million and the additional disclosure of over forty pages of significant material information to shareholders concerning the transaction.

*In re Mediacom Communications Corp. Shareholders Litigation (Delaware Chancery Court)* in which Class Counsel were solely responsible for obtaining an aggregate benefit to the shareholder class of more than $10 million and the additional disclosure of significant material information to shareholders concerning the transaction.

*In re Storage USA Shareholder Litigation (Shelby County Chancery Court, Tennessee),* in which Class Counsel were solely responsible for an aggregate financial benefit to the class of $10.5 million in connection with the acquisition of the company by its controlling shareholder;

*In re Sodexho Marriot Shareholders Litigation (Delaware Chancery Court),* in which Class Counsel shared responsibility for creating an aggregate financial benefit of approximately $166 million for members of the class, in connection with the acquisition of the company by its controlling shareholder, Sodexho Alliance, S.A.;

*In re Travelocity.com Shareholder Litigation, (Delaware Chancery Court),* in which Class Counsel shared responsibility for creating an aggregate financial benefit of approximately $75 million for members of the class, in connection with the acquisition of the company by its controlling shareholder, Sabre Holdings;

*In re Delhaize America Shareholder Litigation (North Carolina Business Court),* in which Class Counsel shared responsibility for creating an aggregate financial benefit of approximately $225 million for the members of the class in connection with the acquisition of the company by it controlling shareholder; and

*Lieb, et al. v. Unocal Corporation, et al. (Los Angeles Superior Court),* in which Class Counsel shared responsibility for creating a $500 million benefit via the increased consideration paid by Chevron Corp. to Unocal shareholders in the merger.  In addition, Co-Lead Counsel caused defendants to issue important additional disclosures relating to the proposed merger with Chevron prior to the shareholder vote on the merger.

In addition, the Weiser Law Firm has participated as lead or co-lead counsel in cases achieving significant therapeutic benefits to shareholders in connection with M&A transactions, including *In re Art Technology Group, Inc., Shareholders Litig.*, where Class Counsel secured a preliminary injunction in Delaware Chancery Court, enjoining the close of a $1 billion merger transaction for defendants' failure to disclose information concerning potential conflicts of interest suffered by the target company's financial advisor as a result of certain fees previously paid to that advisor by the buyer in the transaction.

In *Weigard v. Hicks, et al.*, No. 5732-VCS ("*Health Grades*"), the Weiser Firm and co-counsel successfully demonstrated to the Delaware Chancery Court that the defendants had

likely breached their fiduciary duties to the company's shareholders by failing to maximize value as required by *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). In *Health Grades*, the Class Counsel were successful in reaching a settlement in which defendants agreed to, among other things, modify the merger agreement, including by reducing the termination fee, imposing a "majority of the minority" requirement, reducing the period of notice to the buyer before Health Grades could enter into a superior proposal, extending the tender offer so as to allow other potential bidders an opportunity to make a competing bid, as well as to create and empower an independent committee. The settlement also required Health Grades to issue a "*Fort Howard*" press release.

Moreover, at the preliminary injunction hearing in *Health Grades*, Vice Chancellor Strine "applaud[ed]" counsel for their preparation and the extraordinary high-quality of the work:

> I want to applaud the lawyers today for being so well prepared. And I particularly want to applaud the plaintiffs for being not only well prepared but exceedingly measured and logical in their argument. I really -- in a world where we all read briefs and letters and probably read e-mails to each other where I-y words are there and everybody is saying outrageous, the plaintiffs have really focused their claims -- you know, the claims they pressed in the injunction in a reasonable way. They haven't thrown hand grenades; but they've made some, frankly, very potent arguments about the reasonableness of the board's process without, frankly, making wildly speculative -- often we see sinister motives thrown around without basis. Mr. Jenkins and his team admirably really focused on the core of the matter and in a very skillful way.

Ms. Weiser was also part of the litigation team that won an injunction in the seminal Delaware Chancery Court case *In re Pure Resources Shareholder Litigation*, forcing changes to certain terms of the proposed transaction as well as the public disclosure of significant additional information concerning the transaction, and, ultimately being partially responsible for an aggregate financial benefit of approximately $41 million for the shareholder class.

### ROBERT B. WEISER

Mr. Weiser, a founding member of the firm, received his law degree from the Villanova University School of Law.  While in law school, he also served as a law clerk for the Honorable Clarence J. Newcomer, U.S.D.J. for the Eastern District of Pennsylvania.  He is licensed to

practice law in Pennsylvania and New Jersey and has been admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey.  Mr. Weiser's practice is focused on shareholder derivative litigation and ERISA class action litigation.  While employed at his prior firm, Mr. Weiser managed the firm's shareholder derivative litigation practice, with a particular focus on corporate governance matters.  Mr. Weiser has been involved in some of the most successful shareholder derivative actions in the history of corporate litigation.  Over the past several years, Mr. Weiser has been among the nationwide-leaders in prosecuting "option backdating cases" on a derivative basis.  In addition to being among the attorneys that developed the central pleading theory in the backdating cases (which in turn produced some of the ground-breaking decisions in this area of law), Mr. Weiser (along with his co-counsel) successfully prosecuted backdating cases which caused the subject corporations to cumulatively receive tens of millions of dollars in benefits.  More recently, Mr. Weiser has launched a wave of actions that challenge the executive compensation awarded at the nation's largest banks which received federal "bailout" funds.  A sampling of the notable cases in which Mr. Weiser has served as lead or co-lead counsel include:

> *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917 (Del. Ch. 2003).  Mr. Weiser was co-lead counsel in the Oracle action.  In that case, plaintiffs challenged certain multi-million dollar stock sales made by Oracle's senior officers, including Larry Ellison, Oracle's founder.  Oracle's board of directors appointed a "special litigation committee" to investigate plaintiffs' claims, and after a lengthy investigation, the committee moved to dismiss the case, having concluded that plaintiffs' claims lacked merit.  Among other things, plaintiffs' challenged the independence of the committee members, their good faith, and their ultimate conclusion.  The court denied the committee's motion, which allowed the action to proceed to trial.  At the time it was issued, the Oracle decision was one of only four reported Delaware cases where a special litigation committee's motion to dismiss was denied by a Delaware chancellor and many commentators view the Oracle case as a landmark decision for shareholders.  For example, the *Wall Street Journal* called the seminal decision "one of the most far-reaching ever on corporate governance." This case eventually settled for $100 million on the eve of trial.  Mr. Weiser believes that the $100 million recovery was the second largest derivative settlement ever.  The Oracle case, and its impact on corporate governance matters nationwide, is the subject of numerous scholarly articles and treatises.

*In re Affiliated Computer Services Derivative Litig.,* USDC for the ND of TX, No. 3:06-cv-1110. In this option backdating action, plaintiffs challenged the stock option grants received by ACS' officers & directors over a multi-year period. Plaintiffs in a related action purported to settle these claims for approximately $1.8 million, a paltry sum which Mr. Weiser and his co-counsel believed was far less than they were worth. After objecting to the settlement of the related action, and engaging in a contentious discovery battle, Mr. Weiser and his co-counsel were able to materially enhance the settlement by securing a $30 million recovery for ACS. Mr. Weiser believes that this is the largest derivative recovery in an action litigated in Texas.

*In re KB Home Derivative Litigation,* Superior Court of the State of CA, Los Angeles County, Master File No. BC355179. Mr. Weiser was co-lead counsel in this action. In this option backdating action, plaintiffs challenged the stock option grants received by KB Home's officers & directors over a multi-year period. In addition to obtaining valuable corporate governance enhancements for KB, Mr. Weiser and his co-lead counsel settled this action for benefits worth at least $30 million to KB, making it one of the largest derivative settlements in the history of California corporate litigation.

*David, et al., v. Wolfen, et al.,* Superior Court of the State of CA, Orange County, Lead Case No. 01-CC-03930 (the "Broadcom Derivative Action"). Mr. Weiser was co-lead counsel in the Broadcom Derivative Action. Like the Oracle case, the Broadcom Derivative Action was also produced a ground-breaking settlement. In connection with the eventual settlement of the Broadcom Derivative Action, plaintiffs were able to compel Broadcom to make sweeping, substantial changes to its corporate governance practices which included a provision which allows Broadcom's shareholders to nominate directors to Broadcom's Board. In particular, the shareholder-nominated director provision was thought to be a highly significant and unusual achievement for Broadcom's shareholders. As the *Associated Press* reported in commenting on the settlement: "[in contrast to the Broadcom settlement] the Securities and Exchange Commission has met fierce resistance to a proposal just to allow shareholder nominations under very limited circumstances." This type of corporate governance relief has only been achieved in a handful of shareholder derivative actions, and it became a model for corporate governance settlements that followed.

*Barry v. Cotsakos,* CV 49084 (San Mateo County, CA) (the "Etrade Derivative Litigation"). Mr. Weiser was co-lead counsel in the Etrade Derivative Litigation. Mr. Weiser believes that the Etrade Derivative Litigation is one of the most successful executive compensation cases ever brought against a publicly traded corporation's board of directors. In that case, the plaintiff challenged the payment of excessive compensation awarded to Etrade's then-current Chief Executive Officer. As a result of the settlement of the case, Etrade's Chief Executive Officer returned approximately $25 million to the Company, and he also agreed to forego other valuable financial benefits. The Etrade settlement also provided for sweeping changes to the company's corporate governance practices and the structure of its Board. These measures, and the resulting change in the public's perception of Etrade, were

profiled in a September 8, 2003 *Wall Street Journal* article entitled "How One Firm Uses Strict Governance To Fix Its Troubles." Since the time of the Etrade settlement, Etrade added independent directors to its Board, who have since forced out the company's Chief Executive Officer. In response to these changes, the Company's stock increased more than 300% in the 18 months following the settlement and the "new" Etrade was the subject of several positive media reports.

*Klotz v. Parfet, et al.*, Case No. 03-06483-CK (In the Circuit Court of Jackson County, Michigan) (the "CMS Derivative Litigation"). Mr. Weiser was co-lead counsel in the CMS Derivative Litigation. In that case, plaintiff alleged that CMS' Board of Directors failed to develop and implement adequate corporate governance practices and internal controls. Plaintiff alleged that the Board's internal control failures caused the Company to suffer enormous damages to its reputation and prestige. In settling the CMS Derivative Litigation, the Weiser Firm was able to recover $12 million for the Company, and the Board agreed to adopt what one commentator called "some of the most substantial corporate governance reforms" ever undertaken by a publicly traded corporation. Mr. Weiser believes that the CMS derivative settlement is the largest in the history of Michigan corporate litigation.

*Gebhardt v. Allumbaugh, et al.*, Case No. 2002-13602 (Harris County, Texas)(the "El Paso Derivative Litigation"). Mr. Weiser was lead counsel in the El Paso Derivative Litigation. This action centered on the Company's alleged anti-competitive conduct in California during the state's energy crisis of 2001-02. In addition to making sweeping changes to the Board's structure and the Company's corporate governance practices, Mr. Weiser was able to secure a $16.75 million recovery for the Company. Mr. Weiser believes that the El Paso Derivative Litigation was either the first or second largest derivative settlement in Texas history at the time it was agreed to.

*Eliasoph v. Johnson*, C.A. No. 05-CVS-3698 (North Carolina General Civil Litigation Court)(the "SPX Derivative Litigation"). Mr. Weiser was lead counsel in the SPX Derivative Litigation. Like the Etrade Derivative Litigation, Mr. Weiser believes that the SPX Derivative Litigation is among the most successful executive compensation cases ever brought against a publicly traded corporation's board of directors. In this case, the plaintiff challenged the fairness of the Company's entire executive compensation structure. In connection with the settlement of the SPX action, the Company's board of directors agreed to adopt a new executive compensation plan which was designed in part, with plaintiff's counsel and her expert. The new compensation plan more closely aligned shareholder and management interests and it was estimated that the new plan would save the Company at least $25 million.

*In Re Staples, Inc. Shareholders Litigation*, 792 A.2d 934 (Del. Ch. June 5, 2001). Mr. Weiser was one of three lead counsel in the Staples action. In that case, plaintiffs secured a financial benefit worth at least $12 million to Staples by winning an injunction preventing Staples from holding a shareholder vote on an improperly disclosed recapitalization plan that would have unfairly

benefitted Staples' insiders at the expense of the Company and its stockholders.

*Wanstrath v. Doctor R. Crants, et al.*, C.A. No. 99-1719-III (Tenn. Chan. Ct., 20th Judicial District, 1999)(the "Prison Realty Derivative Litigation"). In the Prison Realty Derivative Litigation, plaintiff challenged the transfer of assets from Prison Realty to a private entity owned and controlled by several of the Company's top executives. Plaintiffs also alleged that the proposed transaction would have crippled the Company's liquidity. Plaintiffs were able to halt the planned transaction, which prevented the Company from suffering a $120 million loss, which was a highly significant victory in light of the Company's then-precarious financial position. As a result of the settlement of the case, the members of the Company's top management were removed, the composition of the Board of Directors was significantly altered and important corporate governance provisions were also put in place to prevent future abuse. Notably, all of these corporate benefits occurred at a time when the Company was facing near-certain bankruptcy which would have wiped out shareholders' equity in the Company. Because the Company had adopted these significant changes, it was able to renegotiate the terms of its credit facility with its lenders and it never had to file for bankruptcy protection. Since the time the case was settled, the Company's new management has led the Company, now-named Corrections Corporation of America, to profitability, and the price of the common stock increased more than 400% in the two years following the settlement.

*Huscher v. Curley, et. al.*, No. 00 Civ. 21379 (Mich. Cir. Ct., 2000) (the "Sotheby's Derivative Litigation"). In the Sotheby's Derivative Litigation, plaintiffs alleged that the Company's Chief Executive Officer had entered into illegal price-fixing agreements with the Company's leading purported competitor, Christie's International PLC. As a result of the settlement of this case, the Company received the return of certain monetary benefits which had been provided to the Chief Executive Officer that were worth approximately $12 million to the Company. In addition, significant changes in the Company's top management and Board of Directors were achieved in conjunction with the settlement of the case.

Mr. Weiser has been a frequent commentator on corporate governance matters and has lectured on corporate governance issues in both this country and abroad.

## **BRETT D. STECKER**

Mr. Stecker is a graduate of Franklin & Marshall College and of Villanova University School of Law. While in college, Mr. Stecker earned a B.A. in Government and served as a legislative intern for United States Senator Alfonse M. D'Amato. While in law school, Mr. Stecker served as an Executive Member of the Moot Court Board and represented Villanova in national competitions. Upon graduation from law school, Mr. Stecker was an associate with the Litigation Department of

Blank Rome LLP in Philadelphia, PA.  After two years at that firm, Mr. Stecker moved to Weir & Partners, LLP, a boutique commercial litigation firm in Philadelphia, where he focused his practice on banking litigation in cases dealing with consumer lending, check fraud, and the enforcement of guarantee and other security agreements.  At The Weiser Law Firm, Mr. Stecker concentrates his practice on shareholder derivative and ERISA litigation.

### JEFFREY J. CIARLANTO

Mr. Ciarlanto is a graduate of The Pennsylvania State University and Villanova University School of Law.  While in college, Mr. Ciarlanto earned Bachelor of Arts degrees in Economics and Political Science and graduated with honors.  During law school, Mr. Ciarlanto served as the Business Editor of Villanova Law's Sports and Entertainment Law Journal.  Mr. Ciarlanto also served as a judicial extern for the Honorable Matthew D. Carrafiello of the Philadelphia Court of Common Pleas.  Mr. Ciarlanto is licensed to practice law in Pennsylvania and New Jersey.  Prior to joining The Weiser Law Firm, Mr. Ciarlanto was an associate at Marks, O'Neill, O'Brien & Courtney, P.C., where he focused his practice on labor and employment law.  At The Weiser Law Firm, Mr. Ciarlanto concentrates his practice on shareholder derivative and ERISA litigation.

### KATHLEEN A. HERKENHOFF

Ms. Herkenhoff joined The Weiser Law Firm in January 2010, opening the firm's San Diego, California office. As detailed below, Ms. Herkenhoff has been exclusively litigating securities actions for 16 years, first at the Securities and Exchange Commission ("SEC") and most recently as a Partner at Coughlin Stoia Geller Rudman & Robbins LLP in San Diego.  Ms. Herkenhoff earned her Bachelor of Arts degree in English Literature from the University of California (Berkeley) in 1989. She earned her Juris Doctor degree from Pepperdine University School of Law in 1993, where she was on the Dean's Honor List and received American Jurisprudence Awards in both Constitutional Law and Agency-Partnership. Following law school, Ms. Herkenhoff worked at the SEC's Los Angeles office, investigating and prosecuting complex securities fraud and insider trading actions.

In 1997, Ms. Herkenhoff joined Milberg Weiss Bershad Hynes & Lerach LLP in Los Angeles, California, and ultimately moved to the firm's San Diego office, where she served as a Partner from 2002 to 2009 (the San Diego office became known as Coughlin Stoia). Over the past 12 years at Coughlin Stoia, Ms. Herkenhoff has practiced in all areas of securities class and derivative litigation, working tirelessly to achieve nearly one billion in settlement recoveries for victimized shareholders. Many of these settlements also include sweeping corporate governance improvements negotiated by Ms. Herkenhoff. A sample of notable settlements includes:

- *$618 million in opt-out litigation against AOL Time Warner, Inc.*
- *$122 million in class action against Mattel, Inc.*
- *$100 million in class action against Honeywell International, Inc.*
- *$30+ million in derivative stock option backdating cases*

Ms. Herkenhoff continues her nearly two decades of securities litigation experience by joining the firm's extensive M&A and derivative practice groups.  Ms. Herkenhoff is licensed to practice law in all California state and federal courts, as well as in the District of Colorado.

### JOSEPH M. PROFY

Mr. Profy is a 1991 graduate of the University of Notre Dame and earned his Juris Doctor degree *Cum Laude* from the Dickinson School of Law in 1995.  He is licensed to practice law in the Commonwealth of Pennsylvania and the State of New Jersey and has been admitted to practice in the United States District Court for Eastern District of Pennsylvania, The Third Circuit Court of Appeals and the United States Supreme Court.  From 1995 to 1997, Mr. Profy served as a law clerk to the Honorable John P. Fullam, United States District Court for the Eastern District of Pennsylvania. From 1997 to 2002, Mr. Profy was an associate with Reed Smith LLP.  In 2002, Mr. Profy joined Blank Rome LLP as an associate and in 2006 he was elevated to partner at Blank Rome LLP.  In June of 2011, Mr. Profy joined the Weiser Law Firm.

### JAMES M. FICARO

Mr. Ficaro earned his Bachelor's of Business Administration in Finance from the McCombs School of Business at the University of Texas at Austin and earned his Master of Public Policy from George Mason University.  Mr. Ficaro graduated with a J.D. from Temple University's Beasley School of Law, where he was a member of the Moot Court Honor Society and served on the Editorial Board of the Political and Civil Rights Law Review.

Prior to joining the Weiser Law Firm, Mr. Ficaro spent nearly five years in the financial services industry, most recently as an associate at Janney Montgomery Scott LLC.  At The Weiser Law Firm, Mr. Ficaro litigates a broad range of securities class actions, including corporate mergers, acquisitions and buyouts in state and federal courts across the country.  Mr. Ficaro is licensed to practice law in Pennsylvania and New Jersey and holds the Series 7 & 66 FINRA securities licenses.

### DAVID M. PROMISLOFF

Mr. Promisloff received his law degree from the University of Michigan in 2005.  While in law school, he served as an associate editor of the Michigan Telecommunications and Technology Law Review.  Mr. Promisloff received his undergraduate degree from Emory University in 2002, double majoring in political science and history.  As part of his undergraduate studies, Mr. Promisloff attended the University of New South Wales in Sydney, Australia.  Prior to joining The Weiser Law Firm, Mr. Promisloff worked in the start-up and lead plaintiff departments at Kessler Topaz Meltzer & Check.  Mr. Promisloff began his legal career at Sheller, P.C., specializing in mass tort cases.  Mr. Promisloff is licensed to practice in Pennsylvania, and his admitted to practice in the Eastern District of Pennsylvania.

### CHRISTOPHER L. NELSON

Mr. Nelson, of counsel to the firm, received his J.D. from Duke University School of Law, and his B.S. from Washington University in St. Louis. He is licensed to practice law in Pennsylvania and is admitted to practice before the Supreme Court of the United States, the United States Courts of Appeals for the 2d, 3d, 4th, 5th, 9th, 10th, and 11th Circuits, and the United States

District Court for the Eastern District of Pennsylvania.

Mr. Nelson's practice focuses on securities class action litigation, civil appellate litigation, and broker/dealer arbitration before the Financial Industry Regulatory Authority.  Prior to joining the Weiser Law Firm, Mr. Nelson was a partner at Kessler Topaz Meltzer & Check LLP.

Mr. Nelson has been lead or co-lead counsel for the plaintiffs in some of the largest securities class actions in history, including:

- In re Wachovia Preferred Securities and Bond/Notes Litig., No. 09-Civ. 6351 (S.D.N.Y.).  Co-lead counsel, prosecuted case through discovery.  $627 million recovery.

- In re Satyam Computer Servs., Ltd. Sec. Litig., No. 09 MD 02027 (S.D.N.Y.).  Co-lead counsel, prosecuted case through discovery.  $125 million recovery.

- Johnson v. Aljian, 394 F. Supp. 2d 1184 (C.D. Cal. 2004), aff'd, 490 F.3d 778 (9th Cir. 2007), cert. denied, No. 07-767, 2008 U.S. LEXIS 2481 (U.S. Mar. 17, 2008).  Lead counsel.  Drafted complaint in multi-million dollar insider trading case against Kirk Kerkorian and Tracinda Corporation using novel theory under Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1.  Successfully drafted and argued opposition to defendants' motion to dismiss.  Successfully drafted and argued opposition to defendants' appeal.  Defeated defendants' petition for writ of certiorari.  Class certified February 13, 2009, over defendants' opposition.  $8.1 million recovery.

- Safron Capital Corp. v. Leadis Tech., Inc. (In re Leadis Tech. Inc. Sec. Litig.), No. 06-15623, 274 Fed. Appx. 540; 2008 U.S. App. LEXIS 8699 (9th Cir. 2008), cert. denied, 2009 U.S. LEXIS 1778 (U.S. Mar. 6, 2009).  Lead counsel, successfully appealed decision of District Court granting motion to dismiss. $4.2 million recovery.

- Cent. Laborers Pension Fund v. Merix Corp. (In re Merix Corp. Sec. Litig.), No. 06-35894, 275 Fed. Appx. 599; 2008 U.S. App. LEXIS 9073 (9th Cir. 2008), cert. denied, 2008 U.S. LEXIS 9162 (U.S. Dec. 15, 2008).  Lead counsel, successfully appealed decision of District Court granting motion to dismiss. Drafted and successfully argued motion for class certification.  $2.5 million recovery.

- Kaltman v. Key Energy Servs. (In re Key Energy Sec. Litig.), 447 F. Supp. 2d 648 (W.D. Tex. 2006).  Lead counsel.  Drafted and argued opposition to motion to dismiss, prosecuted case through discovery and argued class certification, and led negotiations.  $15.4 million recovery.

- In re Martek Biosciences Sec. Litig., No. MJG-05-1224 (D. Md. June 14, 2006). Co-lead counsel.  Drafted and argued opposition to motion to dismiss, prosecuted case through discovery, secured certification of plaintiff class, and led negotiations.  $6 million recovery.

Mr. Nelson has an active pro bono practice focused on family law, and serves on the Board of Advisors for the Jennersville Branch of the YMCA of the Brandywine Valley.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 243 of 296   Page ID
#:919
Case 8:10-cv-01352-DOC -MLG   Document 25-8   Filed 10/11/10   Page 1 of 27   Page ID
#:379

# EXHIBIT G

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 244 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 29-8   Filed 10/11/10   Page 2 of 27   Page ID
#:380
#:380

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| SUSAN M. GREGORY, | x<br>:<br>: |
| Plaintiff, | :<br>: |
| vs. | :<br>: |
| KENNETH D. TUCHMAN, JAMES E.<br>BARLETT, WILLIAM A.<br>LINNENBRINGER, RUTH C. LIPPER,<br>SHRIKANT MEHTA, SHIRLEY YOUNG,<br>ROD DAMMEYER, GEORGE C.<br>HEILMEIER, JOHN T. MCLENNAN,<br>MORTON MEYERSON, ALAN<br>SILVERMAN, MARK C. THOMPSON,<br>SHARON A. O'LEARY, DENNIS J. LACEY,<br>JOHN SIMON, ALAN SCHUTZMAN,<br>BRIAN DELANEY, JOHN TROKA, LARRY<br>KESSLER, MICHAEL E. FOSS, and<br>MARGOT O'DELL, | :<br>:<br>:<br>:<br>:<br>: C.A. No. 3925-CC<br>:<br>:<br>:<br>:<br>: |
| Defendants, | :<br>: |
| and | :<br>: |
| TELETECH HOLDINGS, INC., | :<br>: |
| Nominal<br>Defendant | :<br>:<br>x |

## STIPULATION OF SETTLEMENT

This Stipulation of Settlement (the "Stipulation") is dated as of October 26, 2009, and

is entered into by and between the following parties to the above-captioned stockholder's

derivative action (the "Action"): (a) Susan M. Gregory ("Plaintiff") in her capacity as a

shareholder of TeleTech Holdings, Inc. ("TeleTech" or the "Company"); (b) Kenneth D.

Tuchman, James E. Barlett, William A. Linnenbringer, Ruth C. Lipper, Shrikant Mehta,

Shirley Young, Rod Dammeyer, George C. Heilmeier, John T. McLennan, Morton Meyerson,

Case 8:12-cv-01716-DMG-FMO  Document 9-1  Filed 10/27/12  Page 245 of 296  Page ID
Case 8:10-cv-01352-DOC -MLG  Document 29-8  Filed 10/11/10  Page 3 of 27  Page ID
#:381
#:381

Alan Silverman, Mark C. Thompson, Sharon A. O'Leary, Dennis J. Lacey, John Simon, Alan

Shutzman, Brian Delaney, John Troka, Larry Kessler, Michael E. Foss, and Margot O'Dell

(collectively, "Defendants"); and (c) nominal defendant TeleTech, on the terms and conditions

herein. Plaintiff, Defendants, and Teletech are referred to as the "Settling Parties," as defined in

Section V.

## I.    FACTUAL BACKGROUND OF THE ACTION

On November 8, 2007, the Company announced that the Audit Committee (the "Audit

Committee") of the Board of Directors (the "Board") had commenced an "independent" internal

investigation into the Company's historical stock option granting practices between 1996 and

2007. The Company also announced that it would not be able to timely file its quarterly report

on Form 10-Q for the second quarter ended September 30, 2007 due to the ongoing stock option

investigation.

Several months later, on February 20, 2008, the Company disclosed for the first time that

the Audit Committee had found "instances of selecting option grant dates with some hindsight."

Further, on that same day, the Board revealed for the first time that grants issued in previous

years to defendants Tuchman and Barlett exceeded the annual limits expressly set by the terms of

the Company's stock option plans (the "Plans").

Plaintiff initiated the Action on July 28, 2008, when she filed a shareholder derivative

complaint in the Court of Chancery of the State of Delaware (the "Court"). Generally, Plaintiff

alleged that certain of the Company's current and former officers and directors breached their

fiduciary duties to the Company because, *inter alia*, they allegedly caused backdated or

otherwise manipulated stock options to be granted to several of the Company's senior officers

and directors over a multi-year period.  Further, Plaintiff alleged that Defendants violated the express terms of the Plans  by exceeding the annual individual limits imposed therein. .

On January 25, 2008, the first of several class actions initiated pursuant to the Federal securities laws was filed against TeleTech in the United States District Court for the Southern District of New York.  The cases were eventually consolidated into one action, (the "Class Action"), which is being resolved in connection with resolution of the Action.

On November 19, 2008, Defendants filed three motions to dismiss:  (1) a motion to dismiss pursuant to Court of Chancery Rule 23.1 filed by Nominal Defendant Teletech and Individual Defendants Linnenbringer, Lipper, Mehta and Young; (2) a motion to dismiss pursuant to Court of Chancery Rules 12(b)(2), 12(b)(4), 12(b)(5), 23.1 and 12(b)(6) filed by Defendants O'Leary, Lacey, Simon, Schutzman, Delaney, Tioka, Kessler, Foss and O'Dell; and (3) a motion to dismiss pursuant to Court of Chancery Rules 23.1 and 12(b)(6) filed by Defendants Tuchman, Barlett, Dammeyer, Heilmeier, McLennan, Meyerson, Silverman and Thompson (collectively, the "Motions to Dismiss").  In the Motions to Dismiss, Defendants argued, *inter alia*, that Plaintiff had failed to: (1) either make a demand on the  Board   or, alternatively, adequately plead that such a demand would have been futile; (2) make any claim for which relief could be granted; (3) adequately plead that the Board  had failed to act within their business judgment; (4) sufficiently allege that any of Plaintiff's challenged grants were backdated; and (5) sufficiently allege that the challenged grants allegedly in excess of individual plan limits were outside the power and scope of the Compensation Committee to confirm. Defendants also asserted that certain of Plaintiff's claims were time-barred by applicable statutes of limitations.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 247 of 296   Page ID
#:3238
Case 8:10-cv-01352-DOC -MLG   Document 32-8   Filed 10/11/10   Page 5 of 27   Page ID
#:383

After exchanging certain information, on December 2, 2008 the Settling Parties, along with parties in the Class Action, participated in a formal joint mediation before JAMS mediators the Hon. (Ret.) Daniel Weinstein ("Judge Weinstein") and Jed D. Melnick, Esq. in New York, NY. Although the Settling Parties made some progress at the mediation, neither the Action nor the Class Action settled at that time. The mediation, however, served as springboard for continued settlement discussions which occurred throughout the winter and spring of 2009. During the summer of 2009, Plaintiffs reviewed tens of thousands of documents that were produced by the Company in connection with the ongoing settlement discussions. With the substantial assistance of Judge Weinstein and Mr. Melnick, the Settling Parties were able to reach an agreement-in-principle on the settlement terms herein, which ultimately culminated in the proposed settlement (the "Settlement") reflected in this Stipulation.

## II.   INVESTIGATION AND RESEARCH CONDUCTED BY PLAINTIFF'S COUNSEL

Plaintiff's Counsel (as that term is defined in Section V hereof) believe that they have conducted an extensive investigation during the development and prosecution of the Action. This investigation has included, *inter alia*, (i) inspecting, reviewing and analyzing the Company's public filings; (ii) preparing a detailed amended complaint; (iii) performing a detailed internal analysis of Defendants' stock options; (iv) researching the applicable law with respect to the claims asserted in the Action and the potential defenses thereto (v) researching corporate governance issues; (vi) preparing a mediation brief, (vii) attending formal mediation and participating in numerous telephonic meetings with Defense Counsel, Judge Weinstein and Mr. Melnick; (vii); employing a financial expert to conduct an analysis of the stock option grants at issue; and (vi) reviewing Defendants' non-public documents.

Exhibit G, Page 244

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 248 of 296   Page ID
#:324
Case 8:10-cv-01352-DOC -MLG   Document 25-8   Filed 10/11/10   Page 6 of 27   Page ID
#:384

## III.   NO ACKNOWLEDGMENT OF WRONGDOING OR LIABILITY

Without conceding the merit of any of Plaintiff's allegations, or the lack of merit of any of Defendants' defenses, and solely in order to avoid the potentially protracted time, expense, and uncertainty associated with continued litigation, Defendants have concluded that it is desirable that the Action be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation. Defendants have denied and continue to deny each and all of the claims and contentions alleged by the Plaintiff in the Action. Defendants have denied and continue to deny all charges of wrongdoing or liability against them arising out of any of the conduct, statements, acts or omissions alleged, or that could have been alleged, in the Action. Each of the Defendants denies and continues to deny the allegations concerning any alleged breach of fiduciary duty. Defendants have further asserted and continue to assert that at all relevant times, they acted in good faith and in a manner they reasonably believed to be in the best interests of the Company and its stockholders

## IV.   CLAIMS OF THE PLAINTIFF AND BENEFITS OF SETTLEMENT

Plaintiff's Counsel believe that the claims asserted in the Action have merit and that their investigation supports the claims asserted. Without conceding the merit of any of Defendants' defenses or the lack of merit of any of their allegations, and solely in order to avoid the potentially protracted time, expense, and uncertainty associated with continued litigation, including potential trial and appeals, Plaintiff has concluded that it is desirable that the Action be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation. Based on these considerations, among others, Plaintiff's Counsel believe that the Settlement set forth in this Stipulation confers substantial benefits upon TeleTech and Current TeleTech Stockholders (as that term is defined in Section V below).

RLF1-3474800-1

Exhibit G, Page 245

## V.   TERMS OF STIPULATION AND AGREEMENT OF SETTLEMENT

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among Plaintiff, on behalf of herself and derivatively on behalf of TeleTech, and Defendants, by and through their respective counsel, that, subject to the approval of the Court, the Action and the Released Claims shall be finally and fully compromised, settled and released, and the Action shall be dismissed with prejudice, as to Defendants, upon and subject to the terms and conditions of the Stipulation, as follows:

### 1.   <u>Definitions</u>

As used herein, the following terms have the meanings specified below:

1.1.   "Current TeleTech Stockholder" means any record or beneficial holder of TeleTech common stock as of October 26, 2009, and their successors in interest.

1.2.   "Defendants" means Kenneth D. Tuchman, James E. Barlett, William A. Linnenbringer, Ruth C. Lipper, Shrikant Mehta, Shirley Young, Rod Dammeyer, George C. Heilmeier, John T. McLennan, Morton Meyerson, Alan Silverman, Mark C. Thompson, Sharon A. O'Leary, Dennis J. Lacey, John Simon, Alan Shutzman, Brian Delaney, John Troka, Larry Kessler, Michael E. Foss, and Margot O'Dell.

1.3.   "Defense Counsel" means counsel of record who represent the Defendants and TeleTech in the Action and include Dewey & LeBoeuf LLP, Brownstein Hyatt Farber Schreck, McDermott Will & Emery LLP and Richards Layton & Finger, P.A.

1.4.   "Effective Date" means the date that the Final Judgment and Order approving the Settlement in accordance with this Stipulation becomes Final within the meaning of Section 1.6 hereof.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 250 of 296   Page ID
#:326
Case 8:10-cv-01352-DOC -MLG   Document 26-8   Filed 10/11/10   Page 8 of 27   Page ID
#:386

1.5.    "Final" means that with respect to any court order, including but not limited to the Final Judgment and Order, that such order represents a final and binding determination of all issues within its scope and is not subject to further review on appeal or otherwise.  Without limitation, an order (including the Final Judgment and Order) becomes "Final" when: (a) the date as of which the time to appeal the Court's order has expired without any appeal having been sought or taken or (b) if an appeal is filed, sought or taken, the date as of which such appeal shall have been finally determined in such a manner as to affirm the Court's original order without any material change thereto and the time, if any, for commencing any further appeal has expired.  For purposes of this definition, an "appeal" includes appeals as of right, discretionary appeals, interlocutory appeals, proceedings involving writs of certiorari, mandamus, or prohibition, and any other proceedings of like kind.  Any appeal or other proceeding pertaining to any order issued in respect of any application by Plaintiff's Counsel for attorneys' fees and/or expenses, shall not in any way delay or preclude the Final Judgment Order from becoming Final.

1.6.    "Final Judgment and Order" means the Final Judgment and Order of Dismissal to be rendered by the Court, substantially in the form attached hereto as Exhibit C.

1.7.    "Person" means an individual, corporation, limited liability company, professional corporation, joint venture, limited liability partnership, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and their spouses, heirs, predecessors, successors, representatives, or assignees.

1.8.    "Plaintiff" means Susan M. Gregory, together with any of her agents, heirs, assigns, predecessors and/or successors.

   1.9. "Plaintiff's Counsel" means counsel who represent the Plaintiff in the Action and include The Weiser Law Firm, P.C., The Shuman Law Firm, and Rosenthal, Monhait & Goddess, P.A.

   1.10 "Plaintiff's Settlement Counsel" means The Weiser Law Firm, P.C.

   1.11. "Related Parties" means each of a Defendant's past or present directors, families, officers, managers, employees, partners, members, principals, agents, underwriters, insurers, co-insurers, reinsurers, controlling shareholders, attorneys, accountants or auditors, banks or investment banks, associates, personal or legal representatives, predecessors, successors, parents, subsidiaries, divisions, joint ventures, assigns, spouses, heirs, executors, administrators, related or affiliated entities, any entity in which a Defendant has a controlling interest, any members of their immediate families, or any trust of which any Defendant is the settlor or which is for the benefit of any Defendant and/or member(s) of his or her family.

   1.12. "Released Claims" shall collectively mean any and all claims (including "Unknown Claims" as defined in ¶ 1.16 hereof), debts, demands, rights, liabilities, damages, actions, losses, obligations, judgments, suits, fees, expenses, costs, any other relief of any nature whatsoever, matters, issues and causes of action of any and every kind, nature or description whatsoever, whether known or unknown, under state, federal, local, common, foreign or statutory law or any other law, rule or regulation, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, concealed or hidden, or matured or unmatured, direct or derivative that were or could have been asserted in the Action or in the future could be asserted in any court, tribunal or proceeding by Plaintiff, TeleTech or by any Current TeleTech Stockholder ( claiming, derivatively or otherwise, in the right of, or on behalf of, the Company), against any of the Released Persons, which have arisen, could have arisen, arise now or hereafter

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 252 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 32-8   Filed 10/11/10   Page 10 of 27   Page ID
#:388
#:388

arise out of, are based upon or relate in any manner to the allegations, matters, acts, facts,
circumstances, transactions, events, occurrences, disclosures, statements, representations,
misrepresentations, omissions, acts or failures to act, or any other matter, thing or cause
whatsoever, or any series thereof, arising out of, embraced, involved or set forth in, or referred to
or otherwise related, directly or indirectly, in any way to, the Action or the subject matter or
allegations of the Action, including, without limitation, claims for negligence, gross negligence,
breach of fiduciary duty, including without limitation the duties of care and/or loyalty, fraud,
constructive fraud, self-dealing, misrepresentation (whether intentional, negligent or innocent),
omission (whether intentional, negligent or innocent), concealment (whether intentional,
negligent or innocent), mismanagement, gross mismanagement, abuse of control, waste, money
damages, unjust enrichment, breach of contract, or violations of any federal, state, local or
foreign law, or any other rule, law, or regulation, or any other source of legal or equitable
obligation of any kind or description in whatever forum or allegations that could have been made
in the Action.

    1.13.   "Released Persons" means each and all of the Defendants and their
respective Related Parties.

    1.14.   "Settlement" means the proposed settlement and compromise of the
Action as provided for herein.

    1.15.   "Settling Parties" means, collectively, each of the Defendants and the
Plaintiff on behalf of herself and derivatively on behalf of TeleTech, and Teletech.

    1.16.   "Unknown Claims" means any Released Claims which Plaintiff,
TeleTech, or any Current TeleTech Stockholder does not know or suspect to exist in his, her or
its favor at the time of the release of the Released Persons which, if known by him, her or it,

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 253 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 329   Filed 10/11/10   Page 11 of 27   Page ID
#:389

might have affected his, her or its settlement with and release of the Released Persons, or might

have affected his, her or its decision not to object to this Settlement.  Plaintiff, TeleTech, or

Current TeleTech Stockholders may hereafter discover facts in addition to or different from

those which he, she or it now knows or believes to be true with respect to the subject matter of

the Released Claims, but Plaintiff, TeleTech, or Current TeleTech Stockholders shall expressly,

upon the Effective Date, be deemed to have, and by operation of the Judgment shall have, fully,

finally, and forever settled and released any and all Released Claims, known or unknown,

suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden,

which now exist, or heretofore have existed upon any theory of law or equity now existing or

coming into existence in the future, including, but not limited to, conduct which is negligent,

intentional, with or without malice, or a breach of any duty, law or rule, without regard to the

subsequent discovery or existence of such different or additional facts.  Plaintiff and TeleTech

acknowledge, and Current TeleTech Stockholders shall be deemed by operation of the Final

Judgment and Order to have acknowledged, that the foregoing waiver was separately bargained

for and a key element of the Settlement of which this release is a material and essential part and

expressly waive (i) the benefits of the provisions of Section 1542 of the California Civil Code,

which provides that

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
> TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING
> THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE
> MATERIALLY AFFECTED HIS SETTLEMENT WITH THE
> DEBTOR;"

and (ii) the benefits of any comparable law, statute, regulation or legal principle of any other

jurisdiction.

Case 8:12-cv-01716-DMG-FMO  Document 9-1  Filed 10/27/12  Page 254 of 296  Page ID
Case 8:10-cv-01352-DOC -MLG  Document 33-8  Filed 10/11/10  Page 12 of 27  Page ID
#:390

### 2. The Settlement

As a result of the filing, prosecution and Settlement of the Action, the Company received the monetary relief described at section V.2.A, below. Defendants have also agreed that the Company and/or the Board will adopt the corporate governance provisions described at section V.2.B, below.

### A. Monetary Relief

To resolve the Action, the Company shall receive 6.5 million to be paid on behalf of the Defendants' by the Company's directors & officers' insurance carrier(s).

### B. Corporate Governance Relief

Within 90 days of the issuance of an order approving the settlement the Board will adopt resolutions, amend appropriate committee charters, and take other steps required to ensure adherence to the following Corporate Governance Policies. The Company further agrees that the governance provisions included herein will become effective no later than twelve (12) months after the date of the adoption of the above resolutions and will remain in effect for no less than three (3) years; provided, however, that if the Company ceases to be a publicly traded company prior to the end of such three (3) year period, such governance provisions shall expire on the date and at the time the Company ceases to be a publicly traded company.

### 1. Policies and Procedures

a. The Compensation Committee of the Board shall annually examine the Company's director and executive officer compensation policies. The Compensation Committee shall recommend that the Board shall establish a comprehensive and responsible set of assumptions, policies and procedures for determining executive compensation policies and procedures for determining executives' and directors' compensation.

RLF1-3474800-1

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 255 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 33-8   Filed 10/11/10   Page 13 of 27   Page ID
#:391
#:391

b.      The Compensation Committee's Charter will be amended to provide for the retention of outside counsel to provide legal advice to the Compensation Committee.

c.      The Company shall adopt a process to protect against the untimely filing of the required forms with the United States Securities and Exchange Commission ("SEC") by Section 16 officers and directors who are recipients of option grants, RSU grants and warrants.

d.      Re-pricing of "underwater" stock options shall be prohibited absent express stockholder approval.

e.      The Compensation Committee shall engage recognized experts to advise the Compensation Committee regarding executive compensation plans and their compliance with legal requirements for proper documentation, disclosure and accounting.

**2.      Stock Option Plans**

a.      The Compensation Committee shall annually examine the Company's existing policies and procedures for determining executive and director  compensation. Equity award plans shall provide an objective, measurable and good faith mechanism for pricing equities awarded thereunder.

b.      All equity award plans shall clearly define the method for determining the exercise price, the grant date and the fair market value of stock (e.g., the closing price on a specified date, or the average closing price over a specified period). The fair market value of TeleTech stock on a grant date shall be the closing price for a share of TeleTech common stock on such day as reported on the NASDAQ Stock Market or other primary exchange on which the Company's shares are traded or, if no sales prices are reported on that date, on the last preceding date on which such prices of TeleTech stock are so reported.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 256 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 33-8   Filed 10/11/10   Page 14 of 27   Page ID
#:392
#:332

c.      The Compensation Committee shall include a provision in any current and/or subsequent equity award plans, whether subject to stockholder approval or not, to the effect that the date of grant of an option shall, for all purposes, be the date on which the Board or Compensation Committee makes the final determination granting such option and all conditions and requirements for the issuance of such option grant are satisfied. Notice of the determination shall be given to each employee or consultant to whom an option is so granted no more than one week after the date of such grant.

d.      The Compensation Committee shall ensure that equity award plans shall not permit stock options to be issued with an exercise price below the fair market value on the date of the grant.

e.      The Compensation Committee shall ensure that its executive compensation plans, policies or procedures shall designate a Company employee who is responsible for ensuring compliance with the terms and conditions of the equity award plans, NASDAQ (or other primary exchange on which the Company's shares are traded) guidelines and applicable laws and regulations concerning equity award plans (e.g., timely and accurate filing of SEC Forms 3, 4 and 5). This designated Company employee shall prepare an annual report for the Compensation Committee's review which details all stock option and RSUs granted during the applicable six-month period and which otherwise summarizes the Company's compliance with this paragraph.

f.      Retroactive awards of stock grants or RSUs in excess of the annual limits imposed by the terms of the Company's equity award plans shall be prohibited.  This limitation shall not preclude the Company's ability to modify annual limits.  However, any such modifications of annual limits will require unanimous written approval by the Compensation Committee and notice to stockholders before any such modifications are to become effective.

3.      **Granting of Stock Option Awards**

a.      Authority to grant stock option awards should be limited to the full Board or a Compensation Committee constituted according to SEC and NASDAQ (or other primary exchange on which the Company's shares are traded) rules and regulations.

b.      All grants that require Board or Compensation Committee approval shall be made only at a meeting of the Board or Compensation Committee, respectively, or by any duly authorized delegation procedures and not by unanimous written consent. The reporter for any and all meetings where options are granted shall promptly prepare minutes of the meeting.

c.      The Compensation Committee shall ensure that the authorized body for awarding TeleTech equity compensation awards shall be specified in the Compensation Committee Charter and any current and/or subsequent equity award plans, whether subject to stockholder approval or not.

d.      For grants made to the Company's "named executive officers" within the meaning of the SEC's proxy rules, the Company will provide an appropriate description in the CD&A in the annual proxy statement of how such equity compensation grant dates were chosen.

e.      The grant date shall be the same date the Board or Compensation Committee takes final action to grant the option or such later date as may be specified by the Board or Compensation Committee in the granting resolutions. Written documentation identifying grantees, amounts, and prices of all stock options granted on a particular date shall be prepared and distributed to Grantees for signature on the date of grant or within fifteen (15) business days thereafter. This signed documentation shall be transmitted to the Company's legal and accounting departments on the date of grant or within fifteen (15) business days thereafter.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 258 of 296   Page ID
#:354
Case 8:10-cv-01352-DOC -MLG   Document 34-8   Filed 10/11/10   Page 16 of 27   Page ID
#:394

f.      The Company's senior officers shall be prohibited from determining the date of any option award.

**4.   Director Independence**

a.      A majority of the Board and all of the Compensation Committee shall be comprised of independent directors.

b.      The Company agrees to continue to comply with NASDAQ (or other primary exchange on which the Company's shares are traded) and SEC rules and regulations regarding the number, duties and qualifications for independent directors.

c.      Since the Action was initiated, the Board added a new independent director.

**5.   Director Nomination Procedures**

a.      If there is a vacancy on the Board requiring the appointment of a new independent director, the Nominating and Governance Committee shall establish a procedure, to be overseen by the Chairman of the Nominating and Governance Committee, to nominate new directors to the Board.

b.      The procedure for identifying and nominating new directors shall provide for:

i.      Objective criteria to assist in conducting the canvassing efforts detailed below.

ii.      An appropriate review, including background information and interviews of prospective candidates that will be conducted and after which qualified candidates will be sent to the Nominating and Governance Committee for review.

iii.      Identification of candidates from those submitted for review, based on the Nominating and Governance Committee's business judgment as to the most qualified candidate(s) for the open independent director position(s) on the Board.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 259 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 33-8   Filed 10/11/10   Page 17 of 27   Page ID
#:395

c.      Once the Nominating and Governance Committee recommends the new independent director for election to the Board, the Board, subject to its fiduciary duties, shall move to fill the vacancy in a manner consistent with the Company's Charter and Bylaws.

Defendants agree that the Settlement, including foregoing monetary payments and corporate governance measures provide substantial benefits to TeleTech and Current Teletech Stockholders.

## VI.     HEARING ORDER AND SETTLEMENT HEARING

6.1.     Within five (5) days of the execution of this Stipulation, the Settling Parties shall jointly submit this Stipulation together with its Exhibits to the Court and shall apply for entry of an order (the "Hearing Order"), substantially in the form of Exhibit A attached hereto, providing for the scheduling of a hearing on the Settlement set forth in this Stipulation, and approval for the mailing and publication of a Notice of Settlement of the Action (the "Notice"), substantially in the form of Exhibit B attached hereto.  Within ten (10) days of the entry of the Hearing Order, TeleTech shall cause the Notice to be mailed to all Current Teletech Stockholders that can be identified using reasonable efforts.  Additionally, within ten (10) days of the entry of the Hearing Order, TeleTech shall cause the Notice (and this Stipulation) to be published on its corporate website.

6.2.     TeleTech shall pay for the costs associated with disseminating Notice.   Prior to the Settlement Hearing, Teletech's Counsel shall file with the Court an appropriate declaration with respect to the preparation, publication and mailing of the Notice.

## VII.    RELEASES

7.1.     Upon the Effective Date, as defined in Section V, ¶ 1.4, Plaintiff and Plaintiff's Counsel, on their own behalf and derivatively on behalf of TeleTech (as nominal defendant).

RLF1-3474800-1

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 260 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 133-8   Filed 10/11/10   Page 18 of 27   Page ID
#:396

TeleTech and Current TeleTech Stockholders shall be deemed to have, and by operation of the
Final Judgment and Order shall have fully, finally, and forever released, relinquished,
extinguished, and discharged all Released Claims (including Unknown Claims as defined in
Section V, ¶ 1.6) against each and all of the Released Persons and shall be permanently barred
and enjoined from instituting, commencing, or prosecuting or asserting any Released Claim
against any of the Released Persons.

7.2.    Upon the Effective Date, as defined in Section V, ¶ 1.4, Teletech and each of the
Released Persons shall be deemed to have, and by operation of the Final Judgment and Order
shall have, fully, finally, and forever released, relinquished, extinguished, and discharged
Plaintiff and Plaintiff's Counsel from all claims (including Unknown Claims as defined in
Section V, ¶ 1.16), arising out of, relating to, or in connection with the institution, prosecution,
assertion, Settlement or resolution of the Action or the Released Claims.

## VIII.   PLAINTIFF'S COUNSEL'S ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES

8.1.    TeleTech, on behalf of all Defendants, has agreed, subject to approval by the
Court, to pay a total sum of $1,500,000 to Plaintiff's Counsel for their fees and expenses
Defendants shall not object to this request.

8.2.    Such sum as the Court awards Plaintiffs' Counsel (the "Fee Award") shall be paid
to Plaintiff's Settlement Counsel, within 10 days after the entry of the Final Judgment and Order,
or any other order making the Fee Award   In the event that Order concerning the Fee Award is
reversed or modified, and in the event that the Fee Award has been paid to any extent, then
Plaintiff's Settlement Counsel shall within five (5) business days from the reversal or
modification refund the Fee Award (or such portion as the modification may require) plus
interest thereon at a rate of 3% per annum simple interest to TeleTech.  Plaintiff's Counsel, as a

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 261 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 33-8   Filed 10/11/10   Page 19 of 27   Page ID
#:397
#:3367

condition of receiving the Fee Award, on behalf of themselves and each partner and/or shareholder of their respective law firms, agree that each of their respective law firms and its partners and/or shareholders are subject to the jurisdiction of the Court for the purpose of enforcing the provisions of this paragraph.

8.3.    Approval of Plaintiff's Counsels' request for the Fee Award shall not be a condition of the Settlement.  Any order or proceedings relating to Plaintiff's Counsels' request for the Fee Award or any appeal from any order relating thereto or modification thereof shall not operate to terminate or cancel this Stipulation, and shall not affect the Final Judgment and Order approving this Stipulation or prevent the Settlement from becoming Final.

8.4.    Based on the benefits that Plaintiff's Counsel believes that Plaintiff has achieved through her prosecution of the Action, Plaintiff's Counsel intends to seek Court approval for an award in the amount of $2,000 (the "Special Award") for Plaintiff.  Defendants will not object to a request for Court approval of the Special Award.  The Special Award shall be paid out of the Fee Award to the extent that application is approved by the Court.

## IX.    CONDITIONS OF SETTLEMENT, EFFECT OF NON-APPROVAL, CANCELLATION OR TERMINATION

9.1.    The Effective Date shall be conditioned on the occurrence of all of the following events:

A.    The Court has entered the Hearing Order, substantially similar in form to Exhibit A, attached hereto;

B.    The Company has received $6.5 million  pursuant to the Settlement;

C.    The Court has entered the Judgment substantially in the form of Exhibit C;

D.    The Judgment has become Final, as defined in Section V, ¶ 1.5; and

E.    The final judgment and order approving the settlement of the Class Action is rendered

RLF1-3474800-1

Exhibit G, Page 258

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 262 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 133-8   Filed 10/11/10   Page 20 of 27   Page ID
#:398
#:398

by the United States District Court and such order is not subject to further review on

appeal or otherwise.

9.2.   If all of the conditions specified in ¶ 9.1 are not met, then the Stipulation shall be

canceled and terminated, unless Plaintiff's Settlement Counsel and Defense Counsel mutually

agree in writing to proceed with the Stipulation.

9.3.   If the Effective Date does not occur, or if the Stipulation is not approved by the

Court or the Settlement set forth in the Stipulation is terminated or fails to become effective in

accordance with its terms, the Settling Parties shall be restored to their respective positions in the

Action as of the date of execution of this Stipulation.  In such event, the terms and provisions of

the Stipulation, shall have no further force and effect with respect to the Settling Parties and shall

not be used in the Action or in any other proceeding for any purpose, and any Judgment or order

entered by the Court in accordance with the terms of the Stipulation shall be treated as vacated,

*nunc pro tunc.*

9.4.   If the Effective Date does not occur or if the Stipulation is not approved by the

Court or the Settlement set forth in the Stipulation is terminated or fails to become effective in

accordance with its terms, the monetary provision of the Settlement shall be refunded by the

Company to its insurance carrier(s) within five (5) days of the entry of any such order that would

prevent the Effective Date from occurring.

## X.   MISCELLANEOUS PROVISIONS

10.1.   The Settling Parties (a) acknowledge that it is their intent to consummate this

agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and

implement all terms and conditions of the Stipulation and to exercise their good faith best efforts

to accomplish the foregoing terms and conditions of the Stipulation.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 263 of 296   Page ID
#:3398
Case 8:10-cv-01352-DOC -MLG   Document 138   Filed 10/11/10   Page 21 of 27   Page ID
#:399

10.2.    The Settling Parties intend this Settlement to be a final and complete resolution of all disputes between them with respect to the Action and their subject matter.  The Settling Parties agree that the Settlement was negotiated in good-faith by the Settling Parties and reflects a Settlement that was reached voluntarily after consultation with experienced counsel.

10.3.    Pending Court approval of the Stipulation and the Settlement, (i) Plaintiff agrees not to initiate any proceedings other than those incident to the Settlement itself; and (ii) Defendants may seek to prevent or stay any other action or claims brought seeking to assert any Released Claim.  If any action that would be barred by the releases contemplated by this Stipulation is commenced against any of the Released Persons prior to the entry of Final Judgment, and such action is not dismissed prior to the Settlement Hearing contemplated by this Stipulation, any Defendant may, at his, her or its sole option, withdraw from the Settlement prior to the Settlement Hearing.  The Settlement shall remain binding as to the remaining parties thereto, if any.

10.4.    Neither the Stipulation nor the Settlement, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity or invalidity of any Released Claim, or of any wrongdoing or liability or lack thereof of the Defendants and Released Persons; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission or lack thereof of any of the Defendants and Released Persons in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. Defendants and Released Persons may file the Stipulation and/or the Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 264 of 296   Page ID
#:3408
Case 8:10-cv-01352-DOC -MLG   Document 130   Filed 10/11/10   Page 22 of 27   Page ID
#:400

other theory of claim preclusion or issue preclusion or similar defense or counterclaim. Defendants have denied and continue to deny each and all of the claims alleged in the Action. Plaintiff, TeleTech or any Current TeleTech Stockholder, may file the Stipulation in any proceeding brought to enforce any of its terms or provisions. The Settling Parties and their counsel, and each of them, agree, to the extent permitted by law, that all agreements made and orders entered during the course of the Action relating to the confidentiality of information shall survive this Stipulation.

10.5. Plaintiff agrees not to institute, join in, or cooperate in any way in any threatened, pending, or future litigation, lawsuit, claim or action against the Released Persons, or any of them, alleging, prosecuting, regarding, concerning, relating to, referring to or arising out of in any way the Released Claims.

10.6. Plaintiff warrants and represents that she has not assigned or transferred or attempted to assign or transfer to any person or entity any Released Claim or any portion thereof or interest therein.

10.7. Plaintiff hereby represents and warrants that she has adequate information regarding the terms of this Settlement, the scope and effect of the releases set forth herein, and all other matters encompassed by this Stipulation to make an informed and knowledgeable decision with regard to entering into this Stipulation, and that she has independently and without reliance upon the Defendants made her own analysis and decision to enter into this Stipulation.

10.8. Defendants hereby represent and warrant that they have adequate information regarding the terms of this Settlement, the scope and effect of the releases set forth herein, and all other matters encompassed by this Stipulation to make an informed and knowledgeable decision with regard to entering into this Stipulation, and that they have independently and

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 265 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 34-18   Filed 10/11/10   Page 23 of 27   Page ID
#:3618
#:401

without reliance upon the Plaintiff made their own analysis and decision to enter into this
Stipulation. Defendants acknowledge and hereby verify that the Plaintiff has not made any
representation or warranty and has no duty or obligation to them, whether express or implied, of
any kind or character, except as expressly set forth herein.

10.9. This Stipulation has been jointly drafted by the parties at arm's length. No
provision or ambiguity in this Stipulation shall be construed or interpreted against any party by
virtue of its participation in the drafting of this Stipulation. The Stipulation shall in all cases be
construed as a whole, according to its fair meaning and not strictly for or against any of the
parties.

10.10. The covenants contained in this Stipulation provide good and sufficient
consideration for every promise, duty, release, obligation, agreement and right contained in this
Stipulation.

10.11. Any failure by any party to insist upon the strict performance by any other party
of any of the provisions of the Stipulation shall not be deemed a waiver of any of the provisions,
and such party, notwithstanding such failure, shall have the right thereafter to insist upon the
strict performance of any and all of the provisions of the Stipulation to be performed by such
other party.

10.12. All of the Exhibits to the Stipulation are material and integral parts hereof and are
fully incorporated herein by reference.

10.13. The Stipulation may be amended or modified only by a written instrument signed
by or on behalf of all Settling Parties or their respective successors-in-interest.

10.14. The Stipulation and the Exhibits attached hereto constitute the entire agreement
between Plaintiff and Defendants and no representations, warranties or inducements have been

RLF1-3474800-1

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 266 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 34-8   Filed 10/11/10   Page 24 of 27   Page ID
#:402

made to any party concerning the Stipulation or its Exhibits other than the representations, warranties and covenants contained and memorialized in such documents. Except as otherwise provided herein, each party shall bear its own costs.

10.15. Each counsel or other Person executing the Stipulation or any of its Exhibits on behalf of any party hereto hereby warrants that such Person has the full authority to do so.

10.16. The Stipulation may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. A complete set of original executed counterparts shall be filed with the Court.

10.17. The Stipulation shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto.

10.18. The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Stipulation, and all parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement embodied in the Stipulation and for any matters arising out of, concerning, or relating thereto.

10.19 The Stipulation and the Exhibits hereto shall be considered to have been negotiated, executed and delivered, and to be wholly performed, in the State of Delaware, and the rights and obligations of the parties to the Stipulation shall be construed and enforced in accordance with, and governed by, the internal, substantive laws of the State of Delaware without giving effect to that State's choice of law principles.

10.20. IN WITNESS WHEREOF, the parties hereto have caused the Stipulation to be executed, by their duly authorized attorneys.

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 267 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 34-8   Filed 10/11/10   Page 25 of 27   Page ID
#:403
#:3438

Dated:  October 26, 2009

Respectfully submitted,

/s/ Noman M. Monhait

**Rosenthal, Monhait & Goddess,
P.A.**
Norman M. Monhait (#1040)
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, DE 19899-1070
Phone: (302) 656-4433
Fax:  (302) 658-7567

*Counsel for Plaintiff*

**The Weiser Law Firm, P.C.**
Robert B. Weiser
Brett D. Stecker
Jeffrey J. Ciarlanto
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Phone: (610) 225-2677
Fax: (610) 225-2678

**The Shuman Law Firm**
Kip B. Shuman
Rusty E. Glenn
801 East 17th Avenue
Denver, CO 80218
Phone: (303) 861-3003
Fax: (303) 830-6920

/s/ Brock E. Czeschin

**Richards Layton & Finger, P.A.**
Allen M. Terrell, Jr., Esquire (# 709)
Brock E. Czeschin, Esquire (# 3938)
One Rodney Square
920 North King Street
Wilmington, DE 19801

RLF1-3474800-1

Exhibit G, Page 264

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 268 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 32548   Filed 10/11/10   Page 26 of 27   Page ID
#:404

*Counsel for defendants Kenneth D*
*Tuchman, James E Barlett, Rod*
*Dammeyer, George H Heilmeier,*
*John T McLennan, Morton*
*Meyerson, Alan Silverman, Mark C*
*Thompson, Sharon A O'Leary,*
*Dennis J. Lacey, John Simon, Alan*
*Schutzman, Brian Delaney, John*
*Troka, Larry Kessler, Michael E*
*Foss, and Margot O'Dell, and*
*nominal defendant TeleTech*
*Holdings, Inc*

**OF COUNSEL**

**Dewey & LeBoeuf LLP**
Ralph C. Ferrara
Geoffrey H. Coll
1101 New York Avenue, N.W.
Suite 1100
Washington, DC 20005
Phone: (202) 346-8000
Fax: (202) 346-8102

*Counsel for Nominal Defendant*

**Brownstein Hyatt Farber Schreck**
Timothy R. Beyer
Zhonette M. Brown
410 Seventeenth Street
Suite 2200
Denver, CO 80202
Phone: (303) 223-1116
Fax: (303) 223-1111

*Counsel for Defendants James E*
*Barlett, William A. Linnenbringer,*
*Ruth C Lipper, Shrikant Mehta,*
*Shirley Young, Rod Dammeyer,*
*George H Heilmeier, John T*
*McLennan, Morton Meyerson, Alan*
*Silverman, Mark C. Thompson,*
*Sharon A. O'Leary, Dennis J. Lacey,*
*John Simon, Alan Schutzman, Brian*
*Delaney, John C Troka, Larry*

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 269 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 34-58   Filed 10/11/10   Page 27 of 27   Page ID
#:405

*Kessler, Michael E Foss and*
*Margot O'Dell*

**McDermott Will & Emery LLP**
Laurence Berman
Matt Oster
2049 Century Park East, 38th Floor
Los Angeles, CA 90067
Phone:  (310) 277-4110
Fax: (310) 277-4730

*Counsel for Defendant Kenneth D*
*Tuchman*

RLF1-3474800-1

Exhibit G, Page 266

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 270 of 296   Page ID
#:346
Case 8:10-cv-01352-DOC -MLG   Document 25-9   Filed 10/11/10   Page 1 of 9   Page ID
#:406

# EXHIBIT H

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SUSAN M. GREGORY,                    :
                                     :
            Plaintiff,               :
                                     :
        vs.                          :     Civil Action
                                     :     No. 3925-CC
KENNETH D. TUCHMAN, JAMES E.         :
BARLETT, WILLIAM A.                  :
LINNENBRINGER, RUTH C. LIPPER,       :
SHRIKANT MEHTA, SHIRLEY YOUNG,       :
ROD DAMMEYER, GEORGE C.              :
HEILMEIER, JOHN T. MCLENNAN,         :
MORTON MEYERSON, ALAN                :
SILVERMAN, MARK C. THOMPSON,         :
SHARON A. O'LEARY, DENNIS J.         :
LACEY, JOHN SIMON, ALAN              :
SCHUTZMAN, BRIAN DELANEY, JOHN       :
TROKA, LARRY KESSLER, MICHAEL        :
E. FOSS and MARGOT O'DELL,           :
                                     :
            Defendants,              :
                                     :
        and                          :
TELETECH HOLDINGS, INC.,             :
                                     :
         Nominal Defendant.  :
                    - - -
                         Chancery Court
                         34 The Circle
                         Georgetown, Delaware
                         Tuesday, January 5, 2010
                         2:30 p.m.


                    - - -

BEFORE:  HON.  WILLIAM B. CHANDLER III, CHANCELLOR.

                    - - -
            SETTLEMENT HEARING
                    - - -

------------------------------------------------
            CHANCERY COURT REPORTERS
                410 Federal Street
        Dover, Delaware 19901 (302) 739-3934

2

```
 1   APPEARANCES:
     (By telephone):
 2
             NORMAN M. MONHAIT, ESQ.
 3           Rosenthal, Monhait & Goddess, P.A.
                        -and-
 4           ROBERT B. WEISER, ESQ.
             BRETT D. STECKER, ESQ.
 5           JEFFREY J. CIARLANTO, ESQ.
             of the Pennsylvania bar
 6           The Weiser Law Firm, P.C.
                        -and-
 7           KIP B. SHUMAN, ESQ.
             of the Colorado bar
 8           The Shuman Law Firm
                for Plaintiff
 9

10           BROCK E. CZESCHIN, EQ.
             Richards, Layton & Finger, P.A.
11                      -and-
             TIMOTHY R. BEYER, ESQ.
12           of the Colorado bar
             Brownstein, Hyatt, Farber, Schreck
13              for Defendants Kenneth D. Tuchman, James
                Barlett, Rod Dammeyer, George Heilmeier,
14              John McLennan, Morton Meyerson, Alan
                Silverman, Mark Thompson, Sharon O'Leary,
15              Dennis Lacey, John Simon, Alan Schutzman,
                Brian Delaney, John Troka, Larry Kessler,
16              Michael Foss Margot O'Dell and Nominal
                Defendant TeleTech Holdings, Inc.
17                      -and-
             GEOFFREY H. COLL, ESQ.
18           Dewey & LeBoeuf, LLP
                for Nominal Defendant
19

20

21

22                      -  -  -

23

24
```

CHANCERY COURT REPORTERS

Exhibit H, Page 269

Case 8:12-cv-01716-DMG-FMO   Document 9-1    Filed 10/27/12   Page 273 of 296   Page ID
#:349
Case 8:10-cv-01352-DOC -MLG   Document 25-9   Filed 10/11/10   Page 4 of 9   Page ID
#:409

3

1                    THE COURT:  Good afternoon, counsel.

2    Do you have any trouble hearing me?

3                    MR. MONHAIT:  No.  I hear you fine.

4    Can others hear the Chancellor?

5                    THE COURT:  All right.  I have you on

6    speaker phone.  I am in the courtroom, and the only

7    person present in the courtroom besides my clerk and

8    my staff is a member of the press, Jeff Feely, and

9    there is no one else here.  It is past the hour of

10   2:30 at which this settlement hearing was scheduled,

11   which is Gregory versus Tuchman, et al, Civil Action

12   Number 3925.

13                   So if there are introductions, please

14   feel free to do that.  If not, whoever is going to

15   present the settlement to me should feel free to

16   begin.

17                   MR. MONHAIT:  Your Honor, good

18   afternoon.  This is Norm Monhait.  Thank you very much

19   for agreeing to conduct this hearing by phone.

20                   I have on the line with me Robert

21   Weiser and Kip Shuman who have been the principal

22   counsel on behalf of the plaintiff in this action, and

23   Mr. Weiser will be speaking in support of the

24   settlement.  Your Honor has granted his pro hac vice

CHANCERY COURT REPORTERS

Case 8:12-cv-01716-DMG-FMO   Document 9-1    Filed 10/27/12   Page 274 of 296   Page ID
#:350
Case 8:10-cv-01352-DOC -MLG   Document 25-9    Filed 10/11/10   Page 5 of 9   Page ID
#:410

4

 1   motion this morning.

 2                THE COURT:  Very well then.

 3   Mr. Weiser, where are you?  Are you in New York or

 4   here in Wilmington?

 5                MR. WEISER:  Neither, Your Honor.  I

 6   am in Wayne, Pennsylvania which is one of the western

 7   suburbs of Philadelphia.

 8                THE COURT:  I'm sorry.  I now look and

 9   see that your office is in Wayne.  My apologies.

10                MR. WEISER:  None needed.

11                MR. CZESCHIN:  Brock Czeschin from

12   Richards, Layton on behalf of the defendants, and I

13   have on the phone Geoffrey Coll from Dewey & LeBoeuf

14   representing the nominal defendant Teletech, and

15   Mr. Timothy Beyer of Brownstein, Hyatt, Farber,

16   Schreck in Denver who represents all the individual

17   defendants other than Mr. Tuchman.

18                THE COURT:  Very well then.  Welcome

19   to all.  I'm glad you're able to make it by telephone.

20   Hopefully that is a little more convenient for all.

21                MR. MONHAIT:  It is, thank you.

22                MR. WEISER:  Your Honor, thank you.

23                As Your Honor knows, we are here on a

24   final unopposed motion for final settlement approval.

CHANCERY COURT REPORTERS

26

1          MR. COLL:  Geoff Coll on behalf of the

2     nominal defendants, but we are also happy to rest on

3     the submissions.

4          THE COURT:  All right.

5          Well, counsel, thank you very much for

6     being available on by telephone.  This, I know, is

7     convenient for you, but it also is convenient to the

8     Court to do it this way.

9          I have read the brief that was

10     submitted and the affidavits, of course, by Mr. Weiser

11     and his firm and Mr. Monhait's firm and the others, so

12     I am familiar with the issues and with the terms of

13     the settlement.

14          Let me say at the outset that it is

15     comforting to know that this litigation was mediated

16     and that Judge Weinstein was involved in that.  That

17     is something that I do recognize and get comfort from.

18          Secondly, I have to tell you, having

19     had a number of options dating, backdating and excess

20     grant cases in my career, I think I am the only judge

21     perhaps on this Court who can say this, but I think

22     every one of my cases has successfully settled in a

23     way that has resulted in very generous settlements

24     that were highly beneficial to the companies involved

CHANCERY COURT REPORTERS

27

1   and to their stockholders.

2           So I take some, I don't know, personal

3   pride in that I am glad that that has worked out in

4   each of these cases, and this one in particular, as

5   well as the Ryan versus Gifford involving Maxim.  I am

6   happy about that and glad that you were able to

7   achieve this result, and I compliment all counsel

8   involved, those who represent the company and

9   represent the individual defendants as well as counsel

10   for the plaintiffs.

11           So having said that, let me turn then

12   to what I think I am obliged to do at this point.

13   First, a Court, in reviewing the proposed settlement

14   of a derivative litigation, looks primarily at whether

15   the settlement is fair, reasonable and adequate.

16   There is no real litmus test or a blueprint for how

17   courts arrive at what is a fair, reasonable and

18   adequate settlement, but we tend to focus on a number

19   of different factors which include the risks of

20   establishing liability in the litigation and the risks

21   of recovering or establishing any damages as a result

22   of any liability that is found.

23           In this particular case, Mr. Weiser

24   talked about the damages issue at length, and I don't

CHANCERY COURT REPORTERS

Exhibit H, Page 273

32

1   shortly.

2                    THE COURT:   Thank you, Mr. Czeschin.

3   Everyone, have a very good day.

4

5

6                    (The teleconference concluded at

7   3:20 p.m.)

8

9                         -----

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

Exhibit H, Page 274

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 278 of 296   Page ID
#:354
Case 8:10-cv-01352-DOC -MLG   Document 26-9   Filed 10/11/10   Page 9 of 9   Page ID
#:414

33

CERTIFICATE

I, MAUREEN M. McCAFFERY, Official Court
Reporter of the Chancery Court, State of Delaware, do
hereby certify that the foregoing pages numbered
3 through 32 contain a true and correct transcription
of the proceedings as stenographically reported by
me at the hearing in the above cause before the
Chancellor of the State of Delaware, on the date
therein indicated.

IN WITNESS WHEREOF, I have
hereunto set my hand at Dover, this 8th day of
January, 2010.


/s/Maureen M. McCaffery
------------------------------
Maureen M. McCaffery
Official Court Reporter
of the Chancery Court
State of Delaware


Certification Number: 201-RPR
Expiration:   1/31/11

CHANCERY COURT REPORTERS

# EXHIBIT I



**GRANTED**

EFiled: Jan 5 2010 4:26PM EST
Transaction ID 28793714
Case No. 3925-CC

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

---

| | |
|---|---|
| SUSAN M. GREGORY, | X |
| Plaintiff, | : |
| vs. | : |
| KENNETH D. TUCHMAN, JAMES E. BARLETT, WILLIAM A. LINNENBRINGER, RUTH C. LIPPER, SHRIKANT MEHTA, SHIRLEY YOUNG, ROD DAMMEYER, GEORGE C. HEILMEIER, JOHN T. MCLENNAN, MORTON MEYERSON, ALAN SILVERMAN, MARK C. THOMPSON, SHARON A. O'LEARY, DENNIS J. LACEY, JOHN SIMON, ALAN SCHUTZMAN, BRIAN DELANEY, JOHN TROKA, LARRY KESSLER, MICHAEL E. FOSS, and MARGOT O'DELL, | : C.A. No. 3925-CC |
| Defendants, | : |
| and | : |
| TELETECH HOLDINGS, INC., | : |
| Nominal Defendant | : |
| | X |

---

### FINAL JUDGMENT APPROVING
### SETTLEMENT AND ORDER OF DISMISSAL

A hearing having been held before this Court (the "Court") on January 5, 2010, pursuant to the Court's Hearing Order dated October 27, 2009 (the "Hearing Order"), upon a Stipulation of Settlement filed on October 26, 2009 (the "Stipulation") in the above-captioned action (the "Action") brought derivatively on behalf of TeleTech Holdings, Inc. ("TeleTech"), it appearing

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 281 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 35-10   Filed 10/11/10   Page 3 of 7   Page ID
#:417

that due notice of said hearing was given in accordance with the Hearing Order and that said notice was adequate and sufficient; and the Parties having appeared by their attorneys of record; and the attorneys for the respective Parties having been heard in support of the Settlement of the Action, and an opportunity to be heard having been given to all other Persons desiring to be heard as provided in the Notice; and the entire matter of the Settlement having been considered by the Court;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, this 5th day of January 2010, as follows:

1.      Unless otherwise defined herein, all defined terms shall have the meanings as set forth in the Stipulation.

2.      The Notice, annexed as Exhibit B to the Stipulation, has been disseminated by TeleTech pursuant to and in the manner directed by the terms of the Hearing Order,; proof of the dissemination of the Notice was filed with the Court; and full opportunity to be heard has been offered to all Parties and all Persons in interest. The form and manner of the Notice is hereby determined to have been the best notice practicable under the circumstances and to have been given in full compliance with each of the requirements of Court of Chancery Rule 23.1 and due process, and it is further determined that all Current TeleTech Stockholders are bound by the Judgment herein.

3.      The Court finds that the Stipulation and the terms of the Settlement set forth therein are fair, reasonable and adequate and in the best interests of TeleTech and Current TeleTech Stockholders. The Settlement is hereby approved pursuant to Court of Chancery Rule 23.1. The Parties to the Stipulation are hereby authorized and directed to comply with and to

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 282 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 358-10   Filed 10/11/10   Page 4 of 7   Page ID
#:418
#:838

consummate the Settlement in accordance with its terms and provisions, and the Clerk of Court is directed to enter and docket this Judgment.

4.     This Judgment shall not constitute any evidence or admission by any Party herein that any acts of wrongdoing have been committed by any of the Parties to the Action and should not be deemed to create any inference that there is any liability therefore.

5.     The Action (as well as all claims contained therein and all of the Released Claims) is hereby dismissed on the merits and with prejudice, with each party to bear his, her, or its own costs except as detailed in the Stipulation.

6.     Plaintiff (acting on her own behalf individually and derivatively on behalf of TeleTech), Current TeleTech Stockholders, and Plaintiffs' Counsel shall be deemed to have, and by operation of this Final Judgment and Order have fully, finally, and forever compromised, settled, released, discharged and dismissed all Released Claims (including "Unknown Claims," as defined in the Stipulation) and any and all claims arising out of, relating to, or in connection with the defense, settlement or resolution of the Action against the Released Persons, and shall be forever enjoined from instituting, commencing, or prosecuting or asserting these claims, except that this agreement shall have no effect on any and all rights or claims Individual Defendants and/or TeleTech may have under any policies of insurance or for indemnification.

7.     TeleTech and each of the Released Persons shall be deemed to have, and by operation of the Judgment have, fully, finally, and forever compromised, settled, released and discharged Plaintiff and Plaintiff's Counsel from all claims (including Unknown Claims) arising out of, relating to, or in connection with their institution, prosecution, assertion, settlement or resolution of the Action or the Released Claims.

RLF1 3474899v.1

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 283 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 39-10   Filed 10/11/10   Page 5 of 7   Page ID
#:419
#:419

8.      Neither the Stipulation nor the Settlement, nor any act performed or document produced or executed pursuant to or in furtherance of the Stipulation or the Settlement: (a) is or may be deemed to be or may be offered, attempted to be offered or used in any way by the Settling Parties or any other person as a presumption, a concession or any admission of, or evidence of, any fault, wrongdoing or liability of the Individual Defendants or of the validity of any Released Claims; or (b) is intended by the Settling Parties to be offered or received as evidence or used by any other person in any other actions or proceedings, whether civil, criminal or administrative.  The Released Parties may file the Stipulation and/or this Judgment in any action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, full faith and credit, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

9.      This Court further finds that the Settlement has been entered into and made in good faith through arm's-length negotiations, and that Plaintiff and Plaintiff's Counsel have fairly and adequately represented the interests of Current TeleTech Stockholders in connection with the Action.

10.     Plaintiff's Counsel are hereby awarded attorneys' fees and expenses in the amount of $1,500,000.00 (the "Fee Award"), which sum the Court finds to be fair and reasonable and which shall be paid to Plaintiff's Counsel in accordance with the terms of the Stipulation.

11.     Plaintiff is hereby awarded $2,500.00 (the "Special Award") based on the benefits that Plaintiff has achieved through her prosecution of the Action.  The Special Award shall be paid out of the Fee Award in accordance with the terms of the Stipulation.

- 4 -

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 284 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 366-10   Filed 10/11/10   Page 6 of 7   Page ID
#:420
#:420

12.     In the event that the Settlement of the Action does not become effective as set forth in the Stipulation for any reason, then, without the need for any further action by any Party thereto or by the Court, the Stipulation and this Judgment shall become null and void and of no further force or effect, and shall not be used or referred to for any purpose whatsoever. In that event, the Stipulation, this Judgment and all negotiations and proceedings relating thereto shall be withdrawn without prejudice as to the rights of all Parties thereto, who shall be restored to their respective positions existing prior to the execution of the Stipulation and this Judgment.

13.     All other relief not expressly granted in this Judgment is denied.

14.     Without affecting the finality of this Judgment in any way, this Court reserves jurisdiction over all matters relating to the administration and consummation of the Settlement, including but not limited to (a) implementation of this settlement; and (b) construing, enforcing and administering the Stipulation.

SO ORDERED.

Signed this 5th day of January, 2010.

_____

CHANCELLOR WILLIAM B. CHANDLER III

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 285 of 296   Page ID
Case 8:10-cv-01352-DOC -MLG   Document 305-10   Filed 10/11/10   Page 7 of 7   Page ID
#:421

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | William B Chandler |
| **File & Serve Transaction ID:** | 28791044 |
| **Current Date:** | Jan 05, 2010 |
| **Case Number:** | 3925-CC |
| **Case Name:** | CONF ORDER Gregory, Susan M vs Kenneth D Tuchman TeleTech Holdings Inc et al |

/s/ Judge William B Chandler

# EXHIBIT J

Case 8:10-cv-01786-DAP   Doc #: 35-11   Filed: 08/20/10   1 of 8.   PageID #: 925 Page ID
#:423

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| JAMES T. KING, derivatively on behalf of KEYCORP, | : : : | Civil Action No. 1:10-cv-01786-DAP |
| Plaintiff, | : : | |
| v. | : : : | |
| HENRY L. MEYER, III, WILLIAM G. BARES, PETER G. TEN EYCK, II, CAROL A. CARTWRIGHT, EDWARD P. CAMPBELL, BILL R. SANFORD, ALEXANDER M. CUTLER, THOMAS C. STEVENS, EDUARDO R. MENASCE, JEFFREY B. WEEDEN, LAURALEE E. MARTIN, H. JAMES DALLAS, BETH E. MOONEY, JOSEPH A. CARRABBA, RUTH ANN M. GILLIS, KRISTEN L. MANOS, and MERCER, INC., | : : : : : : : : : : : : : | |
| Defendants, | : : | |
| and | : : | |
| KEYCORP, | : : | |
| Nominal Defendant. | : | |

- 1 -

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 288 of 296   Page ID
#:864
Case 1:10-cv-01813-JG   Document 35-1   Filed 06/30/2010   Page 1 of 8   PageID #: 920   Page ID
#:424

| IRVING LASSOFF, derivatively on behalf of KEYCORP, | : | Civil Action No. 1:10-cv-01813-JG |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| HENRY L. MEYER, III, WILLIAM G. BARES, PETER G. TEN EYCK, II, CAROL A. CARTWRIGHT, EDWARD P. CAMPBELL, BILL R. SANFORD, ALEXANDER M. CUTLER, THOMAS C. STEVENS, EDUARDO R. MENASCE, JEFFREY B. WEEDEN, LAURALEE E. MARTIN, H. JAMES DALLAS, BETH E. MOONEY, JOSEPH A. CARRABBA, RUTH ANN M. GILLIS, KRISTEN L. MANOS, and MERCER, INC., | : | |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| KEYCORP, | : | |
| | : | |
| Nominal Defendant. | : | |

## STIPULATION CONSOLIDATING ACTIONS, APPOINTING LEAD COUNSEL AND RELATED MATTERS AND ORDER THEREON

WHEREAS, there are presently two related shareholder derivative actions against certain of the officers and directors of KeyCorp pending in this Court;

WHEREAS, the two KeyCorp shareholder derivative actions arise out of the same alleged transactions and occurrences and involve the same or substantially similar alleged issues of fact and law, and, therefore, should be consolidated for all purposes;

WHEREAS, in an effort to assure consistent rulings and decisions and the avoidance of unnecessary duplication of effort, all of the undersigned counsel, on behalf of parties to this stipulation in the related KeyCorp shareholder derivative actions currently pending in this Court, enter into this stipulation.  The counsel are: (1) The Weiser Law Firm, P.C., Hutton Law Group, and Landskroner Grieco Madden, LLC on behalf of plaintiff James T. King; (2) Ryan &

- 2 -

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 289 of 296   Page ID
#:365
Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 289 of 296   Page ID
#:425

Maniskas, LLP and Landskroner Grieco Madden, LLC on behalf of plaintiff Irving Lassoff; (3)
Jones Day on behalf of individual defendants Henry L. Meyer III ("Meyer"), Thomas C. Stevens
("Stevens"), Jeffrey B. Weeden ("Weeden"), and Beth E. Mooney ("Mooney"); (4) Calfee,
Halter & Griswold LLP on behalf of individual defendants William G. Bares ("Bares"), Peter G.
Ten Eyck II ("Ten Eyck"), Carol A. Cartwright ("Cartwright"), Edward P. Campbell
("Campbell"), Bill R. Sanford ("Sanford"), Alexander M. Cutler ("Cutler"), Eduardo R. Menascé
("Menascé"), Lauralee E. Martin ("Martin"), H. James Dallas ("Dallas"), Joseph A. Carraba
("Carraba"), Ruth Ann M. Gillis ("Gillis"), and Kristen L. Manos ("Manos");[1] (5) Vorys, Sater,
Seymour & Pease LLP on behalf of defendant Mercer, Inc. ("Mercer"); and (6) Baker &
Hostetler LLP on behalf of nominal party KeyCorp;

WHEREAS, KeyCorp, Mercer, and the Individual Defendants take no position at the
present time as to the appointment of: (a) The Weiser Law Firm, P.C. as lead counsel for
plaintiffs; and (b) Landskroner Grieco Madden, LLC as liaison counsel for plaintiffs;

WHEREAS, the plaintiffs, KeyCorp, Mercer, and the Individual Defendants agree that it
would be duplicative and wasteful of the Court's resources for defendants named in plaintiffs'
shareholder derivative actions to have to respond to the individual complaints prior to the agreed-
upon consolidation. Therefore, the plaintiffs, KeyCorp, Mercer, and the Individual Defendants
agree that no response is necessary to the individual complaints that have already been filed until
after the KeyCorp shareholder derivative actions have been consolidated and a consolidated
complaint has been filed.

\* \* \*

Now, therefore, the parties hereto stipulate and the Court ORDERS as follows:[2]

---

[1] Collectively, defendants Meyer, Stevens, Weeden, Mooney, Bares, Ten Eyck, Cartwright,
Campbell, Sanford, Cutler, Menascé, Martin, Dallas, Carraba, Gillis, and Manos shall be referred
to herein as the "Individual Defendants."
[2] By virtue of this stipulation and order, no party waives or otherwise compromises any of its
potential arguments, rights or defenses with respect to and including, among other things,
jurisdiction, venue, or choice of law.

Exhibit J, Page 286

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 290 of 296   Page ID
Case 8:10-cv-01356-DDD   Doc #: 86-1   Filed: 08/26/10   4 of 8.   PageID #: 928   Page ID
#:426

## I.   CONSOLIDATION OF THE RELATED SHAREHOLDER DERIVATIVE ACTIONS

The following shareholder derivative actions are hereby related and consolidated for all

purposes, including pre-trial proceedings and trial:

| Abbreviated Case Name | Case Number | Date Filed |
|---|---|---|
| *King v. Meyer, et al.,* | 1:10-cv-01786-DAP | July 6, 2010[3] |
| *Lassoff v. Meyer, et al.,* | 1:10-cv-01813-JG | August 17, 2010 |

## II.   CAPTION OF CASES

Every pleading filed in these consolidated actions, or in any separate action included

herein, shall bear the following caption:

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE KEYCORP DERIVATIVE LITIGATION | ) Lead Case No. 1:10-cv-01786-DAP |
| | ) |
| | ) |
| This Document Relates to: | ) |
| | ) |
| ALL ACTIONS | ) |
| | ) |

## III.   MASTER DOCKET

The files of these consolidated actions shall be maintained in one file under Master File

No. 1:10-cv-01786-DAP.

## IV.   PLEADINGS AND MOTIONS

Plaintiffs shall file a consolidated complaint (the "Consolidated Complaint") no later than

60 days from the date of entry of this Order, unless otherwise agreed between the parties and

approved by the Court, which shall be deemed the operative complaint, superseding all

complaints filed in any of the actions consolidated hereunder.  Defendants shall have up to 45

days after the filing of the Consolidated Complaint to move, answer or otherwise respond to the

---

[3] The KeyCorp shareholder derivative action captioned *King v. Meyer, et al.,* Case No. 1:10-cv-01786-DAP (the "*King* Action"), was filed on July 6, 2010 in the Court of Common Pleas of Cuyahoga County, Ohio, Case No. CV-10-730994.  On August 12, 2010, certain of the defendants removed the *King* Action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 291 of 296   Page ID
Case 8:10-cv-01856-DOC-RNB   Document 36-1   Filed 06/26/10/5 of 8.   PageID #:12 Page ID
#:427

Consolidated Complaint.  Plaintiffs shall file their opposition to any motion(s) to dismiss within

45 days after the filing of Defendants' motion(s).  Defendants shall file any replies to plaintiffs'

opposition within 30 days after plaintiffs' filing of the opposition.

## V.   ORGANIZATION OF COUNSEL

Lead Counsel for plaintiffs for the conduct of these consolidated actions is:

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

Each counsel's appearance and service in these capacities is subject to approval of a *pro
hac vice* application to be filed within 60 days.

Lead Counsel shall have authority to speak for plaintiffs in matters regarding pre-trial

procedure, trial and settlement negotiations and shall make all work assignments in such manner

as to facilitate the orderly and efficient prosecution of this litigation and to avoid duplicative or

unproductive effort.

Lead Counsel shall be responsible for coordinating all activities and appearances on

behalf of plaintiffs and for the dissemination of notices and orders of this Court.  No motion,

request for discovery, or other pre-trial or trial proceedings shall be initiated or filed by any

plaintiffs except through plaintiffs' Lead Counsel.

Lead Counsel also shall be available and responsible for communications to and from this

Court, including distributing orders and other directions from the Court to counsel.  Lead

Counsel shall be responsible for creating and maintaining a master service list of all parties and

their respective counsel.  Service on Lead Counsel shall be sufficient as notice to plaintiffs in this

consolidated action.

Liaison counsel for plaintiffs for the conduct of these consolidated actions is:

LANDSKRONER GRIECO MADDEN, LLC
JACK LANDSKRONER
DREW LEGANDO
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  (216) 522-9000
Facsimile: (216) 522-9007

## VI.   NEWLY FILED OR TRANSFERRED ACTIONS

This Order shall apply to each case arising out of the same or substantially the same transactions or events as these cases, which is subsequently filed in or transferred to this Court.

When a case which properly belongs as part of the *In re KeyCorp Derivative Litigation*, Lead Case No. 1:10-cv-01786-DAP, is hereafter filed in this Court or transferred here from another court, this Court requests the assistance of counsel in calling to the attention of the clerk of the Court the filing or transfer of any case which might properly be consolidated as part of the *In re KeyCorp Derivative Litigation*, Lead Case No. 1:10-cv-01786-DAP, and counsel are to assist in assuring that counsel in subsequent actions receive notice of this Order.

IT IS SO STIPULATED.

DATED: August 19, 2010              **THE WEISER LAW FIRM, P.C.**
                                    ROBERT B. WEISER
                                    BRETT D. STECKER
                                    JEFFREY J. CIARLANTO
                                    121 N. Wayne Avenue, Suite 100
                                    Wayne, PA 19087
                                    Telephone:  (610) 225-2677
                                    Facsimile:  (610) 225-2678


                                    By: s/ Robert B. Weiser (with permission)
                                         ROBERT B. WEISER

                                    [Proposed] Lead Counsel and Counsel for Plaintiff James
                                    T. King

                                    **RYAN & MANISKAS, LLP**
                                    KATHARINE M. RYAN
                                    RICHARD A. MANISKAS
                                    995 Old Eagle School Rd.
                                    Suite 311
                                    Wayne, PA 19087
                                    Telephone:  (484) 588-5516
                                    Facsimile:  (484) 450-2582

Counsel for Plaintiff Irving Lassoff

**LANDSKRONER GRIECO MADDEN, LLC**
JACK LANDSKRONER
(Ohio Bar Registration No. 0059227)
DREW LEGANDO
(Ohio Bar Registration No. 0084209)
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: 216-522-9000
216-522-9007 (fax)


By: s/ Jack Landskroner (with permission)
      JACK LANDSKRONER

[Proposed] Liaison Counsel and Counsel for Plaintiffs
James T. King and Irving Lassoff

Dated: August 19, 2010    **JONES DAY**
JOHN M. NEWMAN, JR.
(Ohio Bar Registration No. 0005763)
GEOFFREY J. RITTS
(Ohio Bar Registration No. 0062603)
MICHAEL A. PLATT
(Ohio Bar Registration No. 0082926)
901 Lakeside Avenue
Cleveland, OH 44114
Telephone: 216-586-3939
Fax: 216-579-0212


By: s/ Michael A. Platt
      MICHAEL A. PLATT

Counsel for defendants Henry L. Meyer III, Thomas C.
Stevens, Jeffrey B. Weeden, and Beth E. Mooney

Dated: August 19, 2010    **CALFEE, HALTER & GRISWOLD LLP**
MITCHELL G. BLAIR
(Ohio Bar Registration No. 0010892)
KIMBERLY M. MOSES
(Ohio Bar Registration No. 0029601)
1400 KeyBank Center
800 Superior Avenue
Cleveland, OH 44114
Telephone: 216-622-8361
Fax: 216-241-0816

- 7 -

Exhibit J, Page 290

Case 8:12-cv-01716-DMG-FMO   Document 9-1   Filed 10/27/12   Page 294 of 296   Page ID
#:430
Case 8:13-cv-01362-UDJ-DAP   Doc #: 370-1   Filed: 08/26/10   8 of 8.   PageID #: 932 Page ID

By:  s/ Mitchell G. Blair (with permission)
MITCHELL G. BLAIR

Counsel for defendants William G. Bares, Peter G. Ten
Eyck II, Carol A. Cartwright, Edward P. Campbell, Bill R.
Sanford, Alexander M. Cutler, Eduardo R. Menascé,
Lauralee E. Martin, H. James Dallas, Joseph A. Carraba,
Ruth Ann M. Gillis, and Kristen L. Manos

Dated: August 19, 2010

**VORYS, SATER, SEYMOUR & PEASE LLP**
DAVID J. TOCCO
(Ohio Bar Registration No. 0037266)
LAURA G. KUYKENDALL
(Ohio Bar Registration No. 0012591)
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, OH 44114
Telephone: 216-479-6113
Fax: 216-479-6060

By:  s/ Laura G. Kuykendall (with permission)
LAURA G. KUYKENDALL

Counsel for defendant Mercer, Inc.

Dated: August 19, 2010

**BAKER & HOSTETLER LLP**
DANIEL R. WARREN
(Ohio Bar Registration No. 0054595)
3200 PNC Center
1900 East Ninth Street
Cleveland, OH 44114
Telephone: 216-861-7145
Fax: 216-696-0740

By:  s/ Daniel R. Warren (with permission)
DANIEL R. WARREN

Counsel for nominal party KeyCorp

## ORDER

PURSUANT TO STIPULATION, IT IS SO ORDERED.

Date:   8/26/10                              /s/Dan Aaron Polster

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2012, I authorized the electronic filing of the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I hereby certify that I am a member of the Bar of the United States District Court, Central District of California.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 27, 2012.

         s/ KATHLEEN A. HERKENHOFF
         KATHLEEN A. HERKENHOFF

         THE WEISER LAW FIRM, P.C.
         12707 High Bluff Drive, Suite 200
         San Diego, CA 92130
         Telephone: 858/794-1441
         Facsimile:  858/794-1450

         E-mail:kah@weiserlawfirm.com

# Mailing Information for a Case 8:12-cv-01716-DMG-FMO

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Frank J Johnson**
  frankj@johnsonandweaver.com,shawnf@johnsonandweaver.com,shelbyr@johnsonandweaver.com

- **Peter Bradley Morrison**
  peter.morrison@skadden.com,alejandra.lopez@skadden.com,allison.velkes@skadden.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

David Elliot
Johnson and Weaver, LLP
110 West A Street    Suite 750
San Diego, CA 92101